IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2002 Session

## STATE OF TENNESSEE  v. EVANGELINE COMBS and
## JOSEPH D. COMBS

**Consolidated Direct Appeal from the Criminal Court for Sullivan County
Nos. S41,992 &  S41,993    R. Jerry Beck, Judge**

No. E2000-02801-CCA-R3-CD
No. E2000-02800-CCA-R3-CD
September 25, 2002

The Defendants, Joseph D. Combs and Evangeline Combs (husband and wife), were charged by presentment returned by a Sullivan County grand jury with numerous offenses: Joseph Combs was indicted for one count of especially aggravated kidnapping, two counts of aggravated assault, one count of aggravated perjury, one count of aggravated rape, and seven counts of rape. Evangeline Combs was indicted for one count of especially aggravated kidnapping, three counts of aggravated assault, two counts of assault, and four counts of aggravated child abuse. Following the close of all proof, the trial court dismissed one count of aggravated assault in the presentment against both Defendants and three counts (one for aggravated assault and two for simple assault) against Evangeline, finding the offenses in these four counts were barred by the statute of limitations. Following deliberation, the jury found Defendant Evangeline Combs guilty of especially aggravated kidnapping and four counts of aggravated child abuse, and not guilty of one count of aggravated assault. Defendant Joseph Combs was found guilty of especially aggravated kidnapping, aggravated assault, aggravated perjury, and aggravated rape, in addition to  seven counts of rape. Evangeline Combs received a sentence of 65 years, and Joseph Combs received an effective sentence of 114 years. The Defendants, represented by different counsel, filed separate notices of appeal. Thereafter, the two cases were consolidated to form the instant appeal which presents the following issues: (1) whether the trial court properly conducted voir dire proceedings; (2) whether the trial court erred by allowing the State to amend the presentment for especially aggravated kidnapping; (3) whether the State properly complied with Defendants' request for a bill of particulars regarding the charge of especially aggravated kidnapping; (4) whether the trial court improperly admitted evidence of prior bad acts; (5) whether the evidence was sufficient to support the Defendants' convictions; (6) whether the trial court's instructions to the jury included all appropriate lesser-included offenses; (7) whether the trial court failed to fully and properly instruct the jury concerning the especially aggravated kidnapping charge; (8) whether the trial court erred by failing to merge the convictions for certain offenses; and (9) whether the sentences imposed on both Defendants were proper. Defendant Joseph Combs additionally presents the issue of whether seven of his eight rape convictions should be reversed because the State failed to allege sufficient facts in the presentment to properly toll the statute of limitations for these offenses. After a thorough review of the record, we reverse Defendant

Joseph Combs' conviction for aggravated perjury and remand the matter for a new trial on that charge. In all other respects, we affirm the judgments of the trial court as modified.

**Tenn. R. App. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Modified in Part.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. GARY R. WADE, P.J., filed a separate concurring opinion.

Stephen M. Wallace, District Public Defender; Terry L. Jordan, Assistant Public Defender; and Joseph F. Harrison, Assistant Public Defender, Blountville, Tennessee, for the appellant, Evangeline Combs; and Richard A. Spivey, Kingsport, Tennessee, for the appellant, Joseph D. Combs.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On February 18, 1997, the Bristol Tennessee Fire Department was alerted that a 911 call for assistance was received from the Emanuel Baptist Church ("EBC") located on Weaver Pike in Bristol, Tennessee. Timothy Estes, James Gouge, and Jewel Rogers, paramedics with the Bristol Fire Department, arrived at EBC at approximately 11:10 a.m. to discover a nineteen-year-old woman, later identified as the victim, Esther Combs, laying on the back seat of a van in the parking lot of the church. Estes testified at trial that Esther was demonstrating "seizure-like activity" and "thrashing about," with her arms and legs waving when he found her. Although she was awake and talking, Estes believed that she was not coherent or aware of her surroundings.

Defendant Joseph Combs was present when the paramedics arrived. He told Estes that Esther was initially discovered in the bathroom. The family removed her from the bathroom, placed her in the van, and then telephoned 911. Estes asked Joseph to show him where they discovered her. Joseph unlocked the door to a yellow building nearby. They entered a foyer, traveled through a second door and proceeded through the fellowship hall. Estes testified that the hall was windowless and contained two or three sofa beds, flanked by a regular wall and two large plastic sheets. Clothes and trash were strewn about the floor, with pathways formed between the piles of debris. Estes found nothing extraordinary in the bathroom and returned to the parking lot. Meanwhile, James Gouge, another paramedic, had been working with Esther. Gouge testified that he asked a young man who was sitting on the other side of the seat near Esther's head how long she had been like this. The young man turned away and said nothing. Gouge repeated the question, but again received no answer. When Estes returned, the paramedics transported Esther to Wellmont Bristol Regional Medical Center ("Medical Center").

Esther turned away from the paramedics and curled up into a fetal position on the way to the Medical Center. As she did this, her shirt raised a bit. Estes and Gouge observed scars on her back. When Gouge and Estes lifted the shirt a bit further, they noted additional scarring. Her hands, arms, chin, and forehead were also scarred. The paramedics reported their observations to the medical personnel once they arrived at the hospital and to the deputy police chief when they returned to the fire station. Estes testified that, during his seventeen years as a paramedic, he had never before observed that many scars on a single person.

Esther Combs arrived at the Medical Center at approximately 11:30 a.m. Dr. Gregory Allen Gerlock, the emergency room physician on duty at that time, was the first person to examine her. At trial, he described Esther's initial condition as "acutely ill" and somewhat delirious. Her vital signs were stable, but Dr. Gerlock was concerned about her "mentation" and the "numerous scars all across her body." He testified that there were "scars on top of scars all over" but, given the emergency nature of the encounter and the number of scars, it was not practical to map them during the exam. Unable to extract any coherent answers or information from Esther regarding her condition, Dr. Gerlock asked Joseph Combs whether he knew how she had acquired the marks on her body. Joseph responded, "What marks?" When Dr. Gerlock replied, "All the scars over her body," Joseph informed him that Esther "falls a lot." At trial, the prosecutor asked Dr. Gerlock whether, based on his experience and training, he considered the explanation received from Joseph Combs (i.e., that the injuries were caused by falls) to be consistent with the scars and condition of Esther's body. Dr. Gerlock responded negatively. Joseph had also informed Dr. Gerlock that Esther was "adopted." However, Dr. Gerlock claimed that he was extremely vague concerning any additional information, such as where the adoption occurred or any other specific details.

Terri Matney, also on duty in the Medical Center's emergency room on February 18, 1997, testified that Esther was "real hysterical" when she arrived. She appeared disoriented and confused and kept repeating, "I'm sorry. Don't hurt me. I made the coffee." Matney tried, unsuccessfully, to calm her down. The medical staff then pumped her stomach. Matney observed scars "from head to toe" on Esther's neck, front side, arms, back, and legs. She had never before seen a patient with that many scars. Emergency room nurse Vickie Lee Blaylock was responsible for taking blood pressure readings on Esther. At trial, Blaylock testified that each time she touched Esther's arm, Esther would say, "I'm sorry. Don't hurt me. I'll be good," over and over again. Blaylock corroborated Matney's observation, i.e., that Esther was thrashing, screaming, and crying--in a state of delirium--when she initially arrived at the hospital. Blaylock said that later, when Esther calmed down, she became combative only when someone touched her.

Dr. Gerlock treated Esther until her condition stabilized, at which point he recommended that she be admitted into the hospital. Esther was transferred to the Cardiac Intensive Care Unit ("CICU") of the Medical Center. Elizabeth Owens Cribb, the assistant nurse manager for the Critical Care Division, was instructed to take photographs of the scars on Esther's body. She did so on February 18, 1997, the day Esther arrived at the hospital. Cribb testified at trial that Esther's body presented layers of scar tissue along the inside of her thighs and her back, neck, forehead, and chin.

Esther was drifting in and out of consciousness during the photograph session. Later, when Esther became coherent, Cribb heard her ask for her family.

Dr. Jennifer Quesenberry Stiefel was the resident physician in charge of Esther's care at the Medical Center. Dr. Stiefel's initial evaluation took place in the emergency room, shortly after Esther arrived. She described Esther's condition at that time as "critical." Her eyes were closed and she was moaning. Verbal communication was not possible. Dr. Stiefel spoke with Joseph Combs, who related the following information: Esther had gone to bed at approximately 3:00 a.m. that morning, complaining only of a mild headache and some abdominal pain. Later that morning, at approximately 11:00 a.m., they discovered her crumpled on the bathroom floor. Dr. Stiefel asked Joseph whether Esther had a history of medical or behavioral problems. Joseph reported no problems, other than some fainting and dizzy spells over the last two or three years, but reported that Esther had never been evaluated by a physician. When asked whether there was a chance that Esther had ingested any substance, e.g., household chemicals, alcohol, et cetera, capable of altering her mental status, he replied negatively.

When Esther became able to converse intelligibly, she informed Dr. Stiefel that she recalled going to bed at approximately 3:00 a.m. on February 18, 1997, and waking up in the Medical Center three days later. Dr. Stiefel testified that Esther denied drinking antifreeze and, when she asked Esther how she had managed to accumulate so many scars, her answer was nearly identical to that later received from both parents: "I'm a clumsy person. I play rough and I fall a lot."

Dr. Stiefel ordered a variety of tests performed in an effort to accurately determine the cause of Esther's abnormal mental condition, including an arterial blood gas test. The gas test revealed a condition called metabolic acidosis, which indicated that the patient's blood was highly acidic. With this information, Dr. Stiefel narrowed the problem down to approximately five potential disease processes, one of them being ethylene glycol poisoning, and started Esther on an ethanol drip with bicarbonate, the treatment of choice when ethylene glycol ingestion is suspected. Over time, Esther's condition began to improve.

Dr. Kenneth Emile Ferslew, an expert in the area of pharmacology and toxicology, testified that ethylene glycol, the chemical compound commonly known as antifreeze, is toxic if ingested. If the toxin is not removed from the person's system, two things typically occur. First, the central nervous system is depressed, the effect of which resembles alcohol intoxication. Second, the liver metabolizes the compound to form various acids, or metabolites, including oxalic acid. In a period of two to three days, the oxalic acid will bind with calcium to form calcium oxalate crystals, which causes kidney failure. If left untreated, death usually occurs within several days of ingestion. After reviewing the hospital records and studying the symptoms presented by Esther on February 18, 1997, Dr. Ferslew concurred with Dr. Stiefel's opinion that she was suffering from ethylene glycol poisoning and concluded that she was also treated appropriately. During cross-examination, Dr. Ferslew was asked whether a specific test for ethylene glycol poisoning existed and whether it was performed in this case. Dr. Ferslew replied that such a test existed but, according to the medical records, it was not performed. On redirect, he explained that this was because the Medical Center

did not have the ability to perform the test on site and it would have taken several days to get the results back. In a case where the symptoms of ethylene glycol toxicity are observed, as in this case, a confirmation test would be senseless because the phase of renal toxicity, which then causes death, would already have occurred.

With regard to Esther's physical state, Dr. Steifel's "head to toe" examination revealed the following: Esther was responsive to tactile stimulation, i.e., any type of touch would startle her. Old scars ran the length of her body, front and back, with the area of greatest concentration being the back and buttocks. The length of the scars varied and they appeared to be distributed horizontally. Many overlapped each other. None of the scars were recent, and the causative injuries appeared to have occurred at different times. In response to questions about the origins of Esther's scars, Evangeline Combs informed Dr. Stiefel that "Esther was a very clumsy child. She played rough. She fell a lot. And she was a very active child." Evangeline claimed that Esther had been born with clubbed feet, which contributed to her clumsiness. An examination of Esther's feet revealed "no clubbing," however. Dr. Stiefel also reported that Esther's teeth were in "horrible" condition. She had multiple dental caries (also known as "cavities"), a severe overbite, and clearly had received no dental care in recent years. Dr. Stiefel noted that, at approximately 90 pounds, Esther was emaciated and underweight for her height and build. She was also unable to fully extend her left arm, due to an injury of some kind. A pelvic examination revealed that her hymenal ring was intact with smooth borders--a finding she claimed was not inconsistent with penile penetration of her vagina.

The prosecutor asked Dr. Stiefel if, based upon her experience and training and within a reasonable degree of medical certainty, she could state whether the scars observed on Esther's back were self-inflicted. Dr. Stiefel responded that those scars did not fit the pattern or typical distribution shape of self-inflicted scars. When asked the same question concerning the scars on Esther's head and scalp, Dr. Stiefel replied it was "possible," but "highly unlikely" that the causative injuries were self-inflicted. As for the other scars, Dr. Stiefel testified that the appearance of some were consistent with burn injuries; others appeared linear, which would be consistent with cuts made into the flesh. Burn wounds were located on Esther's arms, thighs, and backside. Dr. Stiefel was informed by Evangeline that these wounds were the result of cooking accidents, as Esther frequently prepared family meals. Dr. Stiefel testified that, all things considered, the scars on Esther's body were inconsistent with the personal/medical history provided by Evangeline and Joseph Combs.

Dr. Stiefel learned that Esther was adopted at the approximate age of five or six months and that she had lived with the Combs family since that time. Esther had never attended public school. Rather, she had been home-schooled, as were the other Combs children. Evangeline claimed that Esther had the equivalent of a 12th grade education and was preparing to take the "GED" exam. As for Esther's employment status, Dr. Stiefel was informed that Esther's job was to care for the children in the church nursery and work for her father, performing cleaning services and secretarial duties at the church.

Susan Francis Early, a clinical social worker employed by the Medical Center, was asked to investigate the suspicions of abuse prompted by Esther's condition. Early testified that her first visit

with Esther occurred on February 19, 1997, while Esther was still in the hospital. Early noted the scars on her face, abdomen, breast, and back. She recalled that the scars on her back were thick and raised approximately 1/4 inch above her skin, running in a "sideways" direction from the base of her neck to her buttocks. Sections of hair were missing from the top of Esther's head. Early questioned both Evangeline and Joseph Combs as to the origin of the scars on Esther's body. Initially, neither defendant would respond to her question. Later, Evangeline informed Early that Esther "fell a lot and was clumsy." Esther was discharged on February 25, 1997. Prior to Esther's departure, Early informed her that the Department of Human Services operated an adult protective services program and that the program was responsible for investigating suspected cases of abuse and/or neglect concerning adults over the age of 18. Esther told Early that she wanted to return to her family and subsequently did so.

Debbie Richmond-McCauley, a detective with the Bristol, Tennessee Police Department, was also alerted to the possibility that Esther was a victim of abuse. Detective McCauley arrived at the Medical Center during the evening on February 18, 1997. Esther was unclothed and semi-conscious. McCauley noted the scarring on Esther's face, neck, chest, inner thighs, back, buttocks, arms, hands, and legs. She took photographs. When Esther regained consciousness, McCauley questioned her about the scars and showed her the photographs. Esther would not look at them or make eye contact with her. During their meetings, Esther experienced periods of shaking and stuttering; her right leg shook very rapidly.

Over the next few days, McCauley spoke with the entire Combs family: the parents, Joseph and Evangeline; Esther's brothers Jimmy, David and Peter; and her sisters Cindy and Sarah. Joseph completely disavowed any knowledge of Esther's scars, claiming that he had never observed any. According to Joseph, Esther played "rough," was "very clumsy," and "fell a lot on the pavement." She was outgoing, but did not have a boyfriend or any outside friends. Joseph also claimed that punishment of the Combs children took the form of restrictions on their television privileges and/or their liberty ("grounding") and that he had not spanked any of the children since they were small. Joseph informed McCauley that Esther was adopted, but he did not recall where the adoption occurred. Joseph was stuttering and shaking while McCauley questioned him. She asked him to sign a statement. He refused.

The statements Detective McCauley received from Evangeline Combs were very similar to Joseph's, to wit: she had never seen the scars; she was unaware that Esther had any scars; Esther was clumsy and slow; she fell a lot on pavement; she was outgoing and rough; she cooked a lot, which may have caused any burns that she suffered; the children had not been spanked since they were very young; and Esther was adopted. Evangeline did not recall where they had adopted Esther. She told McCauley that she would find out and give this information to her, but, according to McCauley, this never happened.

On March 5, 1997, shortly after her release from the hospital, Esther visited Dr. Stiefel for follow-up care. Joseph and Evangeline Combs accompanied her to Dr. Stiefel's office, and Evangeline went with her into the examination room. Esther did not give Dr. Stiefel any new

information as to the cause of her hospitalization and she reported no additional problems, other than a recent burn wound on her right third finger. She returned three weeks later, on March 26th. The burn wound on her finger was healing.

At approximately 8:00 a.m. on March 24, 1997, McCauley accompanied a number of police officers and firemen with a search warrant for the Emanuel Baptist Church, the location of the Combs family residence. The search warrant permitted inspection of the premises for safety and fire code violations. They knocked on the doors and could hear people talking and moving around inside the building, but no one responded. The officers also telephoned the residence, but no one answered their calls. After attempting to gain entry for almost three hours, the officers finally forced the doors open with a crowbar and entered at approximately 11:00 a.m. The entire Combs family was inside the building and still wearing their sleepwear. Joseph and Evangeline Combs claimed that they did not hear any knocking on the door and that they were unaware anyone was outside. The police officers and firemen began an investigation of the interior and took photos which revealed, among other things, the following conditions: piles upon piles of trash bags, with pathways in between them; mice in the kitchen, some dead, with mouse feces scattered about; pools of black liquid in and under the kitchen sink; piles of dirty dishes and spoiled food; a large room with numerous beds and televisions; cats, birds, and other animals living inside.

On July 28, 1997, Detective McCauley filed a lawsuit on behalf of Esther Combs, the purpose of which was to appoint a guardian ad litem and conservator to ensure that Esther received medical care, education, medical insurance, opportunities for employment, a driver's license, and other standard personal documentation, such as a birth certificate, Social Security card, et cetera. In an order dated September 11, 1997, the court appointed attorney David William Tipton to act as Esther's guardian ad litem. A hearing date was set for October 3, 1997. On the day of the hearing, Esther failed to appear. David Tipton, Detective McCauley, and Joseph Combs were present, however. According to McCauley, Joseph claimed that Esther had run away and that she was unaware a hearing had been scheduled. Joseph further claimed that, although he had spoken with her on the phone and seen her during church services, he had no knowledge of her whereabouts at that time. At trial, David Tipton corroborated McCauley's testimony, stating that Joseph Combs had testified that he did not know where Esther Combs was and that he had not seen her in at least a couple of weeks. Tipton also testified that Joseph was under oath when he made the above statements. Richard Edward Ladd, Chancellor of the Second Judicial District, presided at the hearing and similarly testified that Joseph Combs had denied having any knowledge of Esther's whereabouts and that he was under oath when he did so.

On October 3, 1997, the entire Combs family drove Esther to the home of Sonja Caroline Meadows. Meadows testified that they were waiting for her when she arrived home after work at approximately 5:00 p.m. that afternoon. At Joseph Combs' request, Meadows had agreed to drive Esther to a Waffle House restaurant on the interstate near Spartanburg, South Carolina. Meadows testified that the trip "had something to do with [Esther] appearing in court that day." Esther brought with her some clothes, stuffed in plastic grocery bags, and a cellular telephone given to her by Joseph

Combs. They left at approximately 5:30 p.m. Esther was in "bad shape" during the drive. She cried frequently and spoke to Joseph numerous times on the telephone.

At approximately midnight, Meadows arrived at the Waffle House restaurant and met Douglas Carpenter, a personal friend of the Combs family and a pastor at the Palmettoland Baptist Church near Charleston, South Carolina. Carpenter testified at trial that he had offered to keep Esther with him and his family for a while "to give her some relief from the pressure cooker." Via the media, Carpenter was aware that Joseph Combs was being investigated and that the whole family was under a great deal of stress. Initially, Joseph declined Carpenter's offer. Later, Joseph accepted. Carpenter said he had little knowledge of the court proceedings involving the Combs family; he knew that Esther was involved in some form or fashion, but he was uncertain to what extent.

Esther stayed with the Carpenter family for approximately four or five weeks. Carpenter testified that, during this time, there is no question that Joseph or Evangeline Combs knew of Esther's whereabouts. Esther spoke with one or both of them at least once a day by telephone. Carpenter said that Esther occasionally cried, usually at night, and they did their best to console her, but most of the time she "did real well." Esther accompanied the Carpenter family on shopping trips and attended church youth functions with Donna, Douglas Carpenter's daughter of similar age. The two girls became good friends. On cross-examination, Carpenter stated that his family did not restrict Esther in any way during her visit. She appeared to feel very comfortable living with them and behaved like a "normal teenager." Occasionally, she would say that she missed her parents and wanted to go home. She never indicated that she had been abused at home or that she was fearful of returning there. On redirect, Carpenter admitted that he had observed scars on Esther's body, but paid little attention to them because they had "always been there." He noticed that Esther walked with a limp, but testified that she did not appear clumsy or fall a lot. In fact, he saw her fall only once.

The Carpenter family had plans to visit Israel on November 12, 1997. Esther suggested to them that she stay with her aunt and uncle, Susan and Roger Combs (Joseph Combs' brother and sister-in-law) when they left. Joseph Combs agreed. Two or three days before the Carpenters' departure for Israel, Douglas drove Esther to a Hardee's restaurant in Denmark, South Carolina. Roger Combs met him there and then drove Esther to stay with his family at their home in Georgia. Thereafter, the Carpenter family's contact with Esther was limited.

Susan Combs testified that Esther appeared very nervous and withdrawn, small and "frail-looking," when she arrived at their home in Georgia. Esther also cried a lot, jumped when touched, and avoided most attempts to make eye contact. She possessed only a few "shabby," long-sleeved dresses and a cell phone. She could print, albeit poorly, but was unable to write cursive-style or spell well. She was also unable to make change with money or drive a car, and she did not have a Social Security card or driver's license. She had never heard of Elvis Presley. At first, she also refused to go outside the house alone. Every three or four days, she talked with one of her parents on the telephone. After these conversations, she usually appeared upset.

Susan noticed changes in Esther's physical appearance and demeanor after she stayed with them for a while. She had gained weight and changed her attire, e.g., she started wearing jeans and other styles of pants. She also established eye contact when she communicated with people, seemed generally happier, and laughed frequently. Although she was reluctant to walk past the edge of the yard by herself for quite a while, they continuously encouraged her to try and she eventually did so.

Esther telephoned Detective McCauley on February 20, 1998 from Watkinsville, Georgia, while she was living with Roger and Susan Combs. McCauley drove to Georgia, interviewed Esther, and took a statement. From there, McCauley went to the Baptist Children's Home in Indiana, where she subsequently discovered that the Defendants had never legally adopted Esther. Esther's natural mother was Rachel Garcia, a woman who lived in Michigan, north of Detroit. McCauley contacted Ms. Garcia, who then agreed to a blood test which conclusively proved that she was Esther's natural mother.

Dawn Rose Loftis, office manager of the Baptist Children's Home in Valparaiso, Indiana, testified that the home functioned as both an adoption agency and a group home facility in 1977 (the year of Esther's birth). At trial, Loftis identified the adoption agreement for "baby Garcia" (Esther), dated March 1, 1978 and signed by Joseph and Evangeline Combs, in which the parties agreed to adopt the baby girl within six months and also pay a fee to defray the home's expenses. Loftis testified that the infant Garcia was given to the Combs before the adoption was finalized. On September 10, 1980, the home sent a letter to the Combs, at their Indiana address, requesting that they send a copy of the final decree of adoption. The letter was not returned, and no reply was forthcoming. The home sent a second letter of request on January 9, 1984. Again, the letter was not returned and no reply was received. More than ten years later, on March 11, 1994, a third letter was sent. The letter was returned and stamped: "Forwarding Order Expired." As of the date of trial, the file on baby Garcia reflects that the home did not receive a final decree of adoption or any other communication from the Combs after November 8, 1979.

On March 6, 1998, Detective McCauley brought Esther back to Dr. Stiefel for reexamination. Approximately one year had transpired since the hospital incident and Esther's last examination. Dr. Stiefel noted that Esther had gained a significant amount of weight (approximately 24 pounds) and appeared "healthy, rosy." She made eye contact during conversation and the condition of her teeth had greatly improved. Esther was then-currently experiencing nightmares and pain in various parts of her body, however. During the appointment, she also admitted that she had suffered repetitive beatings with baseball bats and electric cords and that she had ingested antifreeze the year before, in an attempt to commit suicide because she saw "no escape." Dr. Stiefel's reexamination revealed no new or additional scarring on Esther's body.

During cross-examination at trial, Dr. Stiefel testified that Esther's March 1998 appointment was set up by Detective Debbie Richmond-McCauley, who informed her that Esther was then "in hiding" at the behest of protective services. Dr. Stiefel acknowledged that the February 1997 hospitalization discharge summary stated that Esther had "firmly denied any type of physical abuse in either the past or the present" and that she had also refused to take advantage of any form of

protective services. Dr. Steifel also testified that Esther's family was not present on every occasion that Esther denied suffering abuse. However, Dr. Stiefel remarked that Esther appeared "extremely nervous" during their discussions concerning protective service options.

The victim in this case, Esther Combs, testified at trial that she had recently changed the name on her birth certificate to Elsa Rachel Garcia. (Notwithstanding the name change, in this opinion we shall refer to her by the name she was called when the offenses in this case were committed.) At the time of trial, Esther was twenty-two years old (date of birth: November 16, 1977). She had five "siblings" while a member of the Combs family: James was the oldest; Esther came next; the third oldest was David; then came Cindy, Peter, and Sarah, in that order of age. Esther testified that both Joseph and Evangeline had informed her that she was adopted by the Combses at the age of four-and-one-half months. Joseph told her that her mother was Hispanic and her father was Caucasian.

Esther's first memories as a child took place when the Combs family lived in Merryville, Indiana. At that time, Joseph Combs taught at a Bible college for novice pastors. The Combs moved from Indiana to Florida sometime in 1986, when Esther was six or seven years old. Joseph worked as a pastor in Florida for a few years. Thereafter, they traveled to various states, evangelizing on the road and living in a trailer for approximately one and one-half years. In April 1989, the family settled down in Bristol, Tennessee, where Joseph became the pastor of EBC. They lived in the trailer for a few more months, then transferred their residence to a yellow building on the church premises, which also housed the church gymnasium and fellowship hall.

During Esther's testimony, the State informed the trial court that it was preparing to ask some questions which concerned only Defendant Evangeline Combs. A hearing ensued outside of the presence of the jury. Thereafter, the trial court instructed the jury, prior to the victim's testimony, that it should consider the upcoming evidence only as to the guilt of Defendant Evangeline until directed to do otherwise. The jury was also told to consider the evidence of other crimes presented at trial for the limited purpose of constructing "the complete story" of the crime of especially aggravated kidnapping, and not as proof of either Defendant's disposition to commit a similar crime. As to the other counts, the jury was to consider the evidence in determining only whether Evangeline possessed "guilty knowledge."

Following the trial court's limiting instruction, Esther began with testimony concerning the wounds and abuse inflicted upon her by Evangeline while the family lived in Indiana. Esther identified a photograph of herself with large bandages covering both of her hands and arms up to the elbows. According to Esther, the underlying injuries were burns caused by hot oatmeal. Evangeline had taken the other children to wash their hands and instructed Esther not to touch the stove while she was gone. Esther nevertheless stirred the oatmeal in an effort to help, but she dropped the spoon into the pot in the process. When Evangeline discovered the spoon had fallen into the oatmeal, she forced Esther's hands into the hot food until she retrieved it. Her hands and arms were burnt as a result, and the wounds were very painful. Evangeline bandaged them herself. Esther did not receive medical treatment. Another time, Evangeline pushed Esther because she was not climbing the stairs

-10-

fast enough.  Esther tripped and hit her chin, which left a scar.  Esther testified that the scar on her right hand was caused when Evangeline opened a pair of scissors and used one of the blades to cut her.  An additional scar on her hand was caused when Evangeline held Esther's hand on a red-hot stove burner for an extended period of time.  The various marks on her chest and another on her left arm resulted from those occasions when Evangeline would twist and pull Esther's skin with a pair of needle-nosed pliers until a chunk of flesh came off.  Esther further testified that her front teeth were in poor condition because they were previously knocked out of her head.  This took place after one of the other children had "turned her in" for jumping on the bed.  To teach Esther not to do this again, Evangeline picked her up by her arm and leg, swung her around, and threw her into the wall.  She hit the wall with her face, and four front teeth fell out.  She was not taken to a dentist.  Instead, Evangeline pushed the teeth back into Esther's head.  After a while, they reattached.  As an additional form of punishment, Esther was occasionally forced to sleep naked in the basement of their Indiana home.  It was uncomfortable and very cold in the winter.  One of Esther's earliest memories was of a time when Evangeline tied her to a high chair and threw her down the stairs.  She recalled tumbling down two flights of stairs and landing in the basement.  Evangeline left her there.  No scars resulted from this event, but Esther recalled being "banged up, black and blue" for a while.

Next, Esther testified as to the treatment she received from Evangeline Combs while the Combs family lived in Clearwater, Florida.  Esther first pointed to the photograph of a scar on her middle finger.  According to Esther, this scar was produced when Evangeline placed her hand on the counter and then hammered this finger until it "busted open."  Another time, Esther was whipped with a rope because the baby sitter had taught her how to write her name.  On yet another occasion, Evangeline whipped the bottom of Esther's feet with an electrical cord because she believed Esther had been kicking the curtains.  Other punishments inflicted upon her while in Florida included denial of food and additional instances of skin removal with the needle-nosed pliers.

Regarding the abuse Esther suffered while the Combs family traveled from state to state in the trailer home, Esther testified first that Evangeline burned her legs because the baby, Sarah Combs, had a diaper rash.  Because it was Esther's job to change Sarah's diapers, Evangeline viewed Sarah's rash as proof of Esther's negligence.  Wanting to demonstrate to Esther how a diaper rash felt, Evangeline burnt the inside of both of her thighs with a curling iron.  The wounds were very painful, and it was difficult for Esther to walk afterward.  Evangeline also beat the inside of Esther's thighs with a shower brush to make boils.  First, she would use water to wet the brush and the inside of Esther's thighs.  Next she beat the skin until it made boils, and then beat the boils until they broke open and started bleeding.

Next, Esther testified about the wounds and abuse Evangeline inflicted upon Esther while the family lived in Tennessee.  She claimed that one of her arm scars resulted from an incident occurring on Jimmy Combs' birthday.  Evangeline was angry because the kitchen was not clean, so she threw a spice bottle through the window and it broke.  Evangeline instructed Esther to clean it up, and Esther thought she complied, but she had missed one rather large piece of glass.  To show Esther what might have happened if one of the younger children had happened upon it, Evangeline took Esther's arm and cut it open with the piece of glass.  The bleeding was heavy.  To stop it,

Evangeline ran Esther's arm under water. When this did not stop the bleeding, she stuffed paper towels into the wound and wrapped bandages around it. One day, after the injured area began to heal, Evangeline flew into a rage for some reason, grabbed Esther's arm, and "tore" the wound open again. The bleeding was profuse. Esther received no medical treatment for either injury.

Another Tennessee incident occurred shortly after Jimmy Combs' birthday. Esther was caught looking at a watch that Jimmy had received as a present. To teach her that she must never touch another person's property, Evangeline burned Esther's arm in two places with a curling iron. On a different occasion, Evangeline beat Esther "all day long" with a water hose for falling asleep in church, and then shook Esther by her hair until it began to fall out. A photograph which revealed numerous scars on Esther's buttocks was presented in court. Esther testified that one of the scars was caused when Evangeline burned her with the top of an iron because she allowed the spaghetti to burn. A scar on her shoulder resulted from being struck by Evangeline with a claw hammer, and additional scars around her mouth and chin were the result of being whipped in that area or having objects thrown at her by Evangeline. Esther claimed that Evangeline gave her numerous black eyes during their stay in Tennessee and generally whipped her at least once per day with a coiled metal cord. When the black eyes were severe, the Combses did not allow her to attend church.

When the State's evidence regarding Defendant Evangeline Combs had been concluded, the trial court reemphasized that the evidence must be considered as to her guilt alone. The court then gave the jury limiting instructions, similar to the instructions previously given for Evangeline, which concerned the upcoming proof of "other crimes" allegedly committed by Joseph Combs.

Esther began by testifying that, while the family lived in Florida, Joseph "belted" her after discovering that the babysitter had taught her how to write her name. Joseph informed her that "Jesus didn't learn to read or write until he was 12, and that [she] wasn't going to either." On another day, while the family was living in the trailer, Joseph laid her on her back and whipped her stomach with a type of "flip-flop" sandal because "he heard something about a pink belly." He did not stop until Esther could remain perfectly still without crying. In Tennessee, Joseph beat her with a water hose for falling asleep during church services. He made her take off her clothes first, to make sure that "he did not miss any inch of [her] skin." Esther claimed that, later that afternoon, he also beat her with a belt but she did not recall the reason for it. Esther next identified a photograph of a hole in the wall of Joseph's office. She claimed that the hole was created by her head, when Joseph repeatedly banged it into the wall. Another time, Joseph became angry because the grocery store was closing and Esther had not yet completed a list of what the family needed. He kneed her in the stomach and knocked the wind out of her. As she bent over, he went to knee her in the stomach a second time but missed. He caught her in the eye instead. She fell backward. Her eye became black and blue and swelled shut. She wore a patch for a long time, but did not receive medical treatment. At the conclusion of Esther's testimony concerning Joseph Combs, the trial court repeated for the jury the limiting instructions previously given them.

Esther also testified as to what specific facts gave rise to the individual counts in the presentment against Joseph and Evangeline Combs. Concerning count 2, charging both Defendants

with committing aggravated assault between June 1, 1996 and September 1, 1996, Esther stated that the incident occurred because Esther had not finished her chores. Earlier in the day, the Combs family was barbecuing outside because it was summertime. Then it began to rain. They brought the grill inside, but Esther had not finished cleaning the dishes or the laundry. As punishment, Joseph took her into the gymnasium and beat her with a rope. Esther was screaming, but Joseph told her he would not stop beating her until she stopped screaming. She did not stop. Consequently, he wrapped the rope around her neck and draped her over his back. She recalled that her feet lifted off of the floor. Evangeline watched the episode. Eventually, Esther passed out. She woke up later on the floor.

Counts 7 through 10 charged Evangeline Combs alone with committing separate offenses of aggravated child abuse. The incident giving rise to count 7 occurred in February 1994. Esther recalled that the other children were making Valentine cards. Evangeline became angry for some reason and took Esther to the gymnasium to "beat" her. She began by beating Esther's backside with a baseball bat, but Esther turned her body and the bat hit her elbow. Esther claimed that it was very painful and her elbow swelled up, but she received no medical attention. Instead, her arm was placed in a sling for what seemed to Esther like months. When church members asked questions about Esther's arm, Evangeline told them that she sprained her elbow when she swung two gallons of milk. Esther testified that she was unable to straighten her arm afterward.

Count 8 stemmed from an offense which was alleged to have occurred in November 1994. Esther recalled that it took place near Thanksgiving Day. She was cleaning out the refrigerator to create room for the holiday fare. To prevent Esther from disposing of any edible foodstuffs, Evangeline wanted to check the spoiled food before Esther threw it away. Quite a bit of food had gone bad. After a while, Evangeline appeared to find the parade of rotten food tiresome. She threw a wooden shoe at Esther, hitting her above the eye. The wound bled profusely. Evangeline tried to stop the bleeding because the wound was "right on [her] face where people could see [her] at church." She knew Joseph would be upset by this. Unable to check the bleeding, Evangeline got a sewing needle and began to stitch the wound closed. Esther was in great pain and would not stop wiggling around, so Evangeline sat on her while stitching the skin together. Again, Esther received no medical attention. Upon discovering the injury, Joseph restricted her from attending church until the wound healed. Later, Evangeline removed the stitches and Esther wore a hairstyle with bangs to cover the forehead scar.

The incident underlying count 9 was alleged to have occurred in September 1994. Esther testified that Evangeline was using needle nose pliers to construct a Christmas plaque that day. She called for Esther. When Esther arrived, Evangeline grabbed the skin on Esther's hip with a pair of needle nose pliers. She then pulled and twisted Esther's skin until a chunk came off. Evangeline called such wounds "marks of the beast." Esther was unable to recall anything she had done to deserve punishment on that occasion.

The offense in count 10 allegedly occurred on a day between September 1995 and November 1995. Esther testified that she had a considerable amount of work to do that day and she was running

behind schedule. Evangeline asked Esther whether she had completed cleaning the kitchen. Esther told her "yes," which was untrue. She had planned to finish cleaning the kitchen at a later time, but Evangeline checked before she had a chance to do so. As punishment for lying, Evangeline made Esther drape her body over the kitchen window ledge and beat her with a baseball bat. Esther's body kept slipping from the window, however. Evangeline recruited Jimmy and David Combs to hold Esther in place. The boys held her by the feet and hands while Evangeline beat her with the bat. Esther claimed that the beating broke her tailbone, and she could barely walk. Joseph Combs gave Esther four Tylenol and four ibuprofen for the pain, and some vitamin E to speed healing. She received no medical attention.

Count 11 alleged that Joseph Combs committed aggravated perjury on or about October 3, 1997. Esther testified that she was aware Detective Debbie Richmond-McCauley had filed a lawsuit, because she was present when the police officer delivered Joseph the subpoena. Evangeline Combs thought the officer's knock on the door was a UPS delivery. Esther did not open the door, but she could see that the caller was a police officer, so Joseph answered the door instead. Esther heard Joseph say, "She's not here right now, but I'll give it to her." When the officer left, Joseph told Esther that the subpoena required Esther to show up in court because Detective McCauley wanted her to have a "legal babysitter" to manage her money and other needs. He said, "I don't think you need that, do you?" Esther replied, "No," because she did not understand what was going on. Joseph told her not to worry about it, because she would be in another county when the court date arrived and he would report to the court that she had run away. On the court date, Esther was at Sonja Meadows' house. Later, Joseph "was laughing at how he had made a fool out of Ms. [McCauley] and the judge by saying that [Esther] had run away." From Sonja Meadows' house, Esther went to South Carolina because Joseph thought "things were getting a little too hot." Later, she stayed with Roger and Susan Combs in Georgia.

Count 12 charged Joseph Combs with committing aggravated rape in April 1989 (Esther was under thirteen years of age at this time). Esther testified that Joseph made her perform oral sex on him on a day near Peter Comb's birthday, April 25th. The Combs family had since settled in Bristol, Tennessee, but was still living in the trailer at that time. Esther claimed that Joseph called her into the bedroom of the trailer, closed the door, sat down on the bed and exposed his penis. He then placed Esther's hand upon it and told her that "he knew [she] wanted it." He made her put her head down and placed his penis into her mouth. She testified that when Joseph was angry with her, he made her swallow his ejaculate. He called it "sugar water."

Counts 13 through 19 charged Joseph Combs with the rape of Esther Combs. Count 13 concerns an incident that occurred on November 16, 1990, Esther's thirteenth birthday. According to Esther, Joseph informed her that he wanted some coffee that day. She made the coffee and brought him a cup. He was sitting in a chair in the foyer at the time. He told her that he wanted to give her a birthday present and closed the doors to the foyer. Esther was then directed to get down on her knees and perform oral sex on him. Joseph instructed her "how hard and how fast to pump it" until he "did it in her mouth." She was not allowed to wash her mouth out afterward.

-14-

Count 14 charged Joseph Combs with the rape of Esther during the summer of 1995. Esther testified that the kids were playing outside on the day he committed this particular offense. Evangeline Combs was also outside and Joseph was inside, standing by the door watching everyone. Joseph called Esther inside to perform oral sex on him. Esther responded that she could not because the Bible said that it was wrong. Joseph told her that "it was okay with God because [she] was his adopted daughter, [not] his biological daughter. And that King David had concubines." He then placed his penis into her mouth and made her "do it until he went." This time, she was allowed to wash her mouth out afterward.

Count 15 alleged that Joseph Combs committed the crime of rape against Esther on June 16, 1991. The date was Evangeline Combs' birthday. Evangeline had gone to the park with the other children. Esther remained behind because she had not yet finished cleaning the kitchen when they departed. Joseph had been at a meeting, but he came home before the rest of the family returned from the park. He stood before the kitchen window, where he would be able to observe Evangeline's return. He had Esther get underneath the counter to perform oral sex on him. Joseph placed his penis into her mouth until he "went" and told her she was "special." She was not allowed to rinse her mouth out.

Count 16 charged Joseph Combs with raping Esther on November 25, 1993. It was Thanksgiving Day and dinner was nearly ready. Evangeline Combs was in the kitchen, yelling, because the dishes were not yet cleaned. She kept sending Esther to the front of the building, where Joseph was sitting in the dark waiting for her, because every five minutes she had to be beaten for one reason or another. After a while, he appeared to grow tired of whipping her. Since the family was busy in the kitchen and he was just sitting in the dark, he made Esther perform oral sex on him. Again, he placed his penis in her mouth and ejaculated. This time he allowed her to wipe her mouth with his boxer shorts.

Count 17 alleged that Joseph Combs raped Esther on November 16, 1993. It was Esther's sixteenth birthday. Esther did not recall where the rest of the family had gone. Joseph was in the foyer and called her to come in because he had something he wanted to give her for her birthday. When she arrived, he closed the door and opened his boxer shorts. (According to Esther, Joseph's "normal" attire was boxer shorts.) She performed oral sex on him, and he ejaculated into her mouth, which she was not allowed to wash out.

The incident giving rise to the rape charge in count 18 occurred on February 14, 1991. The other Combs children were in the kitchen making Valentine's Day cards, and Evangeline Combs was busy doing something in the gymnasium. Esther was clearing a table when Joseph told her that he wanted some coffee. When she brought it to him, he closed the doors and made her perform oral sex, in a fashion similar to the other instances.

Count 19 alleged that Joseph Combs committed another rape of Esther. The incident occurred on February 4, 1992. Joseph was in his office and had spilled a "Coke" under his desk. He instructed Esther to bring him another drink and also clean up what he had spilled. She

clambered onto the floor underneath his desk. He grabbed her head and made her perform oral sex on him as he sat in his chair. Esther was still underneath the desk when Evangeline Combs came into the room. Evangeline demanded to know what Esther was doing down there. Joseph "composed" himself and Esther resumed cleaning the floor. Joseph was in his boxers, as usual, and she was not allowed to clean her mouth afterward.

With regard to her life in general, Esther testified that she had never been allowed to visit other children or go anywhere or do anything without Evangeline, Joseph, or one or more of her siblings present. Moreover, no visitors were permitted inside the Combs residence at EBC. Joseph told her that this was because their home was "a mess." Esther recalled that various church members had come by at different times to deliver food, but they were either met at the door and not allowed in, or the Combs family would not answer the door at all and the visitor would eventually leave the food on the doorstep. On the occasions that Esther was not allowed to attend church services, she was ordered to stay in a small room near the men's bathroom. No one stood guard over her, but Evangeline placed powder in front of the door. Footprints in the powder would reveal any disobedience. This area by the bathroom was also where Esther slept the majority of the time. She was not permitted to sleep with the other children because she reportedly "snored really loud" and "smelled bad."

Esther did not have a driver's license, a Social Security number, or any other standard form of identification. In addition, she was not able to read or write well. The other children participated in home-schooling sessions, but Esther was not allowed to join the lessons until her chores were completed, and this did not happen often. At home, Esther was responsible for the laundry and the ironing, making the beds, cleaning the dishes and the house, cooking the meals, making the grocery list, and whatever else needed to be done. (Because she could not read or write, she prepared the grocery list by copying the letters from near-empty packages of food.) Esther claimed that her siblings had no responsibilities in the way of chores, and Esther did not go to bed until her chores were completed, normally between 3:30 and 5:00 a.m. The other members of the family usually retired between midnight and 1:00 a.m., and they arose anywhere between 9:00 and 11:00 a.m. At whatever time each member of the Combs family got out of bed, Esther was responsible for preparing that person's breakfast. If all seven of them got up at different times, she cooked seven separate breakfasts.

Esther testified that she had been informed several times by both Defendants over the years that her "purpose in life" was to act as a "servant" to the Combs family. On those occasions she did not perform this function properly, she was punished. The "normal position" she assumed when either Defendant beat or whipped her required her to take off all of her clothes, place her hands on the back of a chair, and bend over.

Esther testified that on February 17, 1997, the day prior to her hospitalization at the Medical Center, she did not make the coffee "right." When this occurred, the coffee was thrown in her face and she was beaten. This particular day was no different. Esther decided she "couldn't take it anymore" and "wanted to die." In the early hours of February 18, 1997, she filled a 24-ounce

styrofoam cup with antifreeze, drank it, brushed her teeth, and then went to bed. When she awoke, she was in a bed at the Medical Center. When the prosecutor asked Esther why she failed to report the many incidents of abuse to any medical personnel or the police officers she had encountered during her stay at the hospital, Esther replied that she was "scared." She had previously run away twice, but she was returned to the Combs both times and severely punished afterward. (Esther was unable to recall the dates that she ran away.) Consequently, Esther believed the same thing would happen again. Esther testified that there was no one outside of the Combs' household to whom she could turn for help. She recalled someone mentioning "protective custody" while she was in the hospital, but she did not comprehend what that meant. Approximately one year later, while living in Georgia with her aunt and uncle, Susan and Roger Combs, Esther decided to telephone Detective McCauley and report what the Defendants had done to her.

Esther's first runaway experience involved Officer Vic Jordan, with the Bristol, Virginia Police Department. Officer Jordan testified that on November 5, 1992, he was summoned to an "Abco" store because a female had reportedly locked herself in the bathroom and refused to come out. Officer Jordan arrived at the scene and beat on the door. Someone inside the bathroom unlocked it. When Jordan entered, he observed a young female standing in the corner, "kind of "cowed down" and "real timid." The female was later identified as Esther Combs. Jordan transported her to the police department, where she was subsequently picked up by Joseph Combs. During cross-examination, Officer Jordan read his official report of the incident which stated: "--Vic Jordan, talked with Esther who said that she had a misunderstanding with her parents, and that's why she left home." Officer Jordan confirmed that the report was an accurate statement of what Esther had said to him.

Esther's second runaway incident was reported to the police department by Joseph Combs on September 29, 1996. It was a Sunday. When Detective Jerry Smeltzer arrived at the Emanuel Baptist Church to investigate, Joseph told him that Esther had disappeared from the church nursery during the evening church service. In the nursery, Smeltzer observed a large rocking chair laying on its side, items from a lady's handbag strewn about, and two large "gobs" of human hair, one on a table and the other on the floor near the door. Smeltzer testified that Esther was located in Carter County at 4:30 a.m. the next morning and returned home. Smeltzer telephoned the church the next day. A male voice answered. Smeltzer asked to speak with Esther but the man said that this was not possible. He made two more attempts with similar fruitless results.

The State presented numerous witnesses to testify regarding their contact with the Combs family and what they had observed concerning the family's treatment of Esther. In this vein, Gayland M. Oaks, II, testified that he had known the Combs family for twelve years. He met Joseph Combs in 1981 at Hyles-Anderson College, where Joseph was "a Bible teacher." Gayland was one of his students at the time. Gayland graduated in 1985 and moved to Ohio. Some time later, Gayland called Joseph (who was living in Florida) to invite him to teach a seminar on family life in Ohio. Instead, Joseph asked Gayland to serve as his associate pastor in Florida. Gayland accepted. In Florida, Gayland was responsible for building a music ministry and increasing church attendance, among other things. His wife, Malinda, babysat the Combs children one day per week from July

through October 1987, when Malinda became pregnant and Gayland assumed her babysitting responsibilities. Joseph informed Gayland that only a very few people were permitted to interact with the Combs children. Thus, he should consider it a "great honor" to be selected.

Gayland watched over the Combs children each Thursday beginning in November 1987, until May 1988. He arrived at approximately 8:00 a.m. and stayed until somewhere between 8:00 and 10:00 p.m. Joseph told Gayland that he was only responsible for supervising the children, nothing more, because "Esther would take care of the food, the babies, the diapers, everything." Gayland testified that Esther was nine years old at the time and took care of the babies "exceptionally well." She brought them their bottles, changed their diapers, and prepared food for all of the other children; she made "whatever they asked for, whenever they asked for it." Rarely did the children eat together or at one time, and they seldom went outdoors during the day. Joseph said that he did not want the authorities to learn that the children were not enrolled in school.

Gayland also testified that Evangeline and Joseph Combs treated Esther differently from the other children. Joseph had informed Gayland that Esther Combs' "purpose in life was to be a servant . . . that was what God had created her to be." Consequently, the Combs were training her to do that. When Joseph and Evangeline returned home on the nights that Gayland babysat, they asked him for a report of the childrens' behavior. On those occasions that Gayland reported a child other than Esther had committed some indiscretion, the Combs would instead punish Esther or send her to the office. According to Joseph, the office was where the spankings took place. Joseph informed Gayland that "it was necessary to spank a child through their rebellion . . . [which] meant to spank them until they stopped resisting you, stopped struggling against you, stopped crying."

Regarding Esther's appearance, Gayland testified that she was "very frail, weak, [and] appeared sickly." He noticed a scar on her upper lip and another on her hand. She always wore long dresses which covered most of her body, her arms, and all of her legs. The dresses were often too big for her. She wore her hair long, with bangs which covered most of her forehead. Her teeth were "very bad, the worst [he] had ever seen, protruding out of her mouth and in deplorable condition." Joseph did not specifically explain to Gayland how Esther had received any of her injuries. He said only that Esther was "clumsy" and "fell a lot." Gayland testified that he never personally saw her act clumsily or fall down, however. In addition, Esther was "the most cooperative and amiable and pleasant of the children . . . . [I]t was not necessary to ask her to do anything. She did it without asking." She was not disobedient to Gayland and, at church, she appeared to obey her parents also. Gayland never saw Esther playing rough with the other children or injure herself, and he never saw her apart from the other members of her family. In May 1988, Gayland and his wife returned to Ohio, after which they had no further contact with the Combs family.

Malinda Oaks, wife of Gayland Oaks, also testified that she had performed babysitting duties for the Combs family. During one such occasion, Malinda discovered that Esther was unable to write her name. She was nine years old at the time. Malinda taught Esther to write her name and also gave her instruction on the alphabet. When Evangeline and Joseph returned home that evening, Esther showed them what she had written. She was "excited" about her accomplishment, but the

Combs appeared displeased and sent her to "the office." When asked to describe Esther's appearance, Malinda replied that Esther had scars around her mouth and a broken tooth. Malinda also reported that she had never noticed Esther to be clumsy, fall frequently, or injure herself.

Kelly Rose Wood testified that she also babysat for the Combs family while they lived in Florida. It was during the fall of 1986, and Sarah Combs had just been born. One evening, she observed that Esther had kicked the covers off while sleeping. Wood then noticed that the back of Esther's legs were "very, very scarred." They had "stripes all over the back of them; some old, some new, some very fresh, just scar upon scar upon scar . . . ." Wood observed that the back of Cindy Combs' legs were also visible, and they did not have a single mark on them. Another time, Wood noted a gouge wound on Esther's chest. It was a "fresh wound." Wood also testified that Esther did not appear to be clumsy and she did not behave in a rebellious manner. Instead, Esther was "very quiet" and "meek." She was a small, thin child, and the clothing she wore was very loose, baggy, and long, so that you did not see much of her. Wood claimed that Mr. and Mrs. Combs treated Esther very differently from the other children, but she did not elaborate further.

Andy Steven Arnold testified that he knew the Combs family. He regularly attended Sunday and Wednesday services at EBC from the early months of 1992 until the fall of 1993. Arnold testified that Esther always wore long dresses with long sleeves and that she did not interact with other adults or the other children at the church. Instead, Esther was "very withdrawn" and "kept to herself." When Arnold attempted to talk to her, she would not make eye contact with him, and she only spoke when asked a direct question. Evangeline was always nearby. Arnold claimed that "[Esther] was just never really out of Mrs. Combs' sight." On two separate occasions, Arnold observed that Esther was injured. The first time, her arm was wrapped in gauze and supported by a sling. The second occasion Esther showed up for church with black eyes and bruises on her face. Joseph Combs said that Esther "was clumsy, fell down, things of that nature." Evangeline Combs gave similar explanations. Esther missed more church services than the other children. The Combs family usually said that she was "sick." Arnold also testified that he delivered food to the Combs family several times, but he was never allowed into their home. Instead, he was instructed to set the food on a concrete slab at the door of the fellowship hall, knock, and then leave the premises.

Betty Atkinson testified that she played piano during the church services at EBC, beginning in July 1994. Atkinson also testified that Esther wore long-sleeved clothing and rarely interacted with anyone outside of the Combs family. Atkinson confirmed that Evangeline Combs was usually by Esther's side and that Esther appeared subdued, obedient, and avoided eye contact when spoken to. As far as Atkinson could tell, Esther was not clumsy and she did not fall a lot. Evangeline informed Atkinson that Esther loved to serve and this was her life's purpose, but Esther was "rebellious." Atkinson never saw any indication of this, however. To her, Esther appeared "very sweet . . . [and] obedient to her parents."

David Lamar Wright attended EBC from 1982 until January 1994. Wright testified that he became acquainted with the Combs family, including Esther, during this time. He said that Joseph Combs had characterized Esther as a "rebellious child."

Esther Owens, a member of EBC from 1990 to 1993, testified that Esther did not interact with other members of the church and that she did not recall ever seeing Esther without Evangeline close by. According to Owens, Esther regularly missed church services. On some of those occasions, Joseph Combs gave the congregation reasons for her absence, e.g., she had an accident with her bicycle, lifted a jug of milk, et cetera. Esther looked "[r]eally, really skinny and real bad" when Owens knew her, and she always wore long dresses with long sleeves. Joseph asked Owens to bring food to the family on a few occasions, and he always instructed her to leave it on the porch. He said that someone would come out and pick it up later.

Similar testimony was given by numerous other members of EBS. Leona Dickens, Mary Johnson, and Donna Sue Hensley attended EBS for forty-four years, forty-five years, and two years, respectively. Dickens, Johnson and Hensley testified that they observed the Combs family during church services, and all three noted obvious injuries to various parts of Esther's body, including her arm, eyes, and forehead. The three witnesses were also given various explanations by Joseph and/or Evangeline as to how the injuries were sustained, e.g., Esther was clumsy and fell often. None of these witnesses had ever observed Esther fall or behave clumsily, however. The witnesses corroborated the testimony of previous witnesses concerning Esther's style of dress (long length/long sleeves) and demeanor. Specifically, they claimed that Esther was different from the other Combs children in that she appeared frightened, quiet, and generally did not interact with others or make eye contact during conversation. Johnson testified that instead of playing with other children, Esther worked. The other Combs children always played. Johnson never saw them do any work. Hensley similarly testified that the Combs children, save Esther, were allowed to do "pretty much whatever they wanted." Esther was responsible for taking care of young Sarah Combs and, whenever the Combs family attended a social gathering, Esther served the other members of the family their meals. On the matter of delivering food to the Combs residence, Hensley testified that she performed this service on more than one occasion, but was never once allowed into the Combs home. Ordinarily, she would knock on the door and no one answered. After a few minutes, she put the food down and left. The last time she delivered food, she knocked, left the food, and then drove around the building. By the time she returned to the door, the food had disappeared.

Dr. Mona Gretel Harlan, a forensic pathologist, testified that she examined Esther on April 4, 1999, at the prosecutor's request. Her examination revealed the following: The scars on the inside of Esther's thighs were consistent with burn wounds. The scars on Esther's forehead were not significant in number, but they were layered, some as many as three layers thick, indicating that some of the newer injuries were inflicted upon existing scars. The broad scar on Esther's forearm was consistent with a deep wound which, for some reason, did not heal properly due to reinjury or infection. When asked whether the cause of the scars could have been accidental trauma, Dr. Harlan testified affirmatively with regard to Esther's forehead scars, especially if the injuries occurred when she was a young child. She said that children have large, heavy heads. Thus, they are prone to tip over when moving in a forward direction. By contrast, the wounds on Esther's back, thighs, and buttocks were not consistent with either self-inflicted or accidentally-caused injuries. In her summation, Dr. Harlan reported that the majority of Esther's scars were the result of non-accidental and non-self-inflicted trauma.

Dr. Harlan also testified that she was unable to date the causative injuries. However, none of the observed scars were red at the time of the exam. In other words, the scars had all healed as much as was possible and none of them appeared to be the result of an injury sustained within the past year. A careful and thorough count of the scars on Esther's body revealed 410 discrete scars. Dr. Harlan stated that during her 25 years of practice, she had never before seen so many individual scars on one person's body.

Dr. Henry Nichols testified that he evaluated Esther's dental condition on May 11, 1998, and, at that time, her front teeth were "grossly displaced" or "bucktooth exaggerated." In Dr. Nichols' opinion, the only reasonable cause of the displacement would be some sort of "traumatic episode," i.e., a blow, fall, concussion, or other sort of abrupt physical force contact with the tissue. The prosecutor asked Dr. Nichols if he could state, within a reasonable degree of medical certainty, whether the condition of Esther's front teeth was consistent with complete displacement, followed by reinsertion of the teeth into the gums. Dr. Nichols responded affirmatively, stating that tooth displacement to the degree present in Esther's mouth "just doesn't occur in nature." Dr. Nichols stated that in his twenty years of practice, he had never observed an arrangement of teeth similar to Esther's. Moreover, the shape of Esther's dental arch was not the typical "U" shape, but "terribly distorted." The blunted appearance of the roots of Esther's upper front teeth and the condition of her lower jaw revealed further evidence of trauma: the top half of one of her lower incisors was missing and a cyst had formed on the root, without any sign of decay (the typical cause). With the permission and assistance of Esther's natural parents, Bill and Rachel Whetstone (formerly Rachel Garcia), Dr. Nichols treated Esther's conditions and replaced her two upper front teeth with a permanent bridge.

Dr. Glenda Jo Fox Ramsey, a radiologist, testified that she evaluated x-rays of Esther's left elbow and, in her opinion, the elbow appeared "abnormal." Specifically, the distal humerus, a portion of the long bone at the elbow, had not grown properly. The x-ray showed a healed fracture, caused by some sort of "trauma" (defined by Dr. Ramsey as "an injury, a blow to the bone that's not a normal degree of stress"). She further testified that the appearance of the bone indicated an injury "consistent with being struck by an object such as a [baseball] bat" or the result of a fall. The injury was not consistent with the action of swinging a gallon milk jug. Dr. Ramsey also testified that x-rays of Esther's sacrum ("tailbone") revealed an abnormal "acute" curvature of the bone, as if it were "collapsed inward." Finally, she testified that Esther's "bone age" was "delayed" by at least three years, i.e., the development of her bones was significantly slower than her chronological age, reporting that such "[a] delay in bone age is a common manifestation of malnutrition."

At the conclusion of the above testimony, the State rested its case. Thereafter, Samuel Johnson, an acquaintance of Defendant Joseph Combs, testified that he met Joseph at the Hyles-Anderson Bible College in 1983. Johnson saw him again in Florida in 1986. At that time, Joseph was starting the Tampa Bay Baptist Church. Johnson became a member and saw the Combs children regularly (three to five times per week) for the following two-and-one-half years. In addition, Johnson had stayed as a guest in the Combs' home for two weeks while he was seeking employment. Johnson testified that their home was "very normal," clean, and organized.

Aaron P. Welch, pastor of the Charles Towne Baptist Temple in South Carolina, testified that he met Joseph Combs in 1979. Welch was a student of Joseph's at Hyles-Anderson Bible College and graduated in 1982. In 1986, he saw Defendant again. Joseph was preparing to move to Florida at the time. In 1987, Welch arranged to have Joseph come to his church in South Carolina and preach for him. Thereafter, Welch scheduled Joseph to preach on a regular basis, sometimes as much as twice a year. When this happened, Joseph stayed for five to six days and brought his family with him. Welch found the Combs children, including Esther, to be "quiet, well-mannered kids" who "always dressed very neat." He described Esther as "real sweet" and "quiet."

Joseph Henry Esposito, a pastor at Pacific Baptist Church in Long Beach, California, testified that Joseph Combs was one of his professors at Hyles-Anderson Bible College. In 1986, Esposito left the college and moved with his wife to Clearwater, Florida, where he worked for one year as an assistant pastor to Joseph at the Tampa Bay Baptist Church. When he and his wife first arrived, they were invited to live in the Combs' home for two weeks until they found a place of their own. Esposito saw the Combs children often and his wife babysat occasionally. Esposito claimed that the Combs' home was "beautiful" and the kids were all "normal, happy children." During cross-examination, Esposito testified that he had observed no scars or marks on Esther's body while in Florida. He did recall a possible chip in one of her front teeth, however. When asked whether Esther was ever rebellious, clumsy, or troublesome, Esposito replied negatively. Esposito's wife, Mary Jane, also gave testimony which essentially echoed her husband's statements.

Thomas Edward Boyle testified that he attended Hyles-Anderson Bible College from 1981 to 1984. Joseph Combs was one of his professors. In the fall of 1986, Boyle and his family moved to Clearwater, Florida, and joined the church that Defendant was pastoring. During the next two years, Boyle encountered Joseph and his family during church services on Sundays and Wednesdays. Boyle and his family also visited the Combs several times at their home, which he described as "clean." During cross-examination, Boyle said that he noticed Esther's front teeth were crooked, and he did not observe any evidence of injuries or clumsy behavior.

Trent Pollack testified that he met Joseph Combs while attending Hyles-Anderson Bible College. In 1986 or 1987, Pollack and a few other people moved to Florida to start a church. Pollack was to be the music director, and he lived with the Combs family for approximately one month upon his arrival. The Combs' home served as a place for meetings and the headquarters for the new church. Pollack testified that everyone pitched in to keep the house clean. While in the Combs home, Pollack did not observe any of the children being singled out for preferential treatment. He testified that Esther participated in the home schooling process, along with the rest of the Combs children. During cross-examination, Pollack said that he observed scars on Esther's hands and that he had asked Joseph Combs about them. Joseph informed him that Esther had placed her hands into scalding water and that she appeared to have a high tolerance for pain.

Jeffrey Arnold Coester, a pastor and part-time clothing salesman in Illinois, testified that he met the Combs family when he visited Bristol, Tennessee, in 1995. Coester testified that the children, including Esther, were playing sports (basketball and baseball) at the time. According to

Coester, Esther was dressed "cool and comfortable," the same as the other children. He also reported that the other children did not behave differently toward her, and Esther was not asked to run errands for them. Coester came to Bristol because he was considering joining Joseph Combs' ministry. Consequently, he wanted to learn something about the Combs family and spoke with each child individually for approximately ten minutes. According to Coester, Esther was "very comfortable" with him, "a little bit shy, but never withdrawn." During cross-examination, Coester testified that he had observed scars only on Esther's face and that he was concerned about the condition of Esther's teeth. Coester said that he did not move to Bristol or take the job at EBC, but he gave no reason for this decision.

Ruby Rhotenberry, a regularly-attending member of EBC from 1967 to 1998, testified that she saw the Combs children at church services approximately three times a week. Rhotenberry said that the family, including Esther, appeared "very friendly, happy, always laughing, talking, friendly." Rhotenberry claimed that she had "very few" private conversations with Esther, but, when she did, Esther never reported having been mistreated or sexually abused by either Defendant. During the trial, Rhotenberry identified eighteen photographs that she personally took of the Combs family on various occasions. Most of the pictures showed family gatherings, with the majority of the family present. Our review of this evidence reveals the following: Esther was smiling in all of the photographs, and at least ten of the pictures show Esther wearing clothes with short sleeves. Her left elbow and arm appears abnormal and thin. Scarring is apparent on at least one arm in two photographs, and her front teeth are grossly malaligned. During cross-examination, Rhotenberry testified that Esther was a thin, frail, well-behaved girl, who was never rebellious or clumsy in her presence.

Pauline Melvin testified that she was a member of EBC from 1981 until it closed in 1998. Melvin met the Combs family when they came to the church in 1989, and she usually sat with the Combs children during church services. Melvin reported that all of the children were "nice" and "happy" and gave her hugs when they met. During cross-examination, Melvin testified that Esther was thin, well-behaved, and obedient. In addition, Esther did not fall down frequently or appear clumsy. Melvin also admitted that she was "not really close" to Esther and that she never saw much of Esther's skin exposed, since she usually wore long dresses.

Elizabeth Huff and her husband, Dickie Lee Huff, started attending EBC in 1996. At trial, Elizabeth testified that she observed the Combs children, including Esther, during church services and that they were "all friendly" and "gave us a hug on Sunday." In 1997, the Huffs attended a dinner function with the Combs family. Esther appeared to be "just fine," an obedient child, and not rebellious. Elizabeth acknowledged that she saw Esther only on Sundays. Dickie Lee Huff testified that the Combs children, including Esther, appeared to be "very happy." During cross-examination, Dickie Lee admitted that he also had very little contact with the Combs family, except on Sunday. Dickie Lee also testified that Esther was thin and wore baggy clothing, but he claimed that she looked no different from the other Combs children. He never observed Esther falling down or being clumsy, and he had not observed any scars on her face or body. Dickie Lee admitted that he paid the bond for Joseph Combs in this case.

Hilda Jane Combs, Joseph Combs' mother, testified that prior to 1989, she only saw her son and his family once or twice a year. After Joseph became the pastor at EBC, she saw the Combs family more frequently, at least three times a week (at church services) and during visits. Mrs. Combs testified that all the children seemed "happy," and Esther "was always smiling." Mrs. Combs said that the children "got along fine" and played together, but Esther was a "rough little girl" and liked to wrestle with the boys. Mrs. Combs further claimed that Esther had a temper and, "if she felt something wasn't right, she'd tell you." Consequently, Mrs. Combs professed confusion as to why Esther would not tell her if something was wrong. Mrs. Combs was unaware that anything was amiss until Esther left town. Later, Esther told her that she left because she was afraid of Debbie Richmond [McCauley] and that she would be placed in an "insane asylum."

Mrs. Combs testified that Father's Day 1991 (the day Joseph allegedly committed the rape in count 15) was special because it fell on Evangeline's birthday. Mrs. Combs said that the family gathered at Mrs. Combs' house for fried chicken after church that day and stayed until the time came to leave for the evening church service at 6:00 p.m. Mrs. Combs also testified that on Thanksgiving Day 1993 (the day the rape in count 16 was allegedly committed), the Combs family spent the day at her house and stayed until 11:00 p.m. During cross-examination, Mrs. Combs claimed to have no knowledge of any scars on Esther's body. When asked whether Esther "helped her family out," Mrs. Combs replied that she "played too much" to be helpful. Mrs. Combs described Esther as a smiling, cheerful, obedient child who was always running from place to place, talking to people and keeping busy.

The other five Combs children, James, David, Cindy, Peter, and Sarah Combs, also testified. James Jack Combs, the oldest, was the only child legally adopted by the Combs. (David, Cindy, Peter and Sarah were the Combs' natural children). At the time of trial, James was twenty-two years old. James testified that during the time the Combs family lived in the fellowship hall of EBC, an average day for the household began at approximately 6:00 a.m. on weekdays. On the weekends, they started their day a little later. James claimed that he did not eat breakfast every morning but when he did, he fixed it himself or Peter helped him. Esther never prepared his breakfast. Further, as each Combs child finished the morning meal, that child then carried his or her own dishes to the kitchen, where Peter, Cindy, Sarah and Esther would rinse them and place them in the dishwasher. After the children had finished breakfast and dressed, their studies began. Evangeline and Joseph Combs typically instructed the children for four to five hours. All the children, including Esther, participated in the instruction. According to James, Esther was able to read and write. He had previously observed her reading to Peter, writing in the kitchen, and performing mathematical calculations.

At lunchtime, each of the Combs children usually made his or her own lunch. Each child was also responsible for performing certain chores around the home. James cared for the dogs and cats. Esther was responsible for making her own bed and picking up her clothes. She also helped prepare dinner and clear the table afterward. The job of making a grocery list was assigned to no one in particular. When someone in the family believed something was needed, the person wrote the name of the item on a piece of paper attached to the refrigerator. James claimed that Esther did not have

more chores than the rest of the family, and she did not stay up until 3:00 a.m. to complete the chores she did have. As far as James knew, no member of the family ever treated Esther as a servant or believed that she had been born to such a station.

James testified that after the schoolwork and chores were completed, the children were normally allowed to watch television and movies or play video games. The children were also given access to computers for using the Internet, playing games, and doing homework. Esther participated in all of these activities. The family had a telephone, and Esther used that too. The Combs children recreated together outdoors. They often rode bikes or played basketball, baseball, or Frisbee in the church parking lot or DeFriece Park, which was located approximately one block away. Esther had her own bike. The children also went shopping at the mall, out to eat, and to the movies together. Sometimes their parents or another adult would accompany them on these outings, and sometimes they went without adult supervision.

James testified that the Combs family ate their evening meal together and that various members of the family took turns preparing this meal. Esther was not required to complete her chores or serve everyone at the table before she ate, and she was given the same food as the rest of the family. At the conclusion of the evening meal, each member of the family brought his or her own dishes to the kitchen where Peter, Sarah, Cindy, and Esther rinsed them and placed them in the dishwasher. Evangeline Combs did the family's laundry and James assisted her. Esther's chores did not involve the laundry. When bedtime arrived, the children all slept together in the fellowship hall, Esther included. James never saw Esther sleeping naked or in a room near the showers. That room was used to store musical equipment: speakers, amplifiers, keyboard, et cetera.

According to James, punishment of the Combs children usually took the form of some type of restriction, either of their liberty ("grounding") or one of their privileges (watching television, et cetera). Esther's situation was no different. She was not beaten, whipped, or starved. James did see Esther suffer injuries, however. On one occasion, he saw Esther get hit in the face with a plastic bat because she stood on the wrong side of the plate during a baseball game. This resulted in a black eye and her face was red for a while. Another time, he saw her slip on a base and scrape her knees on the asphalt parking lot. Yet another injury occurred while the children were assisting their parents with bringing in the groceries. Esther had been warned not to carry more than one gallon of milk at a time, but she did not listen. She was carrying two gallons of milk, and the door started to close on her. In an effort to catch it, she swung the gallons and twisted her arm. Evangeline Combs put ice on the arm and placed it in a sling. James testified that the rope burn on Esther's neck was caused by Esther herself. Esther had placed a rope around her neck to pull a wagon with her friend in it up and down a steep hill. Her neck became red and Evangeline told her to stop. She did not. Eventually, she cut her neck. James also claimed that he never saw Esther naked, and he never heard Esther or anyone else claim that she had been injured, beaten, or molested by either parent. Joseph Combs' attorney asked James whether he had witnessed the specific incidents which gave rise to the charges against the Defendants. In each case, James replied negatively.

With regard to Esther's attire, James claimed that no one instructed her how to dress. Because Esther had a smaller frame than Cindy Combs, she wore Cindy's hand-me-down dresses. During church services, Esther would either sit with the family or work in the nursery with other female church members. The nursery had a door to the outside, whereby one could leave without passing through the sanctuary. James claimed that he was home but not awake when the family discovered Esther ill in the bathroom in February 1997. He recalled that she had seemed "normal" the prior day. James and the rest of the family visited Esther in the hospital at every opportunity. She was "really, really happy" to see Evangeline and Joseph, and she also appeared "happy" to go home afterward.

During cross-examination, James testified that he received his driver's license on the 26th or 27th of September 1997. He also claimed that, prior to receiving his driver's license, he did not drive any vehicle on any public road with one exception: the day he drove a car which he was considering purchasing. Once licensed, James drove the other Combs children, including Esther, to the mall and other places. He testified that this happened "on many occasions" before Esther left town on October 3, 1997.

Joseph David Combs, Jr., commonly known as "David" Combs, was twenty-one years old at the time of trial and the third oldest child in the Combs family (Esther being the second oldest). David's testimony at trial essentially paralleled that of James in all material aspects: David claimed that Esther slept in the fellowship hall, along with the rest of the children, and that she did not sleep naked. David also testified that after the Combs children arose at approximately 6:00 a.m., they fixed their own breakfasts and "the girls" (Esther, Cindy, and Sarah) cleaned up. The children were home-schooled, every day, from approximately 7:30 a.m. until after noon and Esther regularly participated. At lunchtime, their mother, Evangeline, fixed sandwiches. Esther and Cindy usually assisted her. David stated that the evening meal was a "special" time, which Joseph liked the family to spend together. This meal was usually prepared by Evangeline alone, and the girls cleaned up.

With regard to chores, David testified that each child was assigned individual tasks to perform. David was responsible for taking out the trash and vacuuming. Esther made her own bed and helped with the cooking. She did not have more chores to do than the other children, and David never heard anyone say that Esther's "purpose" in life was to be a servant. During the children's leisure time, Esther enjoyed playing video games and watching television. Most frequently, the children played basketball, baseball, and rode bikes. Esther joined them frequently, but she played "rough." On Friday and Saturday nights, the children frequently went to the mall. Esther went with them "every time." David said that they were unaccompanied by their parents on these trips, and James drove.

According to David, punishment usually involved "grounding." Occasionally, David was spanked instead or required to write "stuff" on the chalkboard. David claimed that Esther was not punished more severely than the other children, and she was not whipped. David recalled four injuries suffered by Esther while they lived at EBC. The first was a burn that occurred in 1994. The children had been discussing a story they heard on the news about a child who had seriously burned

his hand on a stove. Esther told them that a stove would not burn if the hand was removed quickly enough. As a demonstration, she placed her hand on the stove and burned it. The second injury resulted from a mishap with her bicycle in 1996. She stepped on the brakes too hard, slid off of the seat, and landed on the center bar. (She was riding a boy's bicycle.) The third injury also occurred in 1996. The children needed keys which were locked inside of Joseph's office. They tried to break in through the ceiling, and Esther fell through it. She hit her head on the bookcase and again on the floor when she landed. The fourth injury came about when David accidentally gave Esther a black and blue eye with his elbow while playing.

David testified that he had never seen Esther without clothes on and she never complained of being molested by anyone. Similarly to James, David was asked whether he had witnessed many of the individual incidents which gave rise to the charges against the Defendants. In each case, David also replied negatively. Regarding Esther's style of dress, David implied that long dresses and sleeves must have been Esther's choice, since the children were not told what to wear. David also said that the Combs had three different telephones in their home, and he saw Esther use them. She also used the computers and had friends with whom she communicated via the Internet. David claimed to have a "good relationship" with Esther.

David testified that Esther appeared to be "fine" on the day before she was hospitalized. The next morning, however, one of the other siblings woke him up to come to the bathroom. There he discovered Esther "sitting on the commode and beating her head against the wall." He picked her up, laid her on her bed, and sent one of the other children to inform the Defendants. Later, David moved her out to the van because the rescue people had not arrived. He estimated that they had been waiting approximately thirty minutes, and Esther had already stopped breathing three times. Therefore, the Combs were preparing to drive her to the hospital themselves. He also claimed that Esther seemed "happy" to return home from the hospital.

During cross-examination, David claimed that James drove the Combs children, including Esther, to the mall on twenty-five or thirty occasions. When asked how many times the Combs children were allowed to have friends over to spend the night in the EBC fellowship hall with them, David replied that this never happened. David also testified that on March 24, 1997, the day the police and fire department were banging on the fellowship hall doors, he did not hear anything. When the police and firemen finally entered, the time was 11:00 a.m. and it was a Monday. The children were all still in their bedclothes and lying around, however, because everyone was ill that day.

Cindy Combs was twenty years old at the time of trial and the fourth oldest child in the Combs family. With regard to the children's sleeping arrangements, preparation of meals, chore assignments, punishment, and Esther's frequent participation in home-schooling and playtime, her testimony essentially mirrored that of her older brothers, James and David. She also testified that she had never seen Esther without clothes and that she had no knowledge regarding any abuse or molestation of Esther. With regard to Esther's injuries, Cindy corroborated David's testimony that he accidentally elbowed Esther in the eye while playing. Another time, Cindy saw Esther get hit on

the forehead with a bat during a baseball game. Cindy was also specifically asked whether she had witnessed the specific incidents which gave rise to the individual counts against the Defendants. She replied negatively to all questions.

Cindy testified that on the evening of February 17, 1997 (the day before Esther was taken to the hospital), she and David, Esther, Peter, and Sarah all began to feel sick and went to bed. Sometime later, Cindy woke up and saw Esther running in the direction of the bathroom. Cindy ran after her. She found Esther in the bathroom with the door shut. A few minutes later, she heard a banging sound. Cindy woke up Peter first. Later, they woke up David, who removed Esther from the bathroom. Cindy dialed 911. While they were waiting for emergency medical personnel to arrive, Esther stopped breathing a few times and began to thrash around. The family became nervous when the ambulance did not come quickly. They moved her to the van for transport to the hospital. Shortly thereafter, the ambulance arrived.

Peter and Sarah Combs, the second youngest and the youngest of the Combs children, respectively, gave testimony essentially similar to that related by the three other siblings. Peter, fifteen years old at the time of trial, testified that Esther was home-schooled, along with the rest of the children, and that Esther was able to read and write. Peter claimed that he and Esther read books together and that Esther wrote short stories. According to Peter, Esther slept in the same room as the other children, she did not serve food to the rest of the family, she was not responsible for cleaning up after meals, she was not assigned more chores than any other member of the family, and she was not considered the family servant. Peter further claimed that punishment for all of the children consisted of "grounding." He never saw Esther being whipped, beaten, or starved. Esther was allowed to do the same things the rest of the children did, to wit: she watched television and movies, played Nintendo, talked on the telephone, went to the mall and the park, rode her bike, and used the computer to "surf the Web." Peter claimed that he never heard the Defendants tell her how to dress, he never saw her unclothed, and she was not told where to sit during church services. In fact, she sat with a number of different people. As for injuries, Peter said that he witnessed a few. He saw her injure her hand in January 1997, when hot gravy or grease somehow splashed onto it while she was removing a roast from the oven. She immediately ran to the sink and washed it off. Later that evening, her hand was red but she claimed to be "okay." Another injury occurred in 1994 or 1995, during one of the many baseball games the children played together. Someone threw a bat, which hit Esther in the face. Esther also occasionally scraped her knees when she played on the asphalt parking lot. Another time, he watched her zealously scratch mosquito bites until they bled.

Peter recalled that Esther was "very happy" on the day before she went to the hospital in February 1997. She also appeared "relieved and happy" to see the Defendants when they visited her. Before she left town to stay at Sonja Meadows' house, Esther told Peter she was "sick of Debbie Richmond [McCauley] coming after us, [and] coming after her. She'd seen what Debbie had done to our family and she was just sick of it. She didn't want it." Peter was asked whether he had witnessed the individual incidents which gave rise to the charges against the Defendants. Peter responded negatively to all questions.

The youngest child, Sarah Jane Combs, gave testimony similar to Peter's and the other children regarding the sleeping arrangements, mealtime procedures, home-schooling participation, shared chore assignments, standard punishments, the lack of seating restrictions during church services, and Esther's involvement in family playtime. Sarah also claimed that she never saw Esther unclothed or punished severely. She recalled only two incidents where Esther suffered any injuries. The first occurred in the kitchen, when Esther broke a plate which cut her arm. The second occurred during a baseball game, when one of their friends hit the top of Esther's eye with a baseball bat. It was an accident. Sarah also claimed that Esther was able to read and write. She explained that Esther would often read to her, and Sarah observed her compose long stories and poetry.

According to Sarah, the day prior to Esther's hospitalization in February 1997 was not unusual. Esther seemed "happy." While in the hospital, she also seemed "happy" to see the family when they visited. Esther never complained to Sarah that either Defendant had ever injured her. When Sarah was asked whether she had witnessed the individual incidents which gave rise to the charges against the Defendants, she replied negatively regarding all counts.

Mary Ellen Caldwell testified that she was working 7:00 p.m. to 7:00 a.m. as a nurse in the cardiac intensive care unit at the Medical Center during Esther's treatment in February 1997. Caldwell questioned Esther about the numerous scars on her body. Esther responded that she "fell a lot when [she] was little." Caldwell recalled the visits by Esther's family and described them as "very civil, normal." Caldwell also recalled speaking to Joseph Combs on the telephone when he called to inquire about Esther's condition. He asked Caldwell to tell Esther that "he loved her." During cross-examination, Caldwell testified that she observed Esther clutching her stuffed animals and exhibiting "restless movements" while at the Medical Center. She also moaned loudly and claimed to have nightmares involving her father.

Donna Sue Tiller also worked as a nurse in the Medical Center's cardiac intensive care unit while Esther was a patient. She was scheduled to work only one day during Esther's stay, from 7:00 p.m. to 7:00 a.m., and she saw Esther's family during visitation. Tiller said that the other Combs children were outgoing and friendly. By contrast, Esther would only speak when spoken to, and she did not initiate conversation. At approximately 4:00 a.m., Esther woke up "whining." She said she was "homesick," missed her "mama," and wanted to go home. During her bath, Esther told Tiller that she did most of the cooking at home because she "loved" it. She also said that her siblings had their own chores to do. During cross-examination, Tiller testified that she asked Esther about the many scars on her body, but Esther refused to discuss them. According to Tiller, the scars on Esther's back and buttocks were too numerous to document.

Defendant Joseph Combs testified that he and his wife adopted their son, James, when he was only a few days old. Shortly thereafter, Joseph and Evangeline were told they could not have children, but they wanted additional children for James' sake. Consequently, they decided to adopt another child. Joseph conceded that he was familiar with the adoption process, based on his experience with James, and that he had signed an adoption agreement with the Baptist Children's Home (the "Home") concerning Esther (then "baby Garcia"). Joseph acknowledged that a provision

in the fourth paragraph of the agreement stated as follows: "We agree to pay the fee of gift to the Baptist Children's Home to pay the costs of the Social Services and to help defray the expenses of the birth and care of the child." The terms of the fee were yet to be discussed, but it was due before the adoption was finalized. The Home allowed Joseph and Evangeline to take Esther home for a few months prior to signing the adoption papers. She was five months old at the time. Joseph signed the agreement but a few months later, he became "concerned" about the terms. He sought advice from an attorney named Charles Lee Zandstra, who informed him that he would be required to pay the Home ten percent of his income for an indefinite period of time once the adoption was finalized. Joseph called the Home. Whoever answered the telephone (Joseph claimed to not recall the name) told him to consider the matter further and to "take his time," because "there was no rush."

During his testimony, Joseph Combs was shown copies of two letters previously sent to him by the Home. The first was dated March 31, 1978; the second, January 9, 1994. Both requested that he send the Home a copy of the adoption decree concerning Esther. Joseph admitted doing nothing in response to the first letter and claimed that he did not recall receiving the second. When his attorney asked him why he never legally adopted Esther, Joseph replied that, initially, "it was fear of financial pressure." Since he and his wife already had full custody, they were in "no rush." As the years rolled by, he feared that "if [they] tried to go forward at that point that [they] would lose her." Joseph admitted that Esther did not have a Social Security card, a birth certificate, or a drivers license while she lived with them.

Joseph testified that the Combs family lived in Indiana for thirteen years. In 1986, they moved to Clearwater, Florida, because Joseph wanted to start a church there. All of the Combs children had already been born when they left Indiana except for Sarah, the youngest, who was born in Florida. Their home in Florida was "very nice": 2200 square feet, with four bedrooms, 2 1/2 bathrooms, and a pool. Joseph claimed that all of the Combs children were outgoing; they frequently stopped people on the street to talk with them. Joseph denied that he made any attempts to hide the children. He also denied that Esther was required to prepare the family's meals. His wife, Evangeline, performed that duty. According to Joseph, the relationship between the members of the Combs family was real close, and the family "did a lot together." Joseph tried "to expose [the children] to as many different places and things as possible," and Esther was not treated any differently than any other person in the family. Joseph denied using "the office" in the Florida home as a place to spank Esther. Rather, he claimed that the house did not have an office. The family lived in Florida for eighteen months.

Joseph refuted the testimony of Malinda Oakes and Esther concerning Esther's inability to read and write. He claimed that she knew how to do both before leaving Indiana and her talents included creative writing. Esther participated in the same home-schooling program as the rest of the children. Instruction took place from 8:00 a.m. until approximately noon, Monday through Friday. Joseph admitted that Malinda Oaks had volunteered to help teach the children. Joseph informed her that this was not necessary, but she could possibly tutor them in some subjects if she liked. In sum, he did not encourage her or strictly prohibit her from participating. Joseph also claimed that the

testimony of Rose Kelly Wood, who noticed that the back of Esther's legs were "very, very scarred," was untrue.

In 1988, the Combs family left Florida and traveled from state to state in a "forty-five foot fifth wheel trailer." Joseph had received numerous invitations for extended meetings at churches across the country, and he decided to accept them. Joseph denied giving Esther a "pink belly" during their travels in the trailer, or at any other time.

In April 1989, the family settled down in Bristol, Tennessee. Joseph assumed the pastorship of EBC, and the Combs took up residence in the fellowship hall of the church. According to Joseph, all of the children, including Esther, slept in the fellowship hall. He claimed that Esther interacted well with the other Combs children. She was "positive," "cheerful," and played with all of them. She also played with some of the children who attended EBC and rode her bike. Esther was not restricted as to where she did these things. With regard to chore assignments, Joseph testified that no child was given more to do than any other child and none of them complained. Moreover, he claimed that Esther was never told that her purpose in life was to be a servant and she was never treated as such. She did not retire at 3:00 a.m. and she was not forced out of bed at 5:00 a.m. Esther watched television with the other children and she was never deprived of food. Joseph testified that Esther was not sick more than the rest of the Combs children; it only appeared that she missed more church services because she worked in the nursery so frequently.

Regarding Esther's two attempts to run away, Joseph gave the following explanations: The first incident followed an argument that occurred between Joseph and his wife. Esther overheard the argument, misunderstood it, and then decided to take a walk. During her walk, she became confused as to her whereabouts. She noticed a little store on the roadway and headed for it, but she became nervous when she saw a police car pull over. Hence, she ducked into the bathroom and locked the door. Meanwhile, the Combs family was searching everywhere for her. Within a few minutes of her departure, they realized she was gone. Joseph said that he was "not comfortable" with the idea of Esther being outside because it was raining and rather windy that evening. When the police reported that they had found her, Joseph picked her up. The second runaway incident began with Esther hearing noises during her shift in the church nursery. Esther became frightened and went outside to investigate. Once outside, she thought someone was chasing her, so she started running. The next thing she knew, she woke up on Highway 421. She began walking along the road. A pastor and his wife from Mountain City picked her up and tried to help her. She would not tell them who she was, so they turned her over to the local authorities. The Combs family learned she had been found at approximately 3:00 or 4:00 a.m. the next morning and then brought her home.

Joseph testified that on February 17, 1997, the day before Esther was taken to the hospital, the Combs children had played vigorously all day. Esther was fine, but tired. When evening came, some of the children did not feel well. Everyone went to bed. The next morning, David alerted he and Evangeline that Esther was having "some kind of seizure or something." She was in the bathroom, "kinda jerking around." Cindy dialed 911. When it appeared as though she stopped breathing a few times, and the emergency personnel had not arrived, Joseph was afraid she would

die any second. The ambulance finally arrived, however, and transported her to the hospital. The rest of the family followed in a car.

The following morning, Detective Debbie Richmond-McCauley questioned Joseph in an attempt to determine how Esther had become sick. Joseph testified that McCauley's questions concerned only Esther's then-present condition. She did not ask him about the scars on Esther's body and Joseph never told her that Esther was "clumsy" and "fell a lot." He also denied that he was ever asked to give or sign a statement. Joseph claimed that he visited Esther in the hospital at every opportunity and that he and Esther had a "close" relationship. They discussed many personal matters and he loved her. He thought that she also loved him. Consequently, he was "bewildered" by the accusations against him.

Joseph recalled when the Bristol Fire Department came to the EBC fellowship hall in March 1997. A day or two later, Cindy, Peter and Sarah Combs (the minor children) were removed from the custody of the Combs for approximately one year. In June 1997, the family moved to a place just outside of Bristol. In October 1997, Esther left town. She stayed with Sonja Meadows for a short time, and then moved to South Carolina. There, she stayed with Reverend Carpenter's family. Joseph testified that he was present when Esther left town. He claimed that Esther was "scared" and "frustrated" by the police driving by the Combs residence and the unfamiliar people dropping by their home. Esther knew that Joseph had been summoned to go to court. She wanted to leave the area and asked him to assist her. Joseph agreed to do so.

Following the hearing on October 3, 1997, the Chancery Court for Sullivan County at Bristol, Tennessee, issued the following court order which was read into evidence during Joseph's testimony:

> Upon Petitioner's motion for physical and psychiatric examinations and appointment of guardian ad litem, brought on notice for hearing on October 3rd, 1997, before the Honorable Richard E. Ladd, Respondent did not appear. Respondent's caretaker, Joseph Combs, appeared and testified that after living with him for over nineteen (19) years, Respondent suddenly left without her [sic] of her plans or whereabouts some time prior to the service of the instant petition on August the 4th, 1997. Although Mr. Combs testified that Respondent, Esther Combs, has called him on the telephone since and has appeared in his Church audience, he has never informed her of this case and has no idea whatsoever as to her present whereabouts.

Joseph admitted that he had knowledge of Esther's whereabouts at the time of the hearing and that his statement to the contrary was untrue. However, Esther's attorney had informed her that she was under no duty to appear. Thus, what she did was her choice, and she chose to leave town. She was no longer a minor, and Joseph was not her caretaker. To avoid doing anything illegal, Joseph had asked for advice from three different attorneys on this matter. (He did not testify regarding the substance of such advice.) Joseph said that he and Esther kept in touch via cellular telephone, but he did not see her again until she testified at trial.

Concerning the charge of especially aggravated kidnapping (count 1), Joseph testified that he never confined Esther by a display of deadly weapons and that he never observed Evangeline do so. The Combs household had three working telephones, and the doors to their residence all locked from the inside, not the outside. In other words, it was not possible to prohibit anyone from exiting the Combs residence by locking the doors. Further, Joseph testified that in the period of time from April 30, 1990 to October 3, 1997, he and Evangeline took frequent trips, during which the children were left at home without adult supervision. Even when the Defendants were home, the children were all allowed to come and go as they pleased, within the normal parameters typically allowed children. Esther never declared a desire to leave home, and, when her hospitalization and the two runaway incidents were over, she had returned home voluntarily.

With regard to count 2, which alleged that Joseph choked Esther with a rope sometime between June 1, 1996 and September 1, 1996, Joseph testified that the charge was untrue. Specifically, Joseph claimed that on March 26, 1996, he underwent surgery to replace the aortic valve in his heart. As a result, he was incapacitated for a period of time thereafter, e.g., he could not preach or drive for months, and he often felt dizzy and sick. Full recovery took approximately one and one-half years. In sum, he asserted that the operation left him so physically weak that he could not have committed this crime.

With regard to count 15, alleging that Joseph raped Esther on June 16, 1991, Joseph testified that the family spent the entire day eating fried chicken at his mother's house. They returned home in time for the evening service at church. On November 25, 1993, the day Joseph allegedly committed the crime of rape in count 16, the Combs family had again spent the entire day at his mother's house. It was Thanksgiving Day, and the family did not return home until approximately midnight.

Joseph also denied committing the crimes in the other counts against him. Joseph's attorney showed him a photograph of four items (Exhibit 178): an umbrella with some of the spokes exposed, a piece of wood, a coiled metal wire, and a piece of metal (resembling a bent curtain rod). The items were discovered by the police investigators at the EBC fellowship hall after the Combs' departure. Joseph denied using the items to beat or whip Esther. Joseph also denied using Esther's head to make the hole in his office wall, as shown in the photograph numbered Exhibit 174. Joseph then repudiated Esther's other allegations, to wit: he claimed he did not beat her black and blue with a water hose as punishment for running away; he did not ever give her a black eye; he was unfamiliar with the "normal position" she had claimed to assume during beatings; he did not require that Esther wear certain types of apparel; he did not force her to wear her hair in any particular style; powder was never placed in front of the door to Esther's room; the condition of Esther's front teeth was the result of a fall, rather than the colliding of her face with a wall; and he did not treat her any differently than the other Combs children. In addition, Joseph said he never observed his wife, Evangeline, behave as described by Esther during her testimony.

During cross-examination, Joseph denied that he responded, "What marks?" when Dr. Gerlock asked him about the scars on Esther's body. He also denied saying, "She falls a lot," when

questioned further. Joseph said that he did not recall meeting Dr. Gerlock. He also did not recall talking with Susan Early, who previously testified that Joseph had refused to respond to questions about the origin of Esther's scars. Joseph explained that he quit answering all questions after talking with Detective McCauley. Joseph denied telling Dr. Stiefel that Esther had never been to a hospital or to see a doctor, because this was not a true statement. He also refuted the testimony of Gayland Oaks, which stated that Joseph had said "it was necessary to spank [a child] through their rebellion until they stop resisting and crying." In addition, Joseph disclaimed making the following statements: (1) God had created Esther to be a servant and he was training her to do so; (2) Esther was clumsy and fell a lot; (3) it was Esther's responsibility to care for the younger children; and (4) he had never seen scars on Esther before. Joseph also claimed that the testimony of Arnold, Owens, and Hensley, concerning food deliveries to the Combs family, was untrue.

Joseph admitted that the Defendants' failure to legally adopt Esther prohibited her from obtaining both a Social Security number and any type of job which required one. Joseph also testified that he did not have Esther "taken" anywhere, when she left town in October 1997. Instead, a man named Ricky Martin "took her somewhere and she ended up at Sonja Meadows' [home]." Joseph claimed that the record of what was said during the hearing, as reflected by Judge Ladd's order, was inaccurate. According to Joseph, his testimony on October 3, 1997, stated that "he wasn't sure where she was and [he] had reason to know or to believe that [he] knew where she was." Next, Joseph stated that he was asked only whether he had informed Esther about the subpoena, and then he admitted that he was "fairly confident that she was [with Sonja Meadows]" at that time. He also admitted arranging Esther's transportation to South Carolina. He said he did this because he loved her and she needed his help.

Also during cross-examination, Joseph was shown sixteen photos of the numerous scars covering Esther's body. For each photograph, the prosecutor asked whether he could give any explanation as to the cause of the scar. Joseph claimed to have knowledge regarding only three scars: a scar on Esther's left arm was caused when she broke a plate; a scar on her right eyebrow was caused when she was hit with a baseball bat while playing a game; and another on her forehead was probably caused when she ran into the television or fell in gravel, he was not certain. As for the scars on her shoulder, lower back, arms, hands, buttocks, and thighs, Joseph claimed to have no knowledge of their presence or their origin. Regarding the photographs of places normally covered by Esther's clothing, Joseph testified that he could have no knowledge concerning these injuries since he had never seen her unclothed.

Evangeline Combs did not testify. Following the testimony of Joseph Combs, both Defendants rested their cases. As rebuttal proof, the State called Ricky Dale Martin, who testified that he never transported Esther from Bristol to the residence of Sonja Meadows. During cross-examination, he stated that Esther had never even been in his vehicle. Sonja Meadows then corroborated Martin's statement that he did not drive Esther to her house.

Jenny Smeltzer, the director of the 911 Dispatch Unit in Bristol, Tennessee, testified that the 911 system is capable of accurately recording the exact time a call is received and the precise time

-34-

the 911 emergency personnel first arrive at the scene. In this case, the 911 dispatch records reflected the following: a 911 call was received from EBC at 11:00:18 a.m.; a second call was received from the same location at 11:04:28 a.m.; the first officer or medical technician arrived at the scene at 11:04:24 a.m.; and the ambulance arrived at 11:09:31. The ambulance arrived nine minutes and thirteen seconds after the first 911 call was received by the 911 Dispatch Unit.

To rebut the testimony of defense witness Samuel Johnson (who claimed the Combs family home was "normal"), the State presented the testimony of Franklin C. McCauley, Jr., a Special Agent, Criminal Investigator with the Tennessee Bureau of Investigation. Agent McCauley said that he had a telephone conversation with Samuel Johnson in connection with Esther's case, during which Johnson informed him that the Combs children were very quiet and did not intermingle with the other kids. Moreover, Esther did not even intermingle with the other children in the family. Johnson informed Agent McCauley that he never really spoke to the children or had the opportunity to get close to them.

Prior to charging the jury, the trial court heard arguments by both parties concerning various motions, including a motion to dismiss counts 3 through 6 on the ground that the charges were barred by the statute of limitations. (Count 3 charged both Defendants with aggravated assault; count 4 charged Evangeline with aggravated assault; and counts 5 and 6 charged Evangeline with assault.) Following the hearing, the trial court dismissed counts 3 through 6 as barred by the statute of limitations and instructed the jury concerning the remaining charges. After some deliberation, the jury convicted Defendant Evangeline Combs of one count of especially aggravated kidnapping and four counts of aggravated child abuse. The jury found her not guilty of one count of aggravated assault. Defendant Joseph Combs was convicted of one count each of especially aggravated kidnapping, aggravated assault, aggravated perjury, and aggravated rape, in addition to seven counts of rape. Following a sentencing hearing, Evangeline Combs received a sentence of 65 years, and Joseph Combs received an effective sentence of 114 years.

## ANALYSIS

### I. Voir Dire Proceedings

Both Defendants contend that the trial court committed errors during the voir dire examination of two prospective jurors. Specifically, the Defendants argue that the examination of Hunter Jones revealed that he would be unable to render an impartial verdict. Accordingly, the Defendants assert that Jones should have been excused "for cause," and the trial court abused its discretion by refusing to do so. The Defendants also contend that the trial court limited the scope of the Defendants' questions with regard to whether a prospective juror, Misty Bishop, harbored "suspicions of guilt." The Defendants maintain that this limitation was improper because it critically impaired their attorneys' ability to uncover juror bias. To summarize, the Defendants argue that these errors require reversal of the judgments in this case because they effectively denied the Defendants their constitutional right to a fair and impartial jury. We disagree.

The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court. State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992); State v. Simon, 635 S.W.2d 498, 508 (Tenn. 1982). The trial judge's actions in the conduct of voir dire will not be disturbed unless there is an abuse of that discretion. State v. Irick, 762 S.W.2d 121, 125 (Tenn. 1988). The Sixth and Fourteenth Amendments unquestionably guarantee a defendant the right to an impartial jury. See Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). The process of voir dire and the defendant's use of peremptory challenges is one means to achieve that end. Ross v. Oklahoma, 487 U.S. 81, 88, 108 S. Ct. 2273, 2278, 101 L. Ed. 2d 80 (1988).

The trial court has wide discretion in ruling upon the qualifications of a juror. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). When the trial court erroneously refuses to excuse a juror for cause, the error is harmless unless the jury that heard the case was not fair and impartial. State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989). It is well-settled that a defendant who disagrees with a trial court's ruling on juror challenges "for cause" must, in order to preserve the claim that the ruling deprived him of a fair trial, first utilize such peremptory challenges as he has available to remove the jurors. State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993). The trial court's failure to properly exclude a juror for cause is grounds for reversal only if the defendant has exhausted all of his peremptory challenges and an incompetent juror is then forced upon him. Ross, 487 U.S. at 89, 108 S. Ct. at 2279; State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990). In their briefs, both Defendants claim that they had utilized all peremptory challenges prior to the voir dire examinations of the jurors in issue. The record does not indicate otherwise, and the State does not dispute their claim in its brief.

## A. Failure to Excuse Hunter Jones for Cause

The Defendants contend that Hunter Jones should have been excused "for cause" because the voir dire examination revealed that (1) Jones was "intricately related" to numerous prosecution witnesses through professional and personal relationships, and (2) his employment in an administrative position with Wellmont Health Systems gave him pre-trial exposure to information about the trial. The Defendants maintain that both circumstances clearly affected his judgment, thereby rendering him unable to deliver a fair and impartial verdict.

The record reflects that Hunter Jones, a registered nurse, was also employed as the Director of Education and Development Services at Wellmont Health System. His duties included setting up continuing education programs for nurses and other health care professionals. Jones stated that, in this capacity, he had met or instructed various witnesses whose names were on the State's potential witness list. (Two of the witnesses known to Jones did, in fact, testify: Susan Early and Elizabeth Owen Cribb.) During voir dire, the attorney for Joseph Combs asked Jones whether he might consider the testimony of those witnesses whom he knew to be more credible than that of the other witnesses. Jones responded, "No, not necessarily." Jones claimed that he knew three of the possible witnesses (Teresa Bott, Susan Early, and Elizabeth Cribb) "fairly well." He had worked as a direct supervisor over Bott for two and one-half years, but they did not socialize; Early was the

social worker assigned to his wife's case, and they had worked on various committees together; and Cribb had served on a committee with him. Jones stated that he had not discussed the case with any of these women and none of them knew he had been called as a potential juror. Jones said that he had a "pretty close personal relationship" with Early, but he claimed that this would not cause him to give her testimony additional weight. With regard to any pre-trial knowledge of the case, Jones testified that the upcoming Combs trial was discussed during a management meeting: management had instructed the department heads to remind their staff that the trial was pending, that some of the staff would be witnesses, and that they were not to discuss the case with anyone.

At the conclusion of Jones' voir dire examination, the attorneys for both Defendants moved to dismiss Jones "for cause." As justification for dismissal, the attorneys argued that Jones worked for the same employer as some of the State's witnesses and that he was tied too closely to them, especially Early. The trial judge denied the motion, stating that Jones was "very specific that he could not overstep any bounds."

In their briefs, the Defendants cite Rule 24(b)(2) of Tennessee's Rules of Criminal Procedure, which provides that any party may challenge a prospective juror for cause if

> The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. *Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability.* A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, *the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed.* If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

(Emphasis added.)

With regard to Jones' pre-trial knowledge of information relating to the Combs case, we find the degree of exposure minimal. The defense attorneys' questions on this matter were cursory and the details regarding his knowledge remained essentially undeveloped. The record only shows that a management meeting was held, which resulted in an admonition to the staff to refrain from discussing the case. Jones was not asked precisely what he heard or from whom he heard it.

According to Rule 24(b)(2), "the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability." The trial judge found that Jones was "very specific that he could not overstep any bounds." We have discovered nothing in the record which casts doubt on the trial court's conclusion. The record is also devoid of any indication that Jones' personal

and/or professional affiliations with the State's witnesses would affect his judgment so that he would be unable to render a fair and impartial verdict in this case. The Defendants argue that the medical personnel of Wellmont Health Systems comprised a significant portion of the State's witnesses. That may be so. However, Jones knew only Early and Cribb, and the testimony of neither witness was conclusive on any issue at trial. Both testified as to the appearance of scars on Esther's body, evidence which was substantiated by photographs and the testimony of numerous other witnesses. In addition, Early testified that the Defendants were not forthcoming with information regarding the origin of Esther's scars, but that Evangeline subsequently informed Early that Esther "fell a lot and was clumsy." Again, this testimony was similar in content to that of other witnesses.

### B. Limitations on the Scope of Voir Dire

The Defendants also contend that the trial court placed limitations on the scope of their questions during voir dire, which prevented them from achieving the well-established goals of this process and also rendered their trial fundamentally unfair. We reject both arguments.

According to the record, Misty Bishop revealed during voir dire that she had been exposed to some pre-trial publicity via prior conversations with people at work. She claimed that she did not recall hearing anything about the case on the news and that she had not read the newspaper, but acknowledged that various co-workers had expressed their opinions to her regarding the Defendants' guilt. The trial judge asked Bishop whether she had formed an opinion herself. She replied, "I don't know that I have enough information. They just told me what they had heard, so I really don't know." The trial judge followed with a pointed question: "[A]s a result of talking with these other people, these people you work with or anywhere else of any information, did you, yourself, form or express any opinion as to the innocence or guilt of either Mr. Joseph Combs or Mrs. Evangeline Combs?" Bishop replied that what she had heard from her co-workers sounded "bad," but she had not "heard from any reputable forum other than this person at work." Consequently, she could not say that she had "actually formed a strong opinion about it because [she had] not heard any real facts about it." Following a few more brief questions, Bishop concluded that she had not "heard enough to really form an opinion." The trial judge explained to Bishop that one of his duties was to ensure "an absolutely even playing field," and then he asked her the following question: "[I]f you were selected as a juror and I instructed you that you could not consider any outside information, T.V., comments of friends or family, that type of thing . . . . [c]ould you, without doubt, follow that instruction . . . and not consider anything except the evidence that comes in at trial?" Bishop replied, "Yes."

Next, Joseph Combs' attorney questioned Bishop whether she had a "suspicion" that the Defendants were guilty. Again, Bishop stated that she did not have enough information to form an opinion. The attorney then asked whether some degree of evidence was required "to do away with what [the co-worker] told [her]" and whether the Defendants "would have to prove something to [her]." Bishop responded that she would need evidence "to see both sides." Thereafter, the attorney representing Evangeline Combs asked Bishop similar questions, including whether the information she previously received had raised a suspicion of guilt in her mind. Bishop replied affirmatively:

a suspicion of guilt had been raised. The attorney then asked whether it was fair to state that, since she had this "suspicion," she was "going to need to hear something from [the Defendants] to prove they're innocent." Bishop replied that this was "probably a fair statement."

The following colloquy then transpired between Bishop and the trial judge:

[THE COURT]:     All right. Let me ask you this, Ms. Bishop.

[BISHOP]:     Yes, sir.

[THE COURT]:     A defendant, in any criminal case, is not required to prove anything.

[BISHOP]:     Yes.

[THE COURT]:     They have no burden in the case. The burden is always upon the State to prove guilt beyond a reasonable doubt. And this burden of the State, it goes to each and every element required to make up the offense and a juror must grant the presumption of innocence to any defendant on trial. Now, can you do that?

[BISHOP]:     I believe so.

[THE COURT]:     All right. Now, the reason I asked you that you had indicated you might not have known that standard, but you say you believe so. Is there any question about it? If there is, just --

[BISHOP]:     I don't--I don't think that I would have a problem doing that. Like I said I've not heard any information from a reputable source to tell me the details about exactly what happened or exactly what went on and I heard this from a co-worker and I've not heard it from the news . . . . As far as believing they're innocent until proven guilty, I believe I can--I could say that.

[THE COURT]:     Could you tell me you would require the State to do that? To prove the guilt beyond a reasonable doubt.

[BISHOP]:     Right.

[THE COURT]:     If they failed to do so, would you acquit the defendants?

[BISHOP]:     Yes.

Immediately thereafter, the attorneys for both sides argued that Bishop should be excused "for cause," based upon her admission that she had a "suspicion of guilt" which must be "overcome

by evidence." In denying the attorneys' request, the trial judge inferred that Bishop's equivocal answers on the issue of suspicion were a result of the way the attorneys' questions were phrased. He then made the following comment:

> Now, the question that you feel any suspicion, well, I'm sure, probably, I--I think any damn fool sitting on a jury is going to feel some suspicion. The fact that somebody's charged. But the point is how is this going to hurt them, in their deliberations, or them to function or do their duty.

Following a review of the record, it appears to this Court that Bishop was clearly reluctant to form an opinion without sufficient information and that the equivocal nature of Bishop's responses to questions regarding her own "suspicions of guilt" may have been begged by the questions put to her. Questions designed or framed to elicit answers which suggest impartiality are disapproved of by the Advisory Commission. See Tenn. R. Crim. P. 24, Advisory Commission Comments. In any event, the critical issue is not whether or not a prospective juror harbors a scintilla of suspicion, but "whether the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852, 83 L. Ed. 2d 841 (1985) (this standard does not require that a juror's bias be proved with "unmistakable clarity"). The record indicates that after the issue of "suspicion" was raised, the trial judge informed Bishop of the legal standards involved and the presumption of innocence due a defendant. The trial judge then questioned Bishop further and, thereafter, was satisfied that Bishop would be capable of fulfilling the role of an impartial juror in this case. The trial court's determinations concerning the fitness and credibility of a potential juror are accorded great deference. Id. at 426, 105 S.Ct. at 853 ("deference must be paid to the trial judge who sees and hears the jurors"); State v. Keen, 31 S.W.3d 196, 228 (Tenn. 2000) (because the trial court has the opportunity to observe the demeanor of prospective jurors and, thus, evaluate their credibility, its findings are accorded great deference and shall not be set aside unless clearly erroneous). We find no abuse of discretion by the trial court in this matter.

With regard to the Defendants' argument that the trial judge improperly limited the scope of their questions during voir dire, we cannot find any statement by the trial judge in the record which could be construed to affirmatively restrict or "limit the scope" of the attorneys' questions. Moreover, neither Defendant has cited any specific circumstance where the trial judge's "ruling" unduly circumscribed their ability to uncover bias. As for the ultimate goal of voir dire--to impanel jurors who are competent, unbiased, and impartial--we do not find it unsatisfied here.

In summary, we conclude that the trial court did not abuse its discretion in refusing to excuse either Hunter Jones or Misty Bishop for cause. "Jurors need not be totally ignorant of the facts of the case on which they sit, and may sit on a case even if they have formed an opinion on the merits of the case, if they are able to set aside that opinion and render a verdict based on the evidence presented in court." State v. Sammons, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982); see also Murphy v. Florida, 421 S. Ct. 794, 799-800, 95 S. Ct. 2031, 2035-36, 44 L. Ed. 2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961); Adams v. State,

563 S.W.2d 804, 807 (Tenn. 1978). The determination of impartiality is a matter within the discretion of the trial court, <u>Sammons</u>, 656 S.W.2d at 869, which may be overturned only in cases of "manifest error." <u>Patton v. Yount</u>, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889, 81 L. Ed. 2d 847 (1984). Since we are unpersuaded that neither Bishop nor Jones was incapable of delivering a fair and impartial verdict, we also find no reversible error. The Defendants are not entitled to relief on this issue.

## II. Amendment of the Presentment

The Defendants contend that the trial court erred by allowing a non-consensual amendment to count 1 of the presentment, charging both Defendants with especially aggravated kidnapping, because the amendment alleged a different offense than that in the original presentment. Specifically, the Defendants assert that the amendment changed certain essential elements of the offense and also removed defenses which were theretofore available to them. As a result, they argue that their substantial rights were affected, in direct contravention of Rule 7(b) of Tennessee's Rules of Criminal Procedure, and that the State's failure to seek grand jury review of the "material variance" created by said amendment also violated their constitutional rights. We disagree.

According to the record, count 1 of the original presentment charged both Defendants with committing the offense of especially aggravated kidnapping, Tenn. Code Ann. § 39-13-305, between November 16, 1989 and October 3, 1997. However, on the date that the offense allegedly commenced, November 16, 1989, the crime of especially aggravated kidnapping did not yet exist. Instead, the offense in issue would have been defined in the applicable statute as aggravated kidnapping, which provided as follows:

> A person is guilty of aggravated kidnapping who unlawfully removes or confines another:
> (1) To hold for ransom or reward, or as a shield or hostage;
> (2) To facilitate commission of any felony or flight thereafter;
> (3) To inflict serious bodily injury on or to terrorize the victim or another;
> (4) To interfere with the performance of any governmental function; or
> (5) While armed with a deadly weapon.

Tenn. Code Ann. § 39-13-301(a) (Supp. 1989). Subsection (b) of that statute designated aggravated kidnapping as a Class A felony. Effective April 30, 1990, the statute defining aggravated kidnapping was amended and the separate offense of especially aggravated kidnapping was created, which is currently defined as follows:

> Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 [i.e., the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty]:
> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon;

(2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement;

(3) Committed to hold the victim for ransom or reward, or as a shield or hostage; or

(4) Where the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-305(a) (1997). Subsection (b)(1) of this statute designates especially aggravated kidnapping as a Class A felony. Aggravated kidnapping is now a Class B felony. See Tenn. Code Ann. § 39-13-304(b)(1) (1997).

During a motions hearing on February 3, 2000, the trial court heard arguments from the Defendants and the State concerning the fact that the time of the offense alleged in count 1 overlapped two different statutes. The State proposed to eliminate the problem in the following manner: (1) amend the offense commencement date in the presentment from November 16, 1989, to April 30, 1990, which would move the entire course of conduct of the continuing offense into the purview of the current statute; (2) delete the language "to terrorize the victim," which did not exist in the current statute, (3) delete the reference to the victim's age at the time of the offense, an element under the current statute only, and (4) change the cite reference in the presentment to reflect the current statute code number: Tenn. Code Ann. § 39-13-305. At the conclusion of the hearing, the trial court permitted the State to amend count 1, over the objection of both Defendants. The trial court's order, filed February 7, 2000, stated its findings in this matter as follows: the statutory language in the presentment and the two statutes involved is concurrent, in that they all describe a Class A felony; the amendment did not enlarge the time frame of the offense; the amendment deleted one aggravating circumstance, i.e., the age of the victim, from the presentment; and the language in the original presentment clearly described the offense of especially aggravated kidnapping. Accordingly, the court found that "no substantial right of the defendants would be prejudiced" by the amendment, citing Tenn. R. Crim. P. 7(b).

Rule 7(b) of Tennessee's Rules of Criminal Procedure, entitled "Amendments of Indictments, Presentments and Informations," provides the following:

An indictment, presentment or information may be amended in all cases with the consent of the defendant. If no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the defendant's consent before jeopardy attaches.

The amendment of count 1 in this case did not effectively charge the Defendants with an additional or different offense than that in the original presentment. The deletion of the phrase concerning "terrorization" of the victim had no substantive effect on the charge. As shown above, the former statute contained the language "[t]o inflict serious bodily injury on or to terrorize the victim or another." Tenn. Code Ann. § 39-13-301 (Supp. 1989). Clearly, this element may be proven by terrorization of the victim *or* serious bodily injury, because the two possible circumstances are connected by the disjunctive term "or." Serious bodily injury is an element of both the former

and the latter statutes. Hence, deletion of the phrase concerning terrorization is of no consequence in this particular case, since serious bodily injury was also alleged in the original presentment.

The Defendants also argue that changing the date of the commencement of the offense in count 1 from November 16, 1989 to April 30, 1990 removed certain defenses which would have been available to them under the former statute. However, their argument is based on an assertion that they can prove they did not terrorize the victim, and we have concluded that whether they can prove this or not is immaterial, for the reasons given above.

The Defendants also contend that the State's deletion of the reference to the victim's age at the time of the offense prejudiced their case by making unavailable a previously viable defense. They assert that the confinement of Esther was not unlawful due to their status as "foster parents" while she was under the age of thirteen. In this argument, Defendants rely on the statutory definition of "unlawful," which states the following:

> "Unlawful" means, with respect to removal or confinement, one which is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare.

Tenn. Code Ann. § 39-13-301(1997) (this definition is identical in all material aspects to the definition contained in the former statute. See Tenn. Code Ann. § 39-13-301(b) (1989)). Apparently, the Defendants believe that the removal or confinement of Esther was, arguably, not "unlawful" because it was clearly accomplished with their consent, as "other person[s] responsible for the general supervision of [her] welfare." Id. Once again, we note the presence of the disjunctive term "or." A plain reading of the statute reveals that removal or confinement by force, threat or fraud remains unlawful, even if accomplished with the consent of a parent, guardian or other person entrusted with the minor's care. Moreover, we further note that Esther turned thirteen years of age on November 16, 1990. Amending the presentment to read April 30, 1990, rather than November 16, 1989, merely reduces the victim's alleged period of confinement while under the age of thirteen from one year to approximately six and one-half months, a reduction of five months and two weeks. Any "defense" arguably available under the old statute would remain not only viable but necessary under the amended presentment, since the presentment as amended only *reduced* the period of time Esther was confined while under thirteen years of age--it did not eliminate it. Nor did it change the fact that, after Esther turned thirteen, the alleged confinement continued for more than six years and ten months. See State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999) ("an act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime at every moment the victim's liberty is taken"). In any event, reducing the period of time in the presentment for the continuing offense of especially aggravated kidnapping did not charge any additional or different offense. Moreover, no substantial rights of either Defendant were prejudiced. Thus, Rule 7(b) permits the court to allow an amendment without a defendant's consent before jeopardy

attaches. Since jeopardy had not attached at the time of the amendment in this case, we find no error. See Tenn. R. Crim. P. 7(b).

We are also unpersuaded that the State's failure to seek grand jury review prior to its amendment of the presentment violated the Defendants' constitutional rights. Specifically, the Defendants argue that the amendment infringed upon their right to be indicted by a grand jury under Article I, section 14 of the Tennessee Constitution, because the crime for which they were convicted in count 1 constitutes a "material variance" from the offense charged in the presentment. For the reasons stated above, we have already determined that changing the commencement date of the offense, along with deleting the reference to the age of the victim and the language involving terrorization, did not charge an additional or different offense. Analogously, the amendment also did not constitute a material variance, and we find no constitutional violation. See State v. Kennedy, 10 S.W.3d 280, 284 (Tenn. Crim. App. 1999) (where the date on an indictment was immaterial, and the indictment as amended did not charge the defendant with a new or additional crime, Article I, section 14 concerns are not implicated).

Under both the United States and Tennessee Constitutions, an indictment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; see Tenn. Const. art. I, § 9. In Tennessee, its form must also satisfy the requirements of Tennessee Code Annotated section 40-13-202, which provides that an indictment

> [M]ust state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

The indictment satisfies the constitutional guarantees of notice to the accused "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court an adequate basis for entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citations omitted).

In summation, we believe that the allegations in the unamended presentment were quite sufficient to advise the Defendants of the offense for which they had to defend and for which they were ultimately convicted. The amendment did not mislead either Defendant as to the charge in count 1; nor did it destroy any potential defenses. The Defendants are not entitled to relief on this issue.

### III. Bill of Particulars

The Defendants contend that the State failed to properly comply with their requests for a bill of particulars regarding the charge of especially aggravated kidnapping. Specifically, the Defendants argue that the State failed to allege in the presentment what specific acts caused the confinement, when the acts occurred, what specific injuries constituted "serious bodily injury," and what weapon

was used to inflict such injury. Accordingly, they assert that the trial court's denial of their request for a bill of particulars was error because this information was necessary to diligently prepare a defense, avoid prejudicial surprise at trial, and preserve a plea of double jeopardy. In response, the State contends that it gave the Defendants all of the information in its possession concerning the above circumstances, in accordance with Rules 3(c) and 16 of Tennessee's Rules of Criminal Procedure, and, therefore, no error exists. We agree with the State.

The record reflects that the Defendants filed separate motions for a bill of particulars on February 22, 1999, both requesting various facts and information regarding all of the counts against each Defendant. On March 24, 1999, the State filed an answer stating that each offense in the presentment occurred at the facilities at Emmanuel Baptist Church, the time of day of each offense in the presentment was not known, and the dates of the offenses were contained in the presentment. With regard to Defendant Joseph Combs's request for "the manner and means that the State relies upon to show the guilt of the Defendant" and the names of "any witnesses to each specific count of the indictment," the State responded that this data is "beyond the scope and purpose of a bill of particulars."

At a subsequent hearing on May 10, 1999, the Defendants requested additional information concerning the nature of the injuries and which injuries were associated with what specific charges. Pursuant to an order of the trial court, the State filed a second response on July 7, 1999, which listed the type of injury inflicted, what part of the victim's body was involved, and the type of weapon used, with respect to the nineteen counts against the Defendants. With regard to count 1, the State provided the following information:

> The State alleges that over the entire period of time that Esther Combs was in custody of the defendants until she left their custody on or about October 3, 1997, she was subjected to beatings, cuttings, and burnings over almost her entire body, and said injuries were caused by various items used as weapons, to-wit, but not limited to: rope, ball bats, curling irons, woodburners, brooms and/or sticks, pieces of tin, metal whip device obtained from an umbrella, wood shoe, pliers, electrical cords, water hose, and other similar items.

In another motions hearing on January 28, 2000, the trial court ordered the State to make available any "descriptive information" that existed which would tend to narrow the time frame of the presentment where exact dates could not be provided. On February 2, 2000, the State supplemented its prior bill of particulars with data concerning "how the dates of offenses were determined" for all nineteen counts. Concerning count 1, the State provided the following information: "November 16, 1989 is the approximate time the Combs family moved into Emmanuel Baptist Church in Bristol and October 3, 1997 is the date Joseph Combs allegedly secreted Esther Combs to keep her from appearing in Court to have a conservator appointed for her."

Rule 7(c) of Tennessee's Rules of Criminal Procedure provides that "[u]pon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the

offense charged." The purposes of a bill of particulars are threefold: (1) to provide the defendant with information about the details of the charge if this is necessary to the preparation of the defense, (2) to avoid prejudicial surprise at trial, and (3) to enable the defendant to preserve a claim of double jeopardy. State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). The Advisory Commission Comments to Rule 7(c) clearly state that the bill of particulars provision has a "singular purpose": to enable the defendant to know precisely what he or she is charged with. It is not meant to be used for purposes of broad discovery. See State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994). "The test in passing on a motion for a bill of particulars is whether it is necessary that the defendant have the information sought in order to prepare his defense and to avoid prejudicial surprise." Id.

The trial judge in this case ordered the State to supplement the presentment with additional information concerning the charges against the Defendants. As a result, the Defendants were provided with facts concerning the place the crimes were committed, the injuries sustained by the victim, the weapons used, and the times the crime were committed. With regard to count 1 (the charge of especially aggravated kidnapping), we find that the Defendants had sufficient information to prepare their defense for this crime and also avoid prejudicial surprise at trial. The trial court stated that the rules of discovery required the State to be as specific as possible and informed the Defendants that, if evidence subsequently presented at trial indicated "overreaching by the District Attorney," the court would consider suppressing the evidence at that time. This situation did not arise. Moreover, neither Defendant points to any specific evidence withheld by the State which unduly surprised them at trial, and neither Defendant has provided this Court with any example of how or why their defense was prejudiced by a lack of details concerning any of the crimes charged.

The Defendants argue that the State not only failed to properly allege which specific acts or injuries initiated the unlawful confinement or caused serious bodily injury to the victim, but it also failed to prove these allegations at trial. With regard to whether these specific facts must be alleged in an indictment or presentment, we note that we have already determined, supra, that the presentment for this offense was sufficient under the principles set forth in State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Moreover, because our supreme court has held that kidnapping offenses are continuing offenses, State v. Legg, 9 S.W.3d 111, 118 (Tenn. 1999), a conviction of kidnapping does not require that the defendant actually took part in the initial removal or confinement. State v. Anthony Perry, No. W1999-01370-CCA-R3-CD, 2001 WL 792627 at *7 n.2, Shelby County (Tenn. Crim. App., Jackson, July 13, 2001), no perm. to app. filed. Thus, it is not necessary to allege or prove that either Defendant committed a specific act which constituted the commencement of the crime. As for whether the evidence was sufficient to sustain the convictions for the offense of especially aggravated kidnapping, we discuss this issue in greater detail later in this opinion. For now, we merely observe that a conviction for especially aggravated kidnapping in this case requires that the State prove false imprisonment "[w]here the victim suffer serious bodily injury." See Tenn. Code Ann. §§ 39-13-305(a)(1)(4), -302 (1997); see also State v. Adams, 24 S.W.3d 289, 291 (Tenn. 2000) (where the conviction was for a continuing offense (aggravated child abuse through neglect), the jury need not unanimously agree as to the particular serious bodily injury it used to support the conviction). The plain language of the statute indicates that the State is not required to prove the Defendants actually inflicted serious bodily injury, only that the victim suffered such injury during

the unlawful confinement. <u>See</u> <u>State v. Paul Lee Whited</u>, No. M1998-00478-CCA-R3-CD, 1999 WL 1209786 at \*\*8, Smith County, (Tenn. Crim. App., Nashville, Dec. 17, 1999), <u>no perm. to app. filed</u> (where the state presented "no proof that [the victim] sustained serious bodily injury *during* an unlawful *confinement* . . . the evidence was insufficient to support the conviction for especially aggravated kidnapping" (emphasis in original)).

Finally, the Defendants also contend that a bill of particulars was necessary because the presentment failed to inform them of the degree of responsibility against which they must defend, i.e., whether they were charged as principal actors or as aiders/abettors. This argument has no merit. The presentments in this case clearly stated that each Defendant was "a party to the offense." Even if this language could be considered vague or misleading, we note that neither Defendant complained of confusion or that clarification was necessary in order to prepare their defense prior to trial. <u>See</u> Tenn. R. Crim. P. 12(b)(2) & (f).

In summation, we conclude that the presentment in this case, along with the supplemental information contained in the two bills of particulars provided by the State, supplied the Defendants with sufficient information about the details of the charge of especially aggravated kidnapping to enable them to adequately prepare their defense, avoid prejudicial surprise at trial, and preserve a claim of double jeopardy. Accordingly, the Defendants are not entitled to relief on this issue.

## IV. Evidence of Prior Bad Acts

The Defendants also jointly argue that the trial court erred by allowing evidence of prior bad acts and other criminal activity allegedly committed by the Defendants to be admitted as evidence at trial. The Defendants contend that this evidence was not relevant and, further, that any probative value was outweighed by the danger of unfair prejudice.

The State acknowledges that a significant portion of the proof in issue here was "outside the scope of the indictment[s]." However, the State submits that the evidence of the Defendants' prior conduct was properly admitted to show the Defendants' "guilty knowledge" and to "tell the complete story." The State asserts that both are proper foundations for allowing evidence of prior bad acts under Rule 404(b) of Tennessee's Rules of Evidence. The State points out that the evidence was admitted only after an exhaustive two-day hearing, during which the trial court heard arguments by both parties and conscientiously reviewed the entire body of evidence in question prior to its presentation to the jury.

In the case <u>sub judice</u>, the Defendants specifically object to the trial court's admission of the following evidence: photographs of scars on Esther's body; photographs of the Combs' home in Indiana; the victim's testimony concerning various injuries inflicted by the Defendants, both prior to and within the time frame stated in the presentment; and the testimonies of Gayland Oaks, Malinda Oaks, Kelly Rose Wood, and Dr. Gretel Harlan.

The record reflects that photographs of the many scars on Esther's body were introduced as evidence during the testimony of Detective McCauley. The Defendants objected on the ground that most of the scars depicted were not associated with specific counts in the presentment. In a jury-out discussion, the trial court noted that EMT personnel, nurses at the hospital, and Dr. Steifel had previously testified that they had observed myriad scars on Esther's body, and witnesses had also testified as to the Defendants' explanations for the scars, to wit: Esther "fell a lot," she was "clumsy," et cetera. The trial court ultimately overruled the Defendants' objection, concluding that the photographs were admissible to show the Defendants' knowledge of Esther's injuries and/or a continuing course of conduct.

During another jury-out hearing, the Defendants also argued that eight photographs of the Combs' residence in Indiana (Exhibits 179 through 186), taken years after the family had moved, were not relevant and, thus, inadmissible as evidence at trial. The State responded that the photographs were relevant because (1) some of the photographs depicted areas where Esther's injuries occurred and (2) the kidnapping, a continuing offense, commenced in Indiana, even though the date of the presentment reflects only the period of time that the crime took place in Tennessee. Following argument, the trial court declared the photographs admissible to show the "complete story," which is helpful when "prior crimes and the present alleged crimes are logically related or connected or part of the same transaction . . . or necessary for a complete account thereof." The court remarked that a "Rule 404(b) hearing" was not necessary because the photographs showed only the residence in Indiana and did not reveal any criminal acts.

During the testimony of the victim, Esther Combs, the Defendants objected when the prosecutor asked what sort of punishment Esther usually suffered when she failed to complete her chores. At this time, the jury was excused and a Rule 404(b) hearing commenced during which Esther Combs gave a detailed account of the injuries and abuse she experienced while the Combs lived in Indiana, Florida, the trailer, and Tennessee. The hearing spanned nearly two days. When Esther completed her testimony regarding Indiana, the trial court evaluated each alleged incident and decided that not all of them had been proved by clear and convincing evidence. For those that successfully met this burden, the trial court found Esther's testimony concerning them admissible under two theories: (1) to prove absence of mistake or accident, under the "guilty knowledge" exception to Rule 404(b), and (2) to provide the "complete story" regarding confinement, an essential element of the continuing offense of kidnapping. The trial court further concluded that the prejudicial effect of the evidence it deemed admissible was outweighed by the probative value. At the conclusion of Esther's testimony regarding incidents which occurred in Florida, the trailer, and Tennessee, the trial court made determinations similar to those made for the evidence concerning Indiana, evaluating each episode to determine (1) whether a material issue was involved and the evidence was relevant, (2) whether the probative value of such evidence outweighed the prejudicial effect, and (3) whether each act was established by clear and convincing evidence. The trial court deemed a significant amount of Esther's testimony inadmissible, for various reasons, which were stated in the record.

Defendants also objected to the testimony of Gayland Oaks (concerning events that occurred in Florida) on the ground that the evidence was not relevant and also not admissible under Rule 404(b). Following a jury-out hearing to review the proposed testimony, the trial court concluded that some of the evidence was admissible, i.e., it was material and relevant, and the probative value outweighed any prejudicial effect. Specifically, the court found Oaks' testimony concerning Esther's treatment as a "servant," the methods by which she was "sequestered" (or "kept away from the world"), her "clumsiness" or lack thereof, Joseph Combs' statements about spanking, and Esther's physical appearance, was admissible to show confinement and a continuing course of conduct. The court also found some of the testimony inadmissible, based on the possibility of unfair prejudice.

The Defendants additionally requested a jury-out hearing to review the testimony of Malinda Oaks prior to its introduction at trial. The Defendants stated that their request was based "on the same line of objections as [they] had previously [with respect to Gayland Oaks]." Following the hearing, the trial court ruled that Malinda's testimony would be admissible if limited to the following general areas: babysitting the Combs children, Esther's appearance and injuries, and her desire to teach Esther to write. The trial court found her testimony relating to certain other matters potentially prejudicial and, thus, inadmissible. Thereafter, Malinda testified within the parameters set forth by the trial judge, with one objection by defense counsel for hearsay testimony.

During the testimony of Kelly Rose Wood, the Defendants objected. The jury was subsequently excused, and the trial court reviewed Woods' testimony to determine its potential prejudicial effect under the balancing test in Rule 403 of Tennessee's Rules of Evidence. At the conclusion of the hearing, the trial judge prohibited certain testimony, but found the testimony concerning her babysitting experiences, her observations of Esther's injuries, and other related matters were admissible. When the jury returned, Wood testified as instructed and no objections were heard from any parties during the examinations which ensued.

Later, when Dr. Gretel Harlan testified concerning her examination of Esther and the four diagrams she produced (showing the location of the 410 discrete scars on Esther's body), the Defendants objected again. In the presence of the jury, but not within its hearing, the Defendants specifically argued that the proof concerning most of the scars was not relevant because the underlying injuries had not been associated with any specific charge against either Defendant. The trial court overruled the objection, finding the testimony relevant based on the State's theory that the confinement of Esther was a continuing offense.

## A. Admissibility Under Rule 404(b)

Resolution of this issue is controlled, in part, by Rule 404(b) of Tennessee's Rules of Evidence, which provides:

> Other Crimes, Wrongs, or Acts.--Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

In State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), the supreme court strongly endorsed the above protective procedures to avoid prejudicing the rights of the accused and to maintain the focus of the trial. Id. at 806. It is well-settled that evidence of a defendant's prior misconduct is inadmissible to establish the accused's bad character or criminal propensity and should usually be excluded. State v. Mallard, 40 S.W.3d 473, 480 (Tenn. 2000); see Tenn. R. Evid. 404(b). However, in the exceptional case where evidence of other crimes, wrongs, or acts is relevant to an issue other than the accused's character, it is admissible if certain criteria are met and the trial court adheres to the procedures set forth in Rule 404(b). Issues to which evidence of other crimes, wrongs or bad acts may be relevant typically include identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. State v. Hall, 958 S.W.2d 679, 707 (Tenn. 1997).

First, upon the request of either party, Rule 404(b) requires the trial court to hold a hearing outside the jury's presence to determine whether "a material issue exists other than conduct conforming with a character trait." Tenn. R. Evid. 404(b)(1), (2). This satisfies the relevancy requirement. If this test is satisfied, the trial judge should state on the record the issue, the ruling, and the reason for ruling the evidence admissible. Id. at 404(b)(2). Second, subsection (3) states that the trial court must determine whether the probative value of the evidence outweighs the danger of unfair prejudice to the defendant. This test is more restrictive that the balancing test established for relevancy in Rule 403. See id. at 403 (requiring that the danger of unfair prejudice *substantially* outweigh the probative value). Third, the trial court must find by clear and convincing evidence that the defendant committed the specific act offered under Rule 404(b). Id. at 404(b), Advisory Commission Comments; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985) (citing Wrather v. State, 169 S.W.2d 854 (1943)).

Before we begin our analysis of the issues presented here, we observe that the admissibility of evidence is a matter within the discretion of the trial court and will be overturned only when there is an abuse of that discretion. Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn.1993) (citations omitted); State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992). However, decisions of the trial court regarding admissibility of Rule 404(b) evidence shall be afforded no deference on appeal unless the trial court has substantially complied with the strict procedural requirements of that rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997) (the standard for

review is abuse of discretion where admissibility procedures concerning the proffered evidence comply with Rule 404(b); where the trial court did not fully comply with the requisite procedures, the reviewing court must independently determine admissibility, based upon the record and evidence presented at the jury-out hearing). Because the term "discretion" essentially "denotes the absence of a hard and fast rule," a trial court's decision to admit evidence will be reversed on appeal "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000) (citations omitted).

In the case sub judice, the trial court did not conduct Rule 404(b) hearings to determine admissibility for all of the evidence presented in this argument. Our review reveals that a 404(b) hearing would not have been proper in every case. Nor did the Defendants request one. In fact, the record reflects that a 404(b) analysis was requested and/or conducted only to review the testimonies of Esther, Gayland Oaks, and Malinda Oaks. Thus, our review under the Rule 404(b) guidelines for admissibility of other crimes, wrongs, and acts is limited to this proof.

First, we conclude that Esther's testimony concerning the abuse and injuries she suffered while the Combs lived in Indiana, Florida, the trailer, and Tennessee, was not inadmissible under Rule 404(b). The Defendants argue, and the State concedes, that the testimony in issue relates to acts which either occurred prior to the time frames alleged in the presentment and/or were not associated with any specific criminal charge. However, the record reflects that the trial court "substantially complied" with the procedural requirements for admitting evidence of other crimes, wrongs, or acts under Tennessee Rule of Evidence 404(b). That is, the trial court conducted a 404(b) hearing, outside the presence of the jury, to consider whether this evidence violated Rule 404's general proscription against character evidence. The proceeding continued for nearly two days. During this time, the trial court evaluated each incident described by the victim to determine whether a material issue existed other than conduct conforming with a character trait and whether the evidence was relevant to the issue. The court also reviewed the evidence to determine whether the probative value was outweighed by the danger of unfair prejudice, and whether it was established by clear and convincing evidence. The issues, rulings, and reasons for admitting the evidence were then placed on the record.

Significantly, the trial court excluded a substantial portion of Esther's testimony on various grounds, which included findings that the acts allegedly committed by the Defendants were not proved by clear and convincing evidence and/or the probative value was outweighed by the danger of unfair prejudice. The testimony ultimately admitted at trial was deemed relevant as follows: with regard to the especially aggravated kidnapping charge against both Defendants, Esther's testimony was deemed admissible to provide the "complete story" concerning confinement, an essential element of the continuing offense of kidnapping. As to the child abuse charges against Evangeline Combs and the assault charges against both Defendants, her testimony was considered relevant to show absence of mistake or accident, under the "guilty knowledge" exception to Rule 404(b). The record further reveals that the trial court gave explicit and extensive instructions to the jury as to how it should consider the evidence, e.g., to which Defendant and to which charges the jury should

allocate the information received. Because the trial court was diligent in its strict adherence to the requirements provided for this evidence, its decisions concerning the admissibility of the Rule 404(b) evidence shall be reviewed under an abuse of discretion standard. See DuBose, 953 S.W.2d at 652.

The trial court found Esther's testimony admissible on the ground that it provided background evidence; it was helpful to convey the "complete story" of Esther's confinement, an essential element in the charge of especially aggravated kidnapping. Evidence offered to show contextual background may be admissible, even if it involves evidence of a defendant's prior acts, in cases where the evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice. Gilliland, 22 S.W.3d at 271. The standard by which a court determines relevance is set forth in Rule 401 of Tennessee's Rules of Evidence (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable then it would be without the evidence"). Although this threshold for admitting evidence is "relatively lenient," background evidence used to show the context of events may not always pass even this low threshold of admission because it is rarely probative of an actual material issue at trial. Id. While the standard under which background evidence involving other crimes, wrongs, or acts will be admissible should be "narrowly drawn to avoid the negative implications associated with criminal propensity evidence, the standard should not be so narrow as to sacrifice the jury's understanding of the necessary context of the case." Id. at 272. Accordingly, our supreme court has held that, in cases where the state seeks to offer evidence of other crimes, wrongs, or acts that are relevant only to provide a contextual background, the state must first establish that (1) the absence of the evidence would create a chronological or conceptual void in its presentation of its case; (2) the void created by the lack of such evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice. Id.

The criteria for admitting contextual background evidence were satisfied in this case. Clearly, the beatings and abuse inflicted upon Esther over the course of her life could be considered probative of the Defendants' attempt to confine and maintain control over her. Without knowledge of her life's experiences and the abuse which began with her earliest memories, the jury may have had difficulty understanding the reasons for her submissiveness and reluctance to escape when opportunities to do so presented themselves. Whether the years of physical and psychological torture endured by Esther enabled the Defendants to accomplish the crime of false imprisonment was a matter for the jury to decide. Without this evidence, a conceptual void might be created which could likely result in jury confusion as to the material issues or evidence presented by the State. The probative value of this evidence is considerable, and we find that it is not outweighed by the danger of unfair prejudice to the Defendants.

Admissibility of the contextual background evidence in this case is supported by the fact that kidnapping statutes are designed to punish a continuing course of conduct. State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999). Thus, by definition, conduct which proves this offense cannot be strictly limited, as a matter of law, but must be determined in accordance with the circumstances presented

in each case. Here, the false imprisonment element of the kidnapping charge did not commence with a single event, as would occur with a victim who was snatched from a car or taken hostage during a crime. Rather, it was established by proof that the victim suffered years of physical and psychological torture, which makes relevant the proof of other acts committed by the Defendants to accomplish the confinement.

As previously noted, evidence of other crimes may be admissible to show identity, motive, common scheme or plan, intent, guilty knowledge or the absence of accident or mistake. State v. Hall, 958 S.W.2d 679, 707 (Tenn. 1997); Collard v. State, 526 S.W.2d 112, 114 (Tenn.1975). On the question of intent, proof concerning the relations which existed between a defendant and the victim of a crime of violence may present relevant matters for the jury's consideration. See State v. Turnbill, 640 S.W.2d 40, 47 (Tenn. Crim. App. 1982); State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981). Here, evidence of the Defendants' continued hostility and abusive behavior toward Esther is relevant to demonstrate their intent to confine or imprison her. In addition, this proof demonstrates the Defendants' guilty knowledge that their actions caused serious bodily injury, and rebuts any notion that the systematic, long-term abuse of the victim was an accident or mistake.

The Defendants argue that the presentation of rebuttal evidence to show "guilty knowledge" was not proper because neither Defendant had claimed that Esther's injuries were an accident. However, Defendant Joseph Combs claimed that he never harmed Esther and had no knowledge of her scars, and Evangeline Combs was charged with multiple counts of aggravated child abuse. A person commits the offense of aggravated child abuse who "knowingly, *other than by accidental means*, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . ." and "[t]he act of abuse results in serious bodily injury to the child." Tenn. Code Ann. §§ 39-15-401, 402 (1997) (emphasis added). Consequently, proof that the Defendants injured Esther knowingly, which clearly infers *non-accidental* conduct, was necessary and proper to both rebut the testimony of Joseph Combs and assist in proving the offense of aggravated child abuse.

Our review of the testimonies of Gayland and Malinda Oaks reveals that this proof is also admissible to show confinement and a continuing course of conduct on grounds similar to those discussed above. Therefore, we find no abuse of discretion or error with regard to the trial court's decisions to admit the evidence of other crimes, wrongs, or acts in this case.

## B. Admissibility Under Rules 401 and 403

The Defendants also contend that the trial court erred by admitting two sets of photographs as evidence at trial. The photographs in issue do not specifically concern prior bad acts, wrongs or criminal activity by either Defendant, and, in the case of Esther's scars, the photographs do not show the identity of the person who *caused* her injuries. Thus, this evidence was not inadmissible under Rule 404(b) as reflecting upon the character of the Defendants, and no 404(b) hearings were conducted prior to admitting this proof. See DuBose, 953 S.W.2d at 653 (where medical examiner's testimony did not show identity of the person who caused the victim's abdominal injuries, it was not

prohibited by Rule 404(b) as reflecting upon the defendant's character). Rather, admissibility of this evidence is dependent upon the principles set forth in our rules of evidence regarding relevance. See Tenn. R. Evid. 401- 403.

Rule 401 of Tennessee's Rules of Evidence defines relevant evidence to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states that relevant evidence is admissible, except as provided by our State and Federal Constitutions, and, conversely, irrelevant evidence, ipso facto, is not admissible. Tenn. R. Evid. 402. Rule 403 requires exclusion of evidence, even when relevant, if the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. at 403.

With these principles in mind, we find the photographs of the scars on Esther's body were clearly admissible. Given that the Defendants were charged with various counts involving physical abuse and/or serious bodily injury, the condition of Esther's body is inordinately relevant. The photographs are further relevant to demonstrate the Defendants' "guilty knowledge" of Esther's injuries, effectively rebutting any claim of accident or mistake, and they showed the Defendants' intent to control and/or confine Esther through physical and, to a lesser extent, psychological torture. In addition, the sheer magnitude of Esther's injuries, disclosed by proof of more than 400 separate scars, indicated a continuing course of abusive conduct. We also find that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other negative considerations which would require the trial court to exclude it under the principles set forth in Rule 403 of Tennessee's Rules of Evidence.

The Defendants argue that the issue concerning this evidence is analogous to that presented in State v. Copenny, 888 S.W.2d 450 (Tenn. Crim. App. 1993), where proof of several prior scars on the victim's body was properly excluded under Rule 403 because the probative value was outweighed by the potential for unfair prejudice, confusion of the issues, and misleading the jury. However, in Copenny, the defendant claimed to have shot the victim in self-defense, and he sought to use proof of the victim's prior scars to demonstrate the victim's propensity for violence. Since we find no correlation between the circumstances and issues presented here and those in Copenny, the Defendants' reliance on this case is misplaced.

Turning to the eight photographs of the Combs' Indiana home, we find one photograph showed a view of the entire front of the house; five revealed different angles of an interior staircase; and the remaining two showed a small area inside of the house and a window, with a few chairs nearby. The photographs, taken sometime in 1999, showed the Combs' residence approximately thirteen years after they had lived there. The State argued that the photographs were relevant (1) to portray an area where Esther's injuries occurred and (2) because the kidnapping commenced while the family lived there. The trial court decided that the photographs would help the jury comprehend the "complete story." Esther testified at trial that she was injured on the stairway in the photographs. Therefore, we agree that the five photographs of the staircase were relevant to show where one

particular injury occurred. As for the others, we fail to see how the photographs of the exterior of the house and the area in front of a window possess any relevancy, namely, any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it otherwise would have been. See Tenn. R. Evid. 401. For the same reasons we find no evidentiary relevance, we also find the danger of unfair prejudice caused by the admission of these three photographs into evidence to be nil. Thus, the admission of this evidence, while error, was nevertheless harmless because it could not have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b).

The admissibility of the testimonies of Kelly Rose Wood and Dr. Gretel Harlan are likewise dependent on their relevance under Rules 401 through 403. As for Wood's testimony, the record reveals that a jury-out hearing was conducted beforehand. During the proceeding, the trial court found certain testimony inadmissible under Rule 404, on the ground that it suggested a crime had been committed by one or both Defendants but it had not been established by clear and convincing evidence. By contrast, the court found relevant and admissible the testimony concerning Wood's babysitting experiences in Florida, her observations concerning Esther's injuries, Esther's lack of clumsiness and the fact that the Defendants treated Esther differently than the other children. In our opinion, Wood's testimony is relevant, under Rule 401, to show a continuing course of conduct and corroborate Esther's testimony, and we find the probative value is not outweighed by the danger of unfair prejudice, confusion of the issues, or any of the other negative considerations listed in Rule 403 which would mandate exclusion. Regarding the testimony of Dr. Gretel Harlan, we agree with the trial court that it was relevant to show a continuing offense. Dr. Harlan's testimony concerning the extent of Esther's injuries was also relevant to show serious bodily injury, and we find that the probative value of her testimony substantially outweighed the danger of unfair prejudice.

With the exception of the three photographs which we deemed were admitted erroneously, albeit harmless, we conclude that the evidence was admissible under the rules of evidence discussed. The Defendants are not entitled to relief on this issue.

### V. Sufficiency of the Evidence

Both Defendants contend that the evidence was insufficient to sustain their convictions for especially aggravated kidnapping. Defendant Joseph Combs further contends that the evidence was insufficient to sustain his convictions for aggravated rape, rape, and aggravated perjury. We disagree.

When evidentiary sufficiency is questioned on appeal, the standard of review is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); see Tenn. R. App. P. 13(e). "This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence."

State v. Lewis, 36 S.W.3d 88, 93 (Tenn. Crim. App. 2000) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Instead, on appeal the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. Hall, 8 S.W.3d at 599. A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory, effectively removing the presumption of innocence and replacing it with a presumption of guilt. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters to be resolved by the trier of fact, not this Court. Id. The defendant bears the burden of demonstrating that the evidence is insufficient to support his or her conviction. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Especially Aggravated Kidnapping

To obtain a conviction for especially aggravated kidnapping, as relevant here, the State must prove: (1) the defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty; and (2) the victim suffered serious bodily injury. See Tenn. Code Ann. §§ 39-13-305(a)(4), 39-13-302(a) (1997). "Serious bodily injury" means bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See id. § 39-11-106(a)(34). With respect to removal or confinement, "unlawful" means "one which is accomplished by force, threat, or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare." Id. § 39-13-301(2).

The Defendants argue that the convictions cannot stand because the State failed to prove that the Defendants "confined" Esther or that any confinement was "unlawful." According to the Defendants, the presentment alleged that they "continuously" confined Esther from April 30, 1990 through October 3, 1997. The Defendants point out that Esther ran away twice, but returned home of her own volition the second time, and that she also asked to return home after her stay in the hospital. The Defendants contend that, because these events "broke the continuity of any alleged unlawful confinement," an essential element of the kidnapping charge remains unproven.

In support of this argument, Defendants cite State v. Paul Lee Whited, No. M1998-00478-CCA-R3-CD, 1999 WL 1209786, Smith County, (Tenn. Crim. App., Nashville, Dec. 17, 1999) no perm to app. filed. In Whited, the proof showed that the defendant had unlawfully confined the victim by locking her in a closet on various occasions. The proof also revealed that the victim

suffered serious bodily injury, but it failed to show that the victim sustained the injuries *during* the confinement. Id. at **7. The State theorized (1) that the defendant unlawfully confined the victim for the entire six month period preceding her death by controlling her money, governing her food intake, and by cursing, beating, and humiliating her; and (2) that the victim sustained serious bodily injury during this time. A panel of this Court decided that, although the defendant's conduct toward the victim was cruel and despicable, the state had presented no proof that the defendant physically restrained the victim's freedom of movement for the entire six month period, or that the victim had felt "mentally restrained" by any force, threat, or fraud on the part of the defendant during that time. Id. at **8. Although the proof of serious bodily injury was undeniable (in fact, the victim died as a result of injuries inflicted by the defendant), this Court modified the conviction from especially aggravated kidnapping to false imprisonment. See id. at **9.

The circumstances in Whited are distinguishable from those presented in the case sub judice. As previously noted, the element of false imprisonment in Whited was proved by evidence that the defendant confined the victim by locking her in a closet. Here, the Defendants confined Esther by restraining her inside of a house for years, during which time she suffered serious bodily injury. In Whited, the victim was dead, and, thus, proof in the form of the victim's testimony could not be offered. In the case sub judice, the testimony of the victim gave the State an opportunity to prove confinement in a much broader sense than that presented in Whited, where the state showed only that the victim was locked in a closet on one or more occasions.

In addition, the victim in Whited left the defendant's home (where the victim resided) on numerous occasions. Sometimes the defendant was home when she left, and other times he was not. Sometimes, the victim would be alone in the house for an entire day. Here, the proof indicated that Esther had no similar freedom of movement. Esther testified that she was restricted to her room on more than one occasion. The punishment for disobedience took the form of beatings and other torture, and Evangeline Combs placed powder outside of her door to ascertain whether she had obeyed. Esther testified that she had never been allowed to visit other children or go anywhere or do anything without Evangeline, Joseph, or a sibling present. No visitors were permitted inside the Combs residence when they lived at EBC. Esther further claimed that both Defendants had repeatedly informed her over the course of her life that her "purpose" was to be a servant in the Combs family. On those occasions when she did not perform this function properly, she was punished severely. In addition to not being able to read or write well, Esther did not possess a driver's license, a Social Security number, or any other standard form of identification. She was told by both Defendants that they had adopted her, an intentional misrepresentation of the facts on their part. Esther had been treated this way as far back as she could remember. Esther's testimony as to these facts was corroborated by the testimony of numerous other witnesses at trial.

From the evidence, taken in the light most favorable to the state, a jury could have reasonably inferred that Esther was confined by force, threat or fraud on the part of the Defendants. See State v. Legg, 9 S.W.3d 111, 118 (Tenn. 1999) ("While the appellee argues that [the victim] had a number of opportunities to escape and was therefore not confined, this Court will not reweigh or reevaluate the evidence presented where the evidence is sufficient for conviction beyond a reasonable doubt.").

The evidence indicates that Esther was not only psychologically and physically beaten into submission, she was also prevented from obtaining even the most rudimentary tools for living independently in society. Moreover, we reject the Defendants' argument that no confinement was proved because she escaped on three occasions and voluntarily returned twice. The evidence suggests that she believed she had no choice in this matter: her third "escape" was the result of an attempt to commit suicide because she "couldn't take it anymore" and "wanted to die."

Defendants also argue that any confinement occurring prior to Esther's thirteenth birthday could not be "unlawful" because it was not accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's welfare, pursuant to the definition of "unlawful" provided in Tenn. Code Ann. § 39-13-301(2) (removal or confinement is unlawful when "accomplished by force, threat, or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare"). In their briefs, the Defendants assert that they gave themselves consent to confine Esther, and, after she became thirteen years of age, their status as foster parents conferred upon them the right to continue to do so "since it is by force of law that all parents, guardians or other persons responsible for the general supervision of a minor's welfare are possessed of the power to confine them." Defendants cite no legal support for this proposition, and we find the argument without merit. As the record shows, any "legal" guardianship claimed by the Defendants is a travesty. They misrepresented their status as Esther's adoptive parents from the beginning of her life with them, and to believe that they did anything but detrimentally affect her welfare would go against a considerable weight of evidence to the contrary.

Moreover, as we discussed <u>supra</u> (in our analysis of the issue concerning amendment of the presentment), the disjunctive term "or" in the definition indicates that removal or confinement by force, threat or fraud may be unlawful, even if accomplished with the consent of a parent, guardian or other person entrusted with the minor's care. Esther turned thirteen years of age on November 16, 1990, which means that the period of confinement (alleged in the presentment) while under the age of thirteen lasted approximately six and one-half months and, after she turned thirteen, it continued for more than six years. The Defendants also maintain that the State failed to prove that Esther's confinement was accomplished through the use or display of a deadly weapon. This argument is also without merit, because the convictions in issue here are not based upon proof of this element.

The proof also supports the jury's finding that the victim suffered serious bodily injury during her confinement. <u>See</u> Tenn. Code Ann. §§ 39-13-305(a)(4). "Serious bodily injury" is defined as bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. <u>See id.</u> § 39-11-106(a)(34). According to Esther's testimony, among other things, she has been choked with a rope until she lost consciousness; she was burned, whipped, beaten with a baseball bat, cut, and sewn together without anesthesia; and her elbow has been permanently damaged. This is sufficient to prove that her

injuries involved unconsciousness, extreme physical pain, protracted disfigurement, *and* substantial impairment of a bodily member. The Defendants argue that the State was required to elect which specific injuries caused the serious bodily injury in order to sustain a conviction. This is not true where the crime is viewed as a single, continuing course of conduct. See State v. Adams, 24 S.W.3d 289, 291 (Tenn. 2000) ("In cases where the nature of the charged offense is meant to punish a continuing course of conduct . . . election of offenses is not required because the offense is, by definition, a single offense."); Legg, 9 S.W.3d at 118 (the offense of aggravated kidnapping punishes a continuing course of conduct).

In summation, after considering all the evidence in the light most favorable to the State, we believe that any rational trier of fact could have found that all the essential elements of this offense were proved beyond a reasonable doubt. Thus, we hold that the evidence is sufficient to support the convictions of both Defendants for the offense of especially aggravated kidnapping.

### B. Aggravated Rape, Rape, and Aggravated Perjury

Defendant Joseph Combs contends that the evidence was also insufficient to sustain his convictions for aggravated rape, seven counts of rape, and aggravated perjury. Concerning the aggravated rape and rape convictions, he argues that the State failed to prove coercion, an essential element of these offenses.

Defendant's assertion that coercion is an essential element of these offenses is only partially correct. Proof of force or coercion to accomplish the unlawful sexual penetration of Esther is necessary to sustain his seven convictions for rape, Tenn. Code Ann. § 39-13-503(a)(1), but not the conviction for aggravated rape. In April 1989 (the date alleged in count 12 of the presentment for the offense of aggravated rape), the offense of aggravated rape was defined as "unlawful sexual penetration of another" when accompanied by any one of four enumerated circumstances, including where "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-2-603 (Supp. 1988) (the 1992 Tenn. Pub. Acts, ch. 878, created the current Class A felony offense of "rape of a child," Tenn. Code Ann. § 39-13-522). Appropriately, count 12 did not allege that force or coercion was used to accomplish the act.

By contrast, counts 13 through 19 alleged that Defendant "did unlawfully, feloniously, and by means of force or coercion sexually penetrate Esther A. Combs . . . ." As relevant here, "rape" is statutorily defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim," and "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1) (1991 & 1997). "'Coercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age." Tenn. Code Ann. § 39-13-501(1) (1997).

We find the proof sufficient to sustain the conviction for aggravated rape and the seven convictions for rape. As to the former, the proof clearly shows that Esther was under the age of

thirteen in April of 1989, and we believe that a rational jury could further find that Defendant sexually penetrated her on that date. The earliest of the seven counts of rape was committed on November 16, 1990 and the most recent was alleged to have occurred during the summer months of 1995. Regarding proof of force or coercion as to the rape counts, we find the evidence clearly sufficient for any rational jury to find that Defendant similarly sexually penetrated Esther on the dates alleged and that, given the substantial proof of the Defendant's abusive treatment of her in general, she was acting under the threat of force or coercion to comply with Defendant's demands.

Regarding the conviction for aggravated perjury, Defendant contends that it must be reversed because the State failed to prove "materiality," an essential element of the charge. Specifically, he claims that his false statements to the court during the conservatorship proceeding were "immaterial" because she had "already left the jurisdiction of the court."

A person commits the offense of aggravated perjury who, with intent to deceive: "(1) [c]ommits perjury as defined in § 39-16-702; (2) [t]he false statement is made during or in connection with an official proceeding; and (3) [t]he false statement is material." Tenn. Code Ann. § 39-16-703(a) (1997). Further, "*it is no defense that the person mistakenly believed the statement to be immaterial.*" Id. § 39-16-703(b) (emphasis added). Tennessee Code Annotated section 39-16-702 provides, in relevant part, that a person commits the offense of perjury who, "with intent to deceive, makes a false statement, under oath." Id. § 39-16-702(a).

The record reveals that Defendant made the untruthful statements concerning Esther's whereabouts during the conservatorship proceeding on October 3, 1997. Attorney David Tipton, Detective Debbie Richmond-McCauley, and Chancellor Richard Ladd all testified that Defendant had informed the court, under oath, that he had no knowledge of Esther's whereabouts and that he had not seen her in at least a couple of weeks. Clearly, this was a false statement, made during an official proceeding, which was intended to deceive the court. We further find sufficient evidence to support a jury's determination that his statements were material. The hearing was convened for the sole purpose of making decisions concerning Esther's future. Thus, it was imperative that she be present and her whereabouts were clearly of considerable import.

To summarize, after considering all the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found all the essential elements of the offenses discussed beyond a reasonable doubt. Therefore, the Defendants are not entitled to relief on this issue.

### VI. Instruction on Lesser-Included Offenses

The Defendants contend that the trial court erred by failing to instruct the jury on all appropriate lesser-included offenses of certain offenses charged, as required under State v. Burns, 6 S.W.3d 453 (Tenn. 1999), and State v. Dominy, 6 S.W.3d 472 (Tenn. 1999). The State responds that any lesser-included offenses upon which the trial court failed to instruct the jury either

constituted harmless error, under State v. Williams, 977 S.W.2d 101 (Tenn. 1998), or failed to satisfy the criteria requiring jury instruction set forth in Burns. With one exception, we agree with the State.

A trial court is required by statute to charge juries as to the law of each offense "included" in an indictment. See Tenn. Code Ann. § 40-18-110 (1997). Our supreme court has interpreted this provision to mean that "a trial court must instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense." State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) (quoting State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999) (add'l citations omitted)). Further, "[t]his mandate to charge lesser-included offenses applies whether or not a defendant requests such an instruction." Id.

In Burns, the supreme court also set forth the factors to consider in determining whether an offense is a lesser-included offense of another crime. Specifically, an offense is a lesser-included offense of another if

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included of lesser-included offense in part (a) or (b); or (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. at 466-467. The mere existence of a lesser offense to a charged offense is not sufficient in itself to warrant a charge, however. Id. at 467. The trial court is not required to instruct the jury on lesser offenses unless it has also determined that (1) evidence exists that reasonable minds could accept as to the lesser charge and (2) such evidence is legally sufficient to support a conviction. Id. at 466-67.

Because a failure to give lesser-included offense instructions is an error of constitutional dimensions, it "is 'presumed' reversible; it will result in reversal unless the State convinces the reviewing court beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001) The question whether a given offense should have been submitted to the jury as a lesser-included offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). Thus, the standard of review is de novo without a presumption of correctness. Id.

### A. Especially Aggravated Kidnapping

The Defendants were each convicted of one count of especially aggravated kidnapping, defined as false imprisonment where the victim suffers serious bodily injury. See Tenn. Code Ann. § 39-13-305(a)(4) (1997). The trial court gave the jury instructions on especially aggravated kidnapping, and the lesser offenses of aggravated kidnapping and kidnapping. Both Defendants contend that the jury should have been instructed on the additional lesser offenses of false imprisonment and aggravated assault. Defendant Joseph Combs adds that instructions on facilitation of the charged offense should have been included.

"A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (1997). "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . , the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403. As relevant here, a person commits aggravated assault who intentionally or knowingly or recklessly commits an assault, as defined in § 39-13-101, and causes serious bodily injury or uses or displays a deadly weapon. See id. § 39-13-102(a), -101.

With regard to false imprisonment, we note that the offense is incorporated by reference into the statutory definition of especially aggravated kidnapping. See id. § 39-13-305(a). Therefore, it is clearly a lesser-included offense under part(a) of the Burns test, supra. The second determination under Burns, i.e., whether evidence exists that reasonable minds could accept as to this lesser charge and whether it is legally sufficient to support a conviction, is unnecessary, however, based on the decision of our supreme court in State v. Williams, 977 S.W.2d 101 (Tenn. 1998). See also State v. Bowles, 52 S.W.3d 69 (Tenn. 2001).

In State v. Williams, the defendant was convicted of first degree premeditated murder. The trial court refused the defendant's request to instruct the jury on voluntary manslaughter as a lesser-included offense, but did instruct the jury on second degree murder and reckless homicide. Williams, 977 S.W.2d at 104. Holding that the trial court's failure to instruct on voluntary manslaughter was harmless, the Tennessee Supreme Court drew the following conclusion:

> [B]y finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. Accordingly, *the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilty on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.*

Id. at 106 (emphasis added). This holding was restated by the supreme court in State v. Bowles, 52 S.W.3d at 78 (defendant's conviction for aggravated rape affirmed; the trial court's failure to charge the jury on the lesser-included offense of sexual battery was harmless beyond a reasonable doubt where the jury was instructed on the lesser offenses of rape and aggravated sexual battery).

The record reveals that the instructions given the jury by the trial court on the lesser-included offense of aggravated kidnapping embraced only the elements requiring the jury to find (1) that the Defendant knowingly and unlawfully confined the victim, and (2) that the victim suffered bodily injury or that the Defendant possessed or threatened the use of a deadly weapon. See Tenn. Code Ann. § 39-13-304(a)(4) and (5) (1997). Likewise, the court's instructions on the lesser-included offense of kidnapping only required the jury to find (1) that the Defendant knowingly and unlawfully confined the victim, and (2) that the confinement was under circumstances that exposed the victim to substantial risk of bodily injury. See id. § 39-13-303(a)(1). Consequently, the jury was presented with proper lesser-included offenses for the offense of especially aggravated kidnapping as charged in this case. Therefore, under Williams and Bowles we may conclude that (1) by finding the Defendants guilty of the greater offense, especially aggravated kidnapping, in lieu of the lesser offenses of aggravated kidnapping and kidnapping, the jury necessarily weighed the evidence and determined that the greater offense was the most appropriate charge supported by the evidence; and (2) the result would have been the same, even if the jury had received instructions on the offense of false imprisonment. We may further conclude that the trial court's failure to charge the jury on this offense, although error, was nevertheless harmless beyond a reasonable doubt. See also Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

Even if Williams was not applicable here, the Defendants' argument would similarly fail under the harmless error analysis set forth by our supreme court in State v. Allen, 69 S.W.3d 181 (Tenn. 2002):

When a lesser-included offense instruction is improperly omitted, . . . the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial. (Citation omitted.) In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury.

Id. at 191. A thorough examination of the record and the evidence presented at trial leads us to conclude that the trial court's error did not affect the outcome of the trial or, more specifically, the jury's verdict for this offense. The fact that Esther suffered serious injury was uncontroverted. Thus, we are convinced beyond a reasonable doubt that a jury, if given the opportunity, would not have convicted either Defendant of the offense of false imprisonment.

An Allen harmless error analysis applies with equal veracity to Defendant Joseph Combs argument concerning the trial court's failure to instruct the jury on the lesser offense of facilitation of especially aggravated kidnapping, clearly a lesser-included offense under Burns, part (c).

Specifically, the proof of Joseph Combs' participation in and criminal responsibility for this offense is so overwhelming that we are convinced beyond a reasonable doubt that no jury, if given the opportunity, would find him guilty of the offense of facilitation of especially aggravated kidnapping. Consequently, the trial court's failure to instruct the jury, while error, is nevertheless harmless beyond a reasonable doubt.

Turning to whether jury instructions were required for aggravated assault, as a lesser-included offense of especially aggravated kidnapping, we find that the trial court did not err because the offense of aggravated assault is not a lesser-included offense under Burns. Specifically, we first find that part (a) of the Burns test is not satisfied, whereas all of the statutory elements in aggravated assault are not included within the statutory elements of especially aggravated kidnapping. As previously noted, a conviction of aggravated assault requires proof that the accused intentionally, knowingly or recklessly caused serious bodily injury to the victim. See Tenn. Code Ann. § 39-13-101, -102 (1997). In this case, especially aggravated kidnapping requires proof that a person knowingly and unlawfully confined the victim so as to interfere substantially with his or her liberty, where the victim suffers serious bodily injury. See id. § 39-13-305, -302. A plain reading of the statute indicates that a conviction for the kidnapping offense requires proof only that the victim's serious bodily injury occurred during the unlawful confinement, and not as the result of any specific *intent* on the part of the accused to harm or injure the victim. Id.

Neither is part (b) of the Burns test satisfied. Part (b) states that a lesser-included offense may be found in cases where the offense "fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest." Burns, 6 S.W.3d at 467. Both offenses involve serious bodily injury, the essential difference being whether especially aggravated kidnapping associates a mental state with *causation* of the injury. Because we find that the mental state required to intentionally, knowingly, or recklessly cause a victim's serious bodily injury cannot be considered a lesser kind of culpability or harm than that required in an offense where serious bodily injury merely results, part (b) is not satisfied. Clearly, part (c) is also not satisfied since the lesser offense does not involve facilitation, attempt, or solicitation of either the charged offense or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Our research reveals that the issue whether the crime of assault is a lesser-included offense of especially aggravated kidnapping was raised in State v. Legg, 9 S.W.3d 111 (Tenn. 1999), but decided on other grounds. Id. at 118. The supreme court made the following observation during its consideration of the two offenses: "Unlike aggravated kidnapping, the elements of the crime of assault do not contemplate a continuing course of conduct . . . . Rather, the crime itself contemplates that it is consummated or completed the moment bodily injury occurs." Id. This suggests that even the nature of the crimes are quite dissimilar. In any event, because we find that the assault offense requires proof of some intent to cause injury, while the kidnapping charge requires confinement where injury *results*, but which need not even be caused by either Defendant, the Burns test for

lesser-included offense status is not satisfied in this case. Thus, the trial court did not err by failing to instruct the jury on the offense of aggravated assault.

Defendant Joseph Combs singularly contends that the trial court also erred by not giving the jury instructions on "involuntary servitude," as a lesser-included offense of especially aggravated kidnapping. "Involuntary servitude" is defined as "the condition of a person who is compelled by force, coercion or imprisonment and against the person's will to labor for another, whether paid or not." See Tenn. Code Ann. § 39-13-301(1) (1997). Involuntary servitude is not a distinct offense, but one of two elements describing a condition of confinement which must be proved to convict a person of kidnapping. See id. § 39-13-303(a)(2) (1997). This argument has no merit.

### B. Aggravated Assault

Count 2 of the presentment in this case charged Defendant Joseph Combs with aggravated assault, i.e., intentionally and knowingly causing bodily injury to Esther Combs by the display of a deadly weapon, Tenn. Code Ann. § 39-13-102 (a)(1)(B). The jury was instructed on intentional/knowing aggravated assault, the crime charged, and reckless aggravated assault as a lesser-included offense. Defendant contends that the trial court committed reversible error by failing to also charge the jury on the offenses of reckless endangerment and assault, as additional lesser-included offenses of aggravated assault. We disagree.

"Reckless endangerment" is committed when the defendant "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103 (1997). "Aggravated assault" is committed when a person intentionally or knowingly or recklessly commits an assault, as defined in § 39-13-101 [which means the defendant caused bodily injury or another to reasonably fear imminent bodily injury], and causes serious bodily injury or uses or displays a deadly weapon. See id. § 39-13-102(a), -101 (1997). When the defendant is convicted of committing the crime of aggravated assault *recklessly*, the crime is a Class D felony, as opposed to a Class C felony when the crime is committed *intentionally* or *knowingly*. Id. § 39-13-102(d).

Under the circumstances presented here, we find that the trial court's failure to instruct the jury on the offense of reckless endangerment, if error, was harmless beyond a reasonable doubt under State v. Williams, 977 S.W.2d 101 (Tenn. 1998). By finding the Defendant guilty of intentional or knowing aggravated assault, in lieu of reckless aggravated assault, the jury expressly rejected any notion that the Defendant committed the crime *recklessly*. See id. at 106. The jury's disinclination to consider the lesser-included offense of reckless aggravated assault clearly demonstrates that it also would not have returned a verdict on the lesser crime of reckless endangerment. Under similar reasoning, we also reject Defendant's argument that the trial court erred by failing to instruct the jury on the lesser-included offense of assault.

## C. Aggravated Rape

Defendant Joseph Combs contends that the trial court erred by not instructing the jury on rape and aggravated assault, as lesser-included offenses of aggravated rape. We disagree.

Count 12 of the presentment, charging Defendant with aggravated rape, alleges that on or about April 1989, Joseph Combs unlawfully and feloniously sexually penetrated Esther, a child under thirteen years of age, contrary to Tennessee Code Annotated section 39-13-502. In April 1989, the offense of aggravated rape was defined as "unlawful sexual penetration of another accompanied by any of the following circumstances:

> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
> (2) The defendant causes personal injury to the victim;
> (3) The defendant is aided or abetted by one (1) or more other persons; and (A) Force or coercion is used to accomplish the act; or (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
> (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-2-603 (Supp. 1988) (rape of a victim less than thirteen years of age is currently codified as "rape of a child," Tenn. Code Ann. § 39-13-522 (1997)). At that time, the offense of rape was defined as the "unlawful sexual penetration of a victim by the defendant or the unlawful sexual penetration of a defendant by a victim," where

> (1) Force or coercion is used to accomplish the act;
> (2) The actor knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
> (3) The actor accomplishes sexual penetration by fraud.

See Tenn. Code Ann. § 39-2-604 (Supp. 1988).

In our prior discussion of the issue regarding sufficiency of the evidence, we pointed out that the conviction of aggravated rape required only proof of "unlawful sexual penetration of a victim by the defendant or the defendant by a victim," where "[t]he victim is less than thirteen (13) years of age." Id. § 39-2-603. Since the conviction for aggravated rape did not require the State to establish any one of the three elements, or "circumstances," enumerated in the offense of rape, the offense clearly does not satisfy part (a) of Burns. It is equally obvious that the criteria for part (c) are not met. Furthermore, under State v. Allen, discussed supra, even if it was error to not instruct the jury on the offense of rape, the error was harmless beyond a reasonable doubt, based upon the proof and the theory of defense. Allen, 69 S.W.3d at 191.

The offense of aggravated assault also fails to satisfy the Burns criterion for a lesser-included offense of aggravated rape, where the victim was less than thirteen (13) years of age. See id. § 39-2-603. Aggravated assault requires proof that the accused (1) willfully, knowingly or recklessly caused or attempted to cause serious bodily injury to another; or (2) willfully or knowingly caused or attempted to cause bodily injury while using or displaying a deadly weapon. See id. § 39-2-101(b). Neither of these elements are included in the offense of aggravated rape as charged here, which means that part (a) is not satisfied. Since parts (b) and (c) are also clearly not satisfied, the trial court did not err by failing to instruct the jury on this crime.

## D. Aggravated Perjury

Defendant Joseph Combs contends that the trial court erred by failing to instruct the jury on the offense of perjury, as a lesser-included offense of aggravated perjury. We agree.

A person commits the offense of aggravated perjury who, with intent to deceive, makes a false statement, under oath; the false statement is made during or in connection with an official proceeding; and the false statement is material. See Tenn. Code Ann. § 39-16-703, -702 (1997). As relevant here, a conviction for the offense of perjury merely requires proof that the accused made a false statement, under oath, with intent to deceive. See id. § 39-16-702.

Defendant correctly asserts that the statutory elements constituting perjury are incorporated by reference within the statutory elements of the offense charged, aggravated perjury. This satisfies part (a) of the test in Burns. See Burns, 6 S.W.3d at 467. Having concluded that perjury is a lesser-included offense, we use the following two-step analysis to determine whether the evidence justified an instruction on that offense:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. Clearly, evidence exists which reasonable minds could accept as to the offense of perjury and the proof is sufficient to support a conviction. Defendant admitted that he made a false statement, under oath, with intent to deceive. The proof also shows that the false statement was unquestionably made during or in connection with an official proceeding, i.e., to the court during the conservatorship proceeding on October 3, 1997. The contested issue was whether Defendant's false statement was "material."

Because the trial court's failure to instruct the jury on this offense was indeed error, we must determine whether the error was harmless beyond a reasonable doubt. State v. Ely, 48 S.W.3d 710,

727 (Tenn. 2001). An erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial. Id. at 725; State v. Bowles, 52 S.W.3d 69, 77 (Tenn. 2001). Williams does not apply here, because the trial court instructed the jury solely on aggravated perjury, without instructions for any lesser-included offenses. See Williams, 977 S.W.2d at 106. "[The supreme court has] never held, however, that a failure to instruct on a lesser-included offense can be harmless beyond a reasonable doubt only when an intermediate offense is rejected." State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002) (The improper omission of a lesser-included offense is analogous to the improper omission of an element of an offense, where the proper inquiry is whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. Id. at 190-91.).

Here, the issue essentially turns on whether Defendant's false statement to the court concerning Esther's whereabouts could be considered "material." For our purposes, "material" means the "statement, irrespective of its admissibility under the rules of evidence, could have affected the course or outcome of the official proceeding." Tenn. Code Ann. § 39-16-702 (1997). Consequently, this Court must determine whether the record contains any evidence from which the jury could rationally conclude that Defendant's statement was not material. In light of the subjective character of the statutory definition of "material," we are unable to conclude beyond a reasonable doubt that the jury, if given the opportunity, would not have decided that Defendant's false statement did not affect the course or outcome of the conservatorship proceeding. As a result, we are also unable to conclude beyond a reasonable doubt that the trial court's failure to instruct on the offense of perjury did not affect the jury's verdict. Because the error is not harmless, we reverse Defendant's conviction for aggravated perjury and remand this matter for a new trial on that charge.

## VII. Instruction on Especially Aggravated Kidnapping

The Defendants also contend that trial court erred by failing to give the complete and proper definition of "unlawful," when instructing the jury on the especially aggravated kidnapping charge. The Defendants assert that if the trial judge had not deleted the reference to the victim's age, as provided in the statute, the jury would have been able to consider, as a "defense," the fact that a parent or guardian may consent to and thus confine the victim *lawfully*, where the victim is under the age of thirteen. We disagree.

It is well-settled that a defendant has a constitutional right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In determining whether jury instructions are erroneous, this Court must read the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. See State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). "It is the duty of the trial judge without request to give the jury proper instructions as to the law governing the issues raised by the nature of the proceedings and the evidence introduced during trial." Teel, 793 S.W.2d at 249.

In the context of kidnapping and false imprisonment offenses, "unlawful" is statutorily defined, with respect to removal or confinement, as "one which is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare." Tenn. Code Ann. § 39-13-301(2) (1997). The record reflects that the Defendants requested the jury be given this definition, in its entirety, before the jury was charged. The trial judge denied the request, finding that the age of the victim as an aggravating factor had been removed from the presentment prior to trial, pursuant to an amendment approved by the court.

The Defendants' assertion concerning the loss of a "defense" based upon the victim's age is essentially a restatement of an argument previously presented. (See the analysis of evidentiary sufficiency concerning Defendants' convictions for especially aggravated kidnapping.) In that argument, the Defendants contended that any confinement occurring prior to Esther's thirteenth birthday could not be "unlawful," because it was not accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's welfare pursuant to the definition of "unlawful" provided by the statute. The Defendants asserted that they gave themselves consent to confine Esther, and, after she became thirteen years of age, their status as foster parents conferred upon them the right to continue to do so since it was "by force of law that all parents, guardians or other persons responsible for the general supervision of a minor's welfare are possessed of the power to confine them."

In our analysis of that issue, we observed that the Defendants cited no legal support for this assertion. They still fail to do so. We also noted that the Defendants never completed the legal formalities necessary to establish either of them as Esther's legal parent, guardian or other person responsible for the general supervision of her welfare. The fact that the Defendants' parental status was never legally sanctioned makes any alleged "defense" on this ground completely without merit. A plain reading of the statutory definition indicates that removal or confinement by force, threat or fraud may be unlawful, even if accomplished with the consent of a parent, guardian or other person entrusted with the minor's care. We concluded that the evidence was sufficient to find that the Defendants confined Esther by "force, threat or fraud." Here, we reemphasize that Esther turned thirteen years of age on November 16, 1990, which means that she endured the great majority of the period of "confinement" (more than six years) *after* attaining the age of thirteen.

Moreover, we do not find a provision for this "defense" among the statutes dealing with "General Defenses" or "Justification Excluding Criminal Responsibility," where the great majority of valid "defenses" are located. See Tenn. Code Ann. §§ 39-11- 501 to 505, 601 to 621 (1997). Hence, the Defendants' classification of the proposed instruction as a "defense," even loosely-defined, is without support by either statute or case law.

In summation, a thorough review of the relevant law and the entire charge submitted to the jury reveals that the instructions given by the trial judge fairly and correctly submitted the proper legal issues and that they do not mislead the jury as to the applicable law. Accordingly, we conclude

that the constitutional rights of the Defendants were not violated and the trial court did not err. The Defendants are not entitled to relief on this issue.

## VIII. Merger of Offenses

Defendant Evangeline Combs argues that the trial court erred by failing to merge her convictions for aggravated child abuse into the conviction for especially aggravated kidnapping. Defendant Joseph Combs argues that it was also error not to merge his conviction for aggravated assault into the conviction for especially aggravated kidnapping. The Defendants claim that the separate convictions in this case violate firmly established rules against multiplicity in indictments because (a) the time periods in the child abuse and assault offenses overlap the time period alleged in the especially aggravated kidnapping count, (b) the elements for these offenses are the same as those for especially aggravated kidnapping, and (c) the same proof was used to establish their guilt for different crimes. We disagree.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Multiple convictions and/or punishments for the same offense violate federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. Art. I, § 10. In State v. Denton, 938 S.W.2d 373 (Tenn. 1996), our supreme court established a framework for determining whether a defendant has received multiple punishments for the "same offense." The reviewing court must consider (1) the statutory elements of the offenses, (2) the evidence used to prove the offenses, (3) whether there were multiple victims or discrete acts, and (4) the purposes underlying the statutes involved. Id. at 381.

### A. Aggravated Child Abuse

Defendant Evangeline Combs was convicted of four counts of aggravated child abuse. A person commits the offense of aggravated child abuse or aggravated child neglect who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare, and the criminal act was accomplished with a deadly weapon or results in serious bodily injury to the child. See Tenn. Code Ann. §§ 39-15-401, -402 (1991 & 1997). (The jury found Evangeline Combs guilty of two counts of aggravated child abuse where serious bodily injury resulted, and two counts where serious bodily injury resulted *and* a deadly weapon was used.) Especially aggravated kidnapping, as relevant here, required proof that (1) the defendant knowingly removed or confined the victim unlawfully, i.e., by force, threat or fraud, so as to interfere substantially with her liberty, and (2) the victim suffered serious bodily injury. See Tenn. Code Ann. §§ 39-13-305(a)(4), 39-13-302(a), -301(2) (1997).

Applying the Denton analysis to Evangeline Combs' convictions for these offenses, we first note that each required an element that the other one did not. First, we note that the offense of aggravated child abuse required the jury to find that Defendant *non-accidentally* treated Esther, *a*

*child under eighteen years of age*, in such a manner as to inflict serious bodily injury or neglected her so as to adversely affect her health and welfare. The kidnapping offense (as charged) did not require a finding concerning Esther's age or that Evangeline Combs non-accidentally neglected or inflicted injury upon her. Second, the kidnapping offense required *removal or confinement by force, threat, or fraud/deception*, and the child abuse offense did not. This initial determination indicates that the two offenses should not be considered one for double jeopardy purposes.

In a similar vein, we find that the evidence relied upon by the State to prove the child abuse offenses was clearly different than that used to prove the kidnapping offense. Two of the child abuse convictions were based on the jury's finding that Evangeline Combs knowingly inflicted specific serious bodily injuries upon Esther, in February 1994 and September 1995, with a deadly weapon, to wit: a baseball bat. The remaining two convictions required proof that Evangeline Combs inflicted serious bodily injury in November 1994 and, again, in September 1994. All four offenses required proof that Esther was under the age of eighteen when the crimes were committed. By contrast, the kidnapping conviction was based upon the jury's finding that Evangeline Combs knowingly and unlawfully confined Esther for more than seven years and that she suffered serious bodily injury during such confinement. As we previously noted, the statute concerning kidnapping also does not require the State to prove that the accused actually *intended* to injure the victim. Consequently, this second factor further supports separate offenses. It follows that the offenses were also committed by discrete acts, the third factor, which weighs in favor of finding two different crimes.

Finally, a comparison of the purposes of the respective statutes reveals that, although both statutes are aimed at prohibiting behavior which causes injury, they are aimed at different evils. The crime of child abuse is located in the chapter concerned with offenses against the family and specifically protects children. The statutes prohibiting kidnapping generally protect a person's liberty. Based on the forgoing, we have no trouble concluding that a defendant who unlawfully confined a person, which resulted in serious bodily injury, should be subject to separate convictions and separate punishments when the evidence shows that, during the confinement, the defendant also treated the victim (a child under eighteen years of age) in such a manner as to inflict serious bodily injury. Thus, Evangeline Combs' convictions for aggravated child abuse and especially aggravated kidnapping should not be merged.

### B. Aggravated Assault

As relevant here, "aggravated assault" is committed when a person intentionally or knowingly causes bodily injury to another and uses or displays a deadly weapon. See Tenn. Code Ann. § 39-13-102(a), -101(a)(1) (Supp. 1994 & 1997). The presentment alleged that Defendant Joseph Combs did "unlawfully, feloniously, intentionally, and knowingly cause bodily injury to Esther A. Combs, by the display of a deadly weapon, to-wit: a rope . . . ." The jury found Joseph Combs guilty of committing intentional/knowing aggravated assault by display of a deadly weapon.

Under Denton, we again note that each of these offenses required an element that the other one did not. That is, the aggravated assault (as charged in this case) required the jury to find that Joseph Combs caused bodily injury and displayed a deadly weapon, to wit: a rope. Although the kidnapping count alleged that Joseph Combs displayed a deadly weapon, the jury did not base its verdict on such a finding. Rather, the conviction of especially aggravated kidnapping required *serious* bodily injury *resulting from confinement*. Confinement is not an element of aggravated assault. This determination suggests that the two offenses are not one for double jeopardy purposes.

In addition, the evidence used to prove the two offenses was different. The assault conviction was based on proof that Joseph Combs, during the time period extending from June 1, 1996 to September 1, 1996, caused bodily injury to Esther by display of a rope. His kidnapping conviction was based on proof that he unlawfully confined Esther from April 30, 1990 to October 3, 1997, a continuous offense, and that serious bodily injury occurred during that time. Proof of a deadly weapon was not necessary for the kidnapping conviction. Thus, this factor also supports separate offenses. Since we find that the offenses clearly involved discrete acts, the third factor further fails to support Joseph Combs' argument.

As with our previous analysis, even though the purposes underlying both statutes appear to prohibit behavior which causes injury, the provisions are aimed at different evils: one protects against an unlawful infringement on liberty; the other protects against fear of harm and bodily injury. Accordingly, we conclude that Joseph Combs is properly subject to separate convictions and separate punishments for the criminal acts which led to his convictions for these individual crimes.

Both Defendants assert that merger was also proper on the ground that the crimes were alleged to occur during time periods which "overlapped" that period set forth in the count for especially aggravated kidnapping. This argument is without merit. Nothing in the law prohibits convictions for crimes committed contemporaneously with other crimes, and the Defendants have cited no legal precedent to support their assertion.

### C. Analysis Under Anthony

Both Defendants further argue that separate convictions are improper under the principles enunciated in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In Anthony, our supreme court recognized that a separate kidnapping conviction may violate due process when the kidnapping is essentially incidental to an accompanying felony conviction and not "significant enough, in and of itself, to warrant independent prosecution." Anthony, 817 S.W.2d at 306. The first question in an analysis of this issue is whether the movement or confinement used was beyond that necessary to commit the accompanying felony. State v. Dixon, 957 S.W.2d 532, 535 (Tenn.1997) (citing Anthony, 817 S.W.2d at 306). "If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. Because the holding in Anthony rested upon the court's understanding of due process, rather than a concern

for constitutional protections against double jeopardy, see Anthony, 817 S.W.2d at 306, we shall briefly address this argument.

First, we find that the confinement of Esther for more than seven years was unquestionably beyond that necessary to commit the accompanying felonies of aggravated assault and aggravated child abuse in this case. Second, it is just as apparent to this Court that the psychological and physical torture which "unlawfully confined" Esther also prevented her from summoning help, since the torture merely increased after acts of disobedience. Third, we believe that the threats of punishment, and near-constant presence of the Defendants or an alleged sibling at Esther's side whenever she was outside the home, certainly lessened the risk that anyone would detect the Defendants' criminal actions. Finally, we also find that the fact and sheer length of Esther's confinement positively increased her risk of harm, since nearly every day risked additional injury.

In summation, we conclude that the trial court did not err by failing to merge the convictions for the aforementioned offenses into the conviction for especially aggravated kidnapping. Specifically, we find that separate convictions do not violate the constitutional principles of due process or prohibitions against double jeopardy in this case for the reasons given. See 21 Am. Jur. 2d Criminal Law § 21 (1998) (citations omitted) ("The doctrine of merger does not apply where the offenses are separate and distinct, but only where the identical criminal acts constitute both offenses."). The Defendants are not entitled to relief on this issue.

## IX. Sentencing

The Defendants also argue that the trial court erred by (1) misapplying various enhancement factors, (2) failing to award sufficient weight to appropriate mitigating factors, and (3) ordering consecutive sentences under State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). After a thorough review of the record, we disagree.

When an accused challenges the length, range, or the manner of service of a sentence, this Court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is de novo. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tenn. Code Ann. § 40-35-210, to consider the following factors in sentencing:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5)

[e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

If our review "reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result." State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998). In the case sub judice, our review is de novo with a presumption of correctness.

## A. Sentencing Factors

If no mitigating or enhancement factors for sentencing are present, Tenn. Code Ann. § 40-35-210(c) provides that the presumptive sentence for Class B, C, D, and E felony offenses shall be the minimum sentence within the applicable range. State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991). The presumptive sentence for a Class A felony under these circumstances is the midpoint of the range. Tenn. Code Ann. § 40-35-210(c). However, if such factors do exist, a trial court should enhance the presumptive sentence, as appropriate, within the range for enhancement factors and also reduce the sentence, as appropriate, within the range for any mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); see Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. Nevertheless, should there be no mitigating factors, but enhancement factors are present, a trial court may set the sentence above the presumptive sentence but within the applicable range. Tenn. Code Ann. § 40-35-210(d); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

With regard to Defendant Joseph Combs, the trial court found the following sentencing factors applicable to the sentence specified: Concerning Defendant's sentence for especially aggravated kidnapping, the trial court applied enhancement factor (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; (2) "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; (4) "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability"; and (15) "[t]he defendant abused a position of public or private trust." Tenn. Code Ann. § 40-35-114(1), (2), (4), and (15) (1997). The trial court applied enhancement factors (1) and (15) also to the sentence for aggravated assault, and enhancement factor (1) to the sentence for aggravated perjury. To Defendant's sentences for aggravated rape and the seven counts of rape, the trial court applied enhancement factors (1) and (15), in addition to enhancement factor (7), applicable where "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement." Id. § 40-35-114(7). As for mitigating

factors, the trial court found the following circumstances applicable to all sentences: Defendant had no prior criminal record and had accomplished some good in the community through charitable work and his teaching vocation. See id. § 40-35-113(13).

Defendant Joseph Combs contends that the trial court erred by applying enhancement factors (1), (2) and (4). To support his argument regarding the impropriety of factor (1), Defendant states merely that he "did not have a criminal record." A criminal record, per se, is not necessary for application of this factor, however. Our supreme court has held that a trial court may utilize previous criminal behavior, which did not result in a conviction, to enhance a sentence where the criminal behavior was shown by a preponderance of the evidence. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000); State v. Carico, 968 S.W. 2d 280, 287-88 (Tenn. 1998). With regard to prior criminal behavior, the trial court noted the absence of a criminal record, per se, and stated that it was not limited to convictions of record. The court then found this factor applicable based on the "substantial amount of information" presented at trial concerning the criminal conduct of Defendant which was not the subject of formal charges.

Defendant also argues that factor (2), requiring the court to find that the defendant was a leader in the commission of the offense, cannot be used to enhance his sentences because it is "illogical." Specifically, Defendant asserts that both he and his wife cannot simultaneously be "leaders." This argument concerns only the sentence for especially aggravated kidnapping, the offense for which both Defendants were convicted and the only sentence to which this factor was applied. Because this crime is a continuing offense, and the proof indicates that each Defendant alternately and substantially contributed to the commission of the crime during the seven plus years the victim was confined, we believe both Defendants could be logically construed a "leader in the commission of the offense." As the State points out in its brief, the statutory language for this enhancement factor requires that the defendant be *a* leader, not *the* leader, where the offense involves two or more criminal actors. See Tenn. Code Ann. § 40-35-114(2) (1997).

Regarding the trial court's use of enhancement factor (4), which requires a finding that the victim was particularly vulnerable due to age, Defendant contends that it was inappropriately applied under State v. Adams, 864 S.W.2d 31 (Tenn. 1993). In Adams, our supreme court stated that the relevant inquiry is not simply whether the victim is under a specific age, but "whether the victim was *particularly vulnerable* because of age or physical or mental disability." Id. at 35 (emphasis in original). The State has the burden of establishing the limitations that render the victim "particularly vulnerable," id., as well as the burden of proving that "the condition which rendered the victim 'particularly vulnerable' was a factor in the commission of the offense." State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994). We believe that the State satisfied its burden here. The record established that the victim was taken into the Combs household at the age of approximately five months old. Thus, she grew up believing the Defendants to be her parents, and she had no other experiences upon which to base an opinion about what is proper behavior in a family or about the differences between right and wrong. This ignorance effectively impaired her ability to summon assistance or to even know that she required it. Put another way, if the Combs had not absconded with Esther at such a young age, their subsequent confinement and abuse of her might not have been

possible. Hence, we find her vulnerability, cultivated almost from birth and endured throughout her life, was a factor in the commission of the offense. See also State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (use of enhancement factor (4) is appropriate if the facts show that "the vulnerabilities of the victims . . . had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" (citations omitted)).

Defendant further argues that the trial court did not give the proper weight due the mitigation factors presented in his case. Defendant contends that his criminal record, which contains no prior convictions, his "good work history," and the contributions he has made to "society at large as a teacher and minister," effectively offset the enhancement factors deemed appropriate by the court. We disagree, noting that the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record, as occurred in this case. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986). This argument is without merit.

Turning to Defendant Evangeline Combs, the record reflects that the trial court applied the following enhancement factors to her sentence for especially aggravated kidnapping: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; (2) "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; (4) "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability"; and (15) "[t]he defendant abused a position of public or private trust." Tenn. Code Ann. § 40-35-114(1), (2), (4), and (15) (1997). The trial court then separately considered the sentences for the four aggravated child abuse convictions (counts 7 through 10). As to count 7, the trial court applied enhancement factors (1) and (15), see supra, in addition to enhancement factor (18), appropriate where "[a] victim [of aggravated child abuse] suffered permanent impairment of either physical or mental functions as a result of the abuse inflicted." Id. § 40-35-114(18). For counts 8 and 9, the trial court utilized enhancement factors (1) and (15), and, with regard to count 10, the trial court applied enhancement factors (1), (15), and (2), see supra. As mitigating circumstances, the trial court considered but gave "little" weight to Defendant's lack of a prior criminal record and the fact that she was "intelligent" and possessed some skills which could assist with rehabilitation. See id. § 40-35-113(13).

Defendant Evangeline Combs contends that enhancement factors (1), (2), (4), (5), (15) and (18) do not apply in her case. Her arguments concerning the application of factors (1), (2), and (4) to her sentence for especially aggravated kidnapping are essentially identical to those presented by the co-defendant, Joseph Combs. Pursuant to his arguments, we found that a trial court may utilize previous criminal behavior, which did not result in a conviction, to enhance a defendant's sentence; both Defendants in this case could be logically construed a "leader" in the commission of the kidnapping offense; and the victim was particularly vulnerable due to age, respectively. These findings apply equally to the issues raised by Evangeline Combs. The trial court used factor (2) to also enhance Evangeline's sentence for the aggravated child abuse conviction in count 10, based on proof that Defendant enlisted the assistance of James and David Combs to hold Esther in place while she beat her with a baseball bat. We find nothing improper in this application.

Regarding enhancement factor (15), applicable where the defendant abused a position of private trust, we find use of the factor appropriate where the defendant occupies the position of parent, even if the position was attained by fraud as demonstrated here. See State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996) (application of the factor requires finding that defendant occupied a position of trust, either public or private, e.g., the position of parent, step-parent, babysitter, teacher, coach). Ostensibly, Defendant was one of Esther's adoptive parents (and she has even argued as much in other issues in this appeal).

Enhancement factor (18), applicable where "[a] victim, under § 39-15-402 [aggravated child abuse and neglect], suffered permanent impairment of either physical or mental functions as a result of the abuse inflicted," Tenn. Code Ann. § 40-35-114(18), is also appropriate. The trial court used this factor to enhance Defendant's sentence for count 7, an offense which clearly resulted in the permanent impairment and disfigurement of Esther's left elbow and arm. Defendant contends that application of this factor constitutes double enhancement, prohibited under State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App. 1995). We find nothing in Bingham to support Defendant's argument against application of this factor. Moreover, a plain reading of the language in factor (18) indicates that the legislature *purposefully* designed factor (18) to enhance this offense.

Defendant's argument that the trial court failed to give proper weight to the mitigation factors presented in her case is likewise without merit. Defendant contends that her character, habits, mentality, propensities and activities indicate she is unlikely to commit another crime, and that the trial court erred by finding that her lack of criminal record, devotion to family, and potential for rehabilitation did not outweigh the enhancement factors. We disagree. Since the weight given to each factor is left to the discretion of the trial court, as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record, as occurred here, we will not modify the sentences.

## B. Consecutive Sentencing

At the conclusion of the sentencing hearing, the trial court imposed the following sentences on Defendant Joseph Combs: twenty-two years for count 1, the especially aggravated kidnapping conviction; five years for count 2, the aggravated assault conviction; two years for count 11, the aggravated perjury conviction; twelve years for count 12, the aggravated rape conviction; and ten years each for counts 13 through 19, Defendant's seven rape convictions. The trial court then found that consecutive sentencing was appropriate based on its finding that (1) Defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," Tenn. Code Ann. § 40-35-114(4); and (2) Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor, Tenn. Code Ann. § 40-35-114(5). The latter factor requires the court to also consider the aggravating circumstances arising from other factors, including the relationship between Defendant and the victim, the span of undetected sexual activity, the nature and scope of the sexual acts, and the extent of residual, physical and mental damage to the victim. See id. The trial court ordered Defendant's sentences for counts 1 and 12 through 19 to be served consecutively to each other, with the sentences

for counts 2 and 11 to be served concurrently with the sentence for count 1, for an effective sentence of 114 years.

For Defendant Evangeline Combs, the trial court imposed a sentence of twenty-two years for count 1, the especially aggravated kidnapping conviction; eleven years each for counts 7, 9 and 10, three of the four aggravated child abuse convictions; and ten years for count 8, the remaining aggravated child abuse conviction. The trial court then ordered all sentences to run consecutively for a sentence of sixty-five years based on its finding that Defendant was a "dangerous offender." See Tenn. Code Ann. § 40-35-114(4) (1997).

Both Defendants contend that consecutive sentences were not proper because the Defendants were not "the kind of offender envisioned in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995)." We disagree.

In Wilkerson, our supreme court stated that "[p]roof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences." Wilkerson, 905 S.W.2d at 938. The supreme court stated that, prior to imposing consecutive sentences, "the proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." Id.

The limits of the holding in Wilkerson were later clarified in State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999), wherein the supreme court stated that, before consecutive sentencing may be imposed based on dangerous offender status, the Sentencing Act requires that "particular facts" exist, "which show that consecutive sentencing is 'reasonably related to the severity of the offenses' and serves to protect society 'from further . . . aggravated criminal conduct.'" Id. at 461 (quoting Wilkerson, 905 S.W.2d at 938. Then, "[i]n order to limit the use of the 'dangerous offender' category to cases where such 'particular facts' exist, . . . sentencing courts must make specific findings regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(4)." Id.

According to the record, when considering consecutive sentencing for Joseph Combs, the trial court noted the mandates set forth in Wilkerson and specifically concluded that the proof was certainly sufficient to find that (1) Joseph Combs was a "dangerous offender," (2) a consecutive sentence in his case would be reasonably related to the crimes committed, and (3) that a consecutive sentence was necessary to protect the public. The trial court elaborated further in its discussion of consecutive sentencing for Evangeline Combs, finding that the serious nature of the offenses, the number of offenses committed, and the fact that the victim was unable to "get away" constituted a "dangerous mix" which the court found sufficient to classify her as a dangerous offender. We agree that the proof established the Defendants' behavior indicated little or no regard for human life, that the sentences imposed are reasonably related to the severity of the crimes committed in this case, and that they are necessary to protect the public. Consequently, consecutive sentences are proper under

the statutory proviso for dangerous offender and under the mandates set forth in <u>Wilkerson</u> and <u>Lane</u>. "Sentencing is inescapably a human process that neither can nor should be reduced to a set of fixed and mechanical rules." <u>Wilkerson</u>, 905 S.W.2d at 938 (citation omitted). Here, the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and made findings of fact which we consider adequately supported by the record. Thus, we find no abuse of discretion in this matter and shall not modify the sentence.

We concur with the trial court that consecutive sentencing is further proper in the case of Joseph Combs based on the fact that Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor, Tenn. Code Ann. § 40-35-114(5). This factor allows the court to also consider the aggravating circumstances arising from various factors, including the relationship between Defendant and the victim, the span of undetected sexual activity, the nature and scope of the sexual acts, and the extent of residual, physical and mental damage to the victim. The statement given by Esther during the sentencing hearing and the record amply support consecutive sentences based on these circumstances. In particular, we note as especially egregious the span of undetected criminal sexual activity and the residual, physical, and mental damage inflicted upon Esther by Defendant's actions.

In his brief, Joseph Combs also argues that the trial court erred when it sentenced him without benefit of the evaluation required by Tennessee Code Annotated section 39-13-705(b). Defendant asserts that this evaluation may have impacted the trial court's decisions regarding term, probation, alternative sentences, and/or split confinement, an "advantage" to which he was entitled as a matter of law. The 1998 amendment to this statute demonstrates the legislature's intent to limit this provision to those sentencing decisions where the defendant is seeking probation or some other form of alternative sentence. <u>See id.</u> § 39-13-705(a) (Supp. 2001). Defendant is not presumed to be a favorable candidate for alternative sentencing, based upon his seven Class B and two Class A felony convictions. <u>See id.</u> § 40-35-102(6) (1997). Thus, evidence to rebut the presumption was not necessary. Neither is he a candidate for probation, since seven of the nine sentences imposed were for terms more than eight years. <u>See id.</u> § 40-35-303(a). (The two sentences less than eight years are to be served concurrently to the twenty-two year sentence for the kidnapping charge.) Finally, as the State pointed out in its brief, where a sex offender is destined to be incarcerated regardless of the contents of the report, a trial court's failure to consider it at the time of sentencing is immaterial and a waste of resources. <u>See</u> <u>State v. Daniel Lovell Brown</u>, No. 03C01-9709-CC-00410, 1998 WL 798922, Jefferson County (Tenn. Crim. App., Knoxville, Nov. 12, 1998), <u>perm. to app. denied</u> (Tenn. 1999) ("Because a sex offender sentenced to the Department of Correction will be evaluated once in its custody, any evaluation at the trial level of an offender ineligible for probation or any other alternative sentence would constitute a duplication of professional and financial resources.").

In conclusion, our <u>de novo</u> review of the record concerning the Defendants' sentencing reveals that the trial court did not err in its utilization of sentencing factors. Thus, we find the length of both Defendants' sentences appropriate. We also conclude that the trial court did not err in ordering consecutive sentences. The resultant length of confinement is justified in this case to

protect the public from future criminal conduct. Further, because of the egregious nature of the offenses committed by the Defendants, the inestimable harm to the victim, and the significant span of time involved, we believe that consecutive sentences are reasonably related to the severity of the crimes. Since the Defendants have failed to carry their burden to show that the trial court's sentences were improper, no relief will be forthcoming on this issue.

## X. Statute of Limitations

Defendant Joseph Combs contends that his convictions for aggravated rape and six of the seven counts of rape should be reversed as barred by the applicable statute of limitations. Defendant argues that the facts alleged in the presentment were insufficient to meet the strict tolling requirements set forth in State v. Davidson, 816 S.W.2d 316 (Tenn. 1991), and that the State also failed to prove the allegations at trial. Consequently, Defendant maintains that the statute of limitations was not properly tolled and, thus, the convictions in issue violate his constitutional rights. The State asserts that the statute of limitations concerning these offenses was effectively tolled by the allegations of concealment contained in the presentment, when viewed as a whole, and that the allegations were adequately proven at trial, as demonstrated by Defendant's conviction for especially aggravated kidnapping. In his reply brief, Defendant further asserts that the issue whether concealment was proven is a question of fact for the jury, and the trial court's failure to submit this issue to the jury through proper instructions constituted plain error under Rule 52(b) of Tennessee's Rules of Criminal Procedure.

### A. Tolling of the Statute of Limitations

Counts 12 through 19 are the subject of this issue. Count 12 alleges that Defendant Joseph Combs committed the offense of aggravated rape of Esther, a child under the age of thirteen, on or about April 1989, a violation of Tenn. Code Ann. § 39-13-503. Counts 13 through 19 allege that Defendant committed the offense of rape, by means of force or coercion, and that thereafter, Defendant "did conceal the existence of the crime by confining Esther A. Combs within his residence, contrary to Section 39-13-503, a Class B felony, Tennessee Code Annotated . . . ." The rape counts allege the following dates, in order, beginning with count 13: November 16, 1990; summer months of 1995; June 16, 1991; November 25, 1993; November 16, 1993; February 14, 1991; and February 4, 1992, all of which occurred on or after Esther's thirteenth birthday and prior to her eighteenth birthday. In Tennessee, a prosecution may be commenced in one of many ways including, as here, the finding of an indictment or presentment. See Tenn. Code Ann. § 40-2-104 (1997). The presentment in this case is dated November 4, 1998, and the applicable statute of limitations for the rape counts 13 through 19 is four years. See id. § 40-2-101(d). As a result, the rape alleged to have been committed during the "summer months of 1995" (count 14) is the only crime that occurred within four years of the date of the presentment. In his brief, Defendant concedes that count 14 is not time-barred.

The purpose of a statute of limitations is to protect a defendant against delay and the use of stale evidence and to provide an incentive for efficient prosecutorial action in criminal cases. See

State v. Pearson, 858 S.W.2d 879, 886 (Tenn.1993). The applicable statute of limitations for charges of rape and aggravated rape, where the victim has not reached the age of majority, is contained in Tennessee Code Annotated section 40-2-101 and provides as follows:

> Prosecutions for any offense committed against a child prior to July 1, 1997, that constitutes a criminal offense under the provisions of §§ 39-2-601 [repealed], 39-2-603 [repealed], 39-2-604 [repealed], 39-2-606 [repealed], 39-2-607 [repealed], 39-2-608 [repealed], 39-2-612 [repealed], 39-4-306 [repealed], 39-4-307 [repealed], 39-6-1137 [repealed], or § 39-6-1138 [repealed], or under the provisions of §§ 39-13-502--39-13-505, § 39-15-302 or§ 39-17-902 shall commence no later than the date the child attains the age of majority or within four (4) years next after the commission of the offense, whichever occurs later; provided, that pursuant to subsection (a), *an offense punishable by life imprisonment may be prosecuted at any time after the offense shall have been committed.*

Tenn. Code Ann. § 40-2-101(d)(1997) (emphasis added).

First, we note that the crime of aggravated rape was codified as Tennessee Code Annotated section 39-2-603 in April 1989 and that it was "a felony punishable by imprisonment in the penitentiary for life or a period of not less than twenty (20) years." See id. § 39-2-603(b) (Supp. 1988). Consequently, the applicable statute of limitations does not bar prosecution of Defendant for that offense. See id. § 40-2-101(d) (1997); Loy Monroe Harris v. State, No. 02C01-9304-CC-00069, 1994 WL 29835 at *1, Madison County (Tenn. Crim. App., Jackson, Feb. 2, 1994), no perm. to app. filed (where the punishment for the convicted offense provided imprisonment from ten years to life, prosecution was not time-barred because a crime that authorizes life imprisonment has no limitation period under Tennessee Code Annotated Section 40-2-101).

As for the remaining rape convictions, the State does not dispute that more than four years had elapsed between the dates of the offenses and the filing of the presentment in this case (with the exception of count 14 as noted above). The record reflects that Defendant raised the issue whether the rape charges were time-barred prior to trial. Therefore, the issue presented here is whether the statute was effectively tolled for a sufficient period of time to allow lawful prosecution for these crimes.

Tennessee Code Annotated section 40-2-103 provides that "[n]o period, *during which the party charged conceals the fact of the crime,* or during which the party charged was not usually and publicly resident within the state, is included in the period of limitation." (Emphasis added.) In State v. Davidson, 816 S.W.2d 316 (Tenn. 1991), the state alleged that the defendant's threats and coercion directed toward the child victim constituted concealment under the tolling provision. Id. at 318. On appeal, our supreme court considered the issue of what allegations of specific facts must be contained in the indictment or presentment to properly toll the applicable statute of limitations to render the prosecution timely where the indictment or presentment shows on its face that the statutory limitation period has since expired. Id. at 318. The presentment at issue in Davidson

alleged that the defendant had concealed his criminal activities by discouraging the victim to tell anyone through use of threats and parental influence, which was additionally intimidating because the victim was particularly dependent on her family since she was legally blind. See id. In its conclusion, the court stated that it was unable to "read the language in the amendments to the presentments and say that for a certain period of time sufficient to render the presentments timely that the fact of the alleged crimes was concealed by the defendant." Id. at 321. Specifically, the court noted that the state failed to allege when the coercion occurred, when and if it ceased, when the alleged crimes were first reported to the authorities, or why the alleged victim did not report the abuse upon attaining the age of majority. Id.

We must first determine whether the presentment contained sufficient allegations of specific facts to effectively toll the applicable statute of limitations. In addition to alleging the specific facts which toll the statute, the state must prove the facts at trial or the accused cannot be convicted of the offense. Id. at 318; Morgan v. State, 847 S.W.2d 538, 542 (Tenn. Crim. App. 1992). Defendant Joseph Combs contends that the facts alleged by the State in the presentment concerning the rape offenses were inadequate to properly toll the statute of limitations under the strict requirements set forth for such purpose in Davidson and, further, that the State failed to prove the tolling facts at trial. We disagree.

The circumstances presented in Davidson are distinguishable from those presented in the case sub judice. The Davidson court noted that the state failed to allege when the coercion occurred. Here, the commencement of the concealment by confinement, as well as the date it terminated, was specified in the presentment. Count 1 alleged that Defendant *continually confined* the victim from April 30, 1990 until October 3, 1997. Counts 13 through 19 alleged that Defendant "did *conceal* the existence of the crime *by confining Esther A. Combs* within his residence." Under certain circumstances, it is proper that "all counts of a multiple-count indictment should be read as a whole, and element missing from one count can be supplied by another." State v. Cureton, 38 S.W.3d 64, 82 (Tenn. 2000) (citation omitted) (where all of counts in an indictment referred to the same victim, set out the same date, and were related to each other, the court found they may be read together for purposes of providing notice to the defendant); see State v. Youngblood, 287 S.W.2d 89, 91 (Tenn. 1956) ("different counts may, within themselves, not support an indictment but if they are properly connected with preceding counts then the two may be taken together and support an indictment"); Hayes v. State, 513 S.W.2d 144, 146 (Tenn. Crim. App. 1974) (where second count of an indictment charging drug possession stated only "the aforesaid controlled substance" and failed to specify the drug, the indictment was not defective). Although these cases concern the state's failure to completely allege all of the *elements* in an offense, we see no reason that the principle should not apply also to allegations concerning tolling facts under circumstances similar to those presented here.

The court in Davidson also expressed concern about the fact that the presentments did not reveal when the alleged crimes were first reported to the authorities, or why the alleged victim did not report the abuse upon attaining the age of majority. Id. at 321. In Davidson, the latest offense charged allegedly occurred in June 1981. The presentments were returned in November 1987, more than six years after the most recent crime and approximately four years and five months after the

-82-

alleged victim reached adulthood (which occurred in June 1983). In the case sub judice, the victim reached adulthood on November 16, 1995, *during* her unlawful confinement. The presentment was returned on November 4, 1998, one year and one day after her confinement terminated. These facts were not alleged in the presentment but, in contrast to Davidson, the period of time was not unreasonable or so lengthy as to raise logical suspicions about what could have caused such a delay. Consequently, information concerning exactly when the crimes were first reported to the authorities and why the victim did not report the crime at the age of majority was not necessary here.

We are mindful that statutes of limitations should be liberally construed in favor of the criminally accused, and provisions tolling the statute during periods of concealment are strictly construed against the state. State v. Henry, 834 S.W.2d 273, 276 (Tenn. 1992). Even so, we conclude that the allegations contained in the presentment, as a whole, provided sufficient specific facts to properly plead concealment and thus toll the statute for the rape offenses for a sufficient period of time to render the presentments timely. Moreover, we find that the jury, by its verdict against Joseph Combs on the especially aggravated kidnapping charge, necessarily found beyond a reasonable doubt that the State proved at trial that Defendant concealed the fact of the rape crimes.

### B.  Failure to Instruct Jury

In his reply brief, Defendant further submits that the issue whether concealment was proven is a question of fact for the jury, and the trial court's failure to instruct the jury on how they should consider the tolling facts constitutes plain error under Rule 52(b) of Tennessee's Rules of Criminal Procedure. Although the record reflects that Defendant Joseph Combs was given an opportunity to request special instructions and to review the jury charge for the purpose of raising objections prior to the trial court's instructing the jury, Defendant failed to do so. Defendant also failed to include this issue in his motion for new trial. It is well-settled that a trial court has a duty to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have each issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge. State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975); Poe v. State, 370 S.W.2d 488, 489 (Tenn. 1963). The trial court is obligated to give the jury instructions concerning issues fundamental to the defense and essential to a fair trial, even where a special request was not made at trial concerning the issue. State v. Anderson, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1997). Our supreme court has intimated that the protection against prosecution provided by a statute of limitations does not rise to the level of a fundamental right. See State v. Pearson, 858 S.W.2d 879, 887 (Tenn. 1993). In the absence of a special request concerning non-fundamental issues, the trial court does not err by failing to instruct the jury, even if the circumstances of the case warrant such an instruction. Anderson, 985 S.W.2d at 17. In the instant case, it became Defendant's responsibility to submit a special request for the trial court to instruct the jury on tolling facts when the trial court's failure to do so became apparent. His failure to submit such request, or to raise the issue in a motion for new trial, would therefore result in waiver of this issue on appeal. See id.

Notwithstanding waiver, in certain circumstances a reviewing court is allowed to take notice of "plain errors" that were not raised in the proceedings below. See Tenn. R. App. P. 36(b); Tenn.

R. Evid. 103(d); Tenn. R. Crim. P. 52(b). Specific guidance is not provided in any of these rules as to when an error will rise to the level of plain error. In general, the error must have affected the substantial rights of an accused, and more probably than not either affected the judgment or resulted in prejudice to the judicial process. "Whether or not an appellate court should recognize the error and grant relief in the absence of an objection in the trial court must depend upon the facts and circumstances of the particular case." State v. Ogle, 666 S.W.2d 58, 61 (Tenn. 1984).

In State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our supreme court adopted the following five factors, previously developed by a panel of this Court, for the purpose of deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" Id. at 282-83 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before the reviewing court may recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. at 283. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Id. (quoting Adkisson, 899 S.W.2d at 642).

A thorough review of the record reveals that the plain error doctrine can afford no relief for Defendant in this case. The third and fifth factors, requiring that a substantial right of the accused must have been adversely affected and that consideration of the error is necessary to do substantial justice, respectively, preclude a finding of plain error. We do not decide now whether Defendant was entitled to a jury instruction concerning whether the statute of limitations was tolled by concealment. However, even if this were decidedly so, and the jury received such an instruction, it would not have affected the result of the trial on Defendant's rape charges. We previously concluded that the jury's verdict on the especially aggravated kidnapping charge effectively decided this issue in favor of the State. Specifically, we concluded that by finding Defendant guilty of this offense, the jury necessarily determined beyond a reasonable doubt that Defendant concealed the fact of the rape crimes, and, thus, the statute for the rape offenses was tolled for a sufficient period of time to render the presentments timely. Consequently, neither is consideration of the error necessary "to do substantial justice." Defendant's constitutional rights to a fair trial and to jury instructions concerning issues fundamental to his defense have not been violated.

In conclusion, we find that the statute of limitations concerning the rape offenses was effectively tolled by the allegations of confinement contained in the presentment, as a whole, and that the allegations were proven at trial. Consequently, Defendant's six convictions for rape do not violate his constitutional rights prohibiting conviction for a time-barred crime. Because we also find that the failure to instruct the jury on the tolling issue did not constitute plain error, Defendant is not entitled to relief on this issue.

## XI.  Modification of Judgment

Our review has revealed a number of clerical errors in the judgments for both Evangeline and Joseph Combs.  With regard to the especially aggravated kidnapping convictions, the judgment forms reflect that the Defendants were convicted of the offense in Tennessee Code Annotated section 39-13-301.  The correct statute section number for this offense is 39-13-305.  In addition, the judgment form for the aggravated rape conviction of Joseph Combs cites the current statute section number for this offense.  The judgment form should reflect the statute section number in effect at the time the offense was committed: 39-2-603.  We order that the judgments be modified to reflect the changes noted herein.

## CONCLUSION

For the foregoing reasons, we reverse Defendant Joseph Combs' conviction for aggravated perjury and remand the matter for a new trial on that charge.  In addition, we modify the judgments as stated in this opinion.  In all other respects, we AFFIRM the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE